# EXHIBIT A

## 2021 CA 002590 B HANKERSON, JHAQUILLE Vs. JUUL LABS INC. et al FYP

- Case Type:
- Civil II
- Case Status:
- Open
- File Date:
- 07/27/2021
- Action:
- Complaint for Personal Injury Filed
- Status Date:
- 07/27/2021
- Next Event:
- 10/29/2021

| All Information | Party | Event | Docket | Receipt | Disposition |

### Docket Information

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 07/27/2021 | Complaint for Personal Injury Filed  Receipt: 476538  Date: 07/28/2021 | |
| 07/27/2021 | eComplaint Submitted 07/27/2021 14:01PM. km<br>Attorney: PARFITT, Ms MICHELLE A A (358592)<br>JHAQUILLE HANKERSON (Plaintiff); | Image |
| 07/28/2021 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 10/29/2021  Time: 9:30 am<br>Judge: PAN, FLORENCE Y  Location: Courtroom 415 | |

| Date | Docket Text | Image Avail. |
| --- | --- | --- |
| 07/28/2021 | Issue Date:  07/28/2021<br>Service:  Summons Issued<br>Method:  Service Issued<br>Cost Per:  $<br><br>VALANI, RIAZ<br>9 ISABELLA AVENUE<br>ATHERTON, CA  94027<br>Tracking No: 5000235366<br><br>JUUL LABS INC,<br>1000 F STREET, NW, 8TH FLOOR<br>WASHINGTON, DC  20004<br>Tracking No: 5000235367<br><br>ALTRIA GROUP, INC,<br>6601 W. BROAD STREET<br>RICHMOND, VA  23230<br>Tracking No: 5000235368<br><br>ALTRIA ENTERPRISES LLC<br>6601 W. BROAD STREET<br>RICHMOND, VA  23230<br>Tracking No: 5000235369<br><br>PHILIP MORRIS USA, INC.<br>6601 W. BROAD STREET<br>RICHMOND, VA  23230<br>Tracking No: 5000235370<br><br>MONSEES, JAMES<br>89 BELGRAVE AVENUE<br>SAN FRANCISCO, CA  94117<br>Tracking No: 5000235371<br><br>BOWEN, ADAM<br>360 ELM STREET<br>SAN MATEO, CA  94401<br>Tracking No: 5000235372<br><br>PRITZKER, NICHOLAS<br>1 LETTERMAN DRIVE, BLDG C-SUITE C4-420<br>SAN FRANCISCO, CA  94129<br>Tracking No: 5000235373<br><br>HUH, HOYOUNG<br>6 REDBERRY RIDGE<br>PORTOLA VALLEY, CA  94028<br>Tracking No: 5000235374 | |

Filed
D.C. Superior Court
07/27/2021 14:01PM
Clerk of the Court

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | |
|---|---|
| **JHAQUILLE HANKERSON** | ) |
| 522 Forest Wind Way | ) |
| Cary, North Carolina  27513 | ) |
| | ) |
| *Plaintiff,* | ) |
| | ) |
| **v.** | )  Case No. _____ |
| | ) |
| **JUUL LABS INC.** | ) |
| 1000 F St NW, | ) |
| 8th Floor | ) |
| Washington, DC 20004 | ) |
| | ) |
| and | ) |
| | ) |
| **ALTRIA GROUP, INC** | ) |
| 6601 W Broad St | ) |
| Richmond, VA 23230 | ) |
| | ) |
| and | ) |
| | ) |
| **ALTRIA ENTERPRISES LLC** | ) |
| 6601 W Broad St | ) |
| Richmond, VA 23230 | ) |
| | ) |
| and | ) |
| | ) |
| **PHILIP MORRIS USA, INC** | ) |
| 6601 W. Broad St. | ) |
| Richmond, VA 23230 | ) |
| | ) |
| and | ) |
| | ) |
| **JAMES MONSEES** | ) |
| 89 Belgrave Ave. | ) |
| San Francisco, CA 94117 | ) |
| | ) |
| and | ) |
| | ) |
| **ADAM BOWEN** | ) |
| 360 Elm Street | ) |
| San Mateo, CA 94401-2512 | ) |
| | ) |

and                                                    )
                                                       )
**NICHOLAS PRITZKER**                                  )
1 Letterman Drive                                      )
Building C – Suite C4-420                              )
San Francisco, CA 94129-2402                           )
                                                       )
and                                                    )
                                                       )
**HOYOUNG HUH**                                        )
6 Redberry Ridge                                       )
Portola Valley, CA 94028-8077                          )
                                                       )
and                                                    )
                                                       )
**RIAZ VALANI**                                        )
9 Isabella Avenue                                      )
Atherton, CA 94027-4031                                )
                                                       )
                    *Defendants.*                      )

## **COMPLAINT**

Plaintiff Jhaquille Hankerson, by and through counsel, for his Complaint and Jury

Demand against Defendants alleges the following:

## **INTRODUCTION**

1.      The battle to end nicotine addiction and its associated diseases and death has

consumed our nation's public health resources for more than half a century. After five decades of

tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on

the path to victory. By 2014, rates of smoking and nicotine addiction in this country were finally

at an all-time low, particularly among teenagers. Until now. The United States, closer than ever

to consigning the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic

of historic proportions. The swift rise in a new generation of nicotine addicts has overwhelmed

parents, schools, and the medical community, drawing governmental intervention at nearly every

level—but it's too little, too late.

2

2.      This public health crisis is no accident. What had been lauded as progress in curbing cigarette use, JUUL LABS INC.'S (JLI) co-founders ADAM BOWEN and JAMES MONSEES viewed as opportunity. Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, BOWEN, MONSEES, and investors in their company sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier. To achieve that common purpose, they knew they would need to create and market a product that would make nicotine cool again, without any of the stigma associated with cigarettes. With help from their early investors and board members, who include NICHOLAS PRITZKER, HOYOUNG HUH, and RIAZ VALANI (together, the "MANAGEMENT DEFENDANTS"), they succeeded in hooking millions of youth, intercepting millions of adults trying to overcome their nicotine addictions, and, of course, earning billions of dollars in profits.

3.      Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant ALTRIA. JLI was created in the image of the iconic American cigarette companies, which JLI founders praised for creating "the most successful consumer product of all time. . . . an amazing product." The secret to that "amazing product"? Nicotine, a chemical that has deleterious effects on the developing brains of youths, and is the fundamental reason that people persist in using tobacco products posing the risk of pulmonary injuries, cardiovascular disease and other serious, often fatal, conditions. Through careful study of decades of cigarette industry documents, JLI knew that the key to developing and sustaining addiction was the amount and the efficiency of the nicotine delivery.

4.      Three tactics were central to decades of cigarette industry market dominance: product design to maximize addiction; mass deception; and targeting of youth. JLI and its co-

conspirators adopted and mastered them all. First, JLI and BOWEN designed JUUL products to create and sustain addiction, not break it. JLI and BOWEN were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what JLI and BOWEN designed was a starter product, not a cessation or cigarette replacement product. JLI and BOWEN also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

5.      Second, JLI, the MANAGEMENT DEFENDANTS and ALTRIA engaged in a campaign of deceit, through sophisticated mass media and social media communications, advertisements and otherwise, about the purpose and dangers of JUUL products. JUUL products' packaging and advertising grossly understates the nicotine content in its products. Advertising campaigns featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a normal part of a daily routine, and as safe as caffeine. In partnership with ALTRIA, JLI adopted a "Make the Switch" campaign to mislead consumers into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions. JLI, the MANAGEMENT DEFENDANTS, and ALTRIA also concealed the results of studies that revealed that JUUL products were far more powerfully addictive than was disclosed. JLI's deceptive marketing scheme was carried out across the country through broad distribution channels: veteran cigarette industry wholesalers, distributors and retailers ensured that JUUL products would become widely available to a new market of nicotine-newcomers, especially youth. JLI and the MANAGEMENT DEFENDANTS joined with these veteran

cigarette industry marketers to secure premium shelf space for vivid displays at convenience stores that would lure e-cigarette users, young and old, who would become long-term customers. These marketing efforts were a resounding success—when JUUL products were climbing in sales, most adults and youth believed that e-cigarettes did not contain nicotine at all.

6.      Third, JLI and the MANAGEMENT DEFENDANTS, just like cigarette companies before them, targeted kids as their customer base. One of JLI's was the need to JUUL products were designed to appear slick and high-tech like a cool gadget, including video-game-like features like "party mode." JLI offered kid-friendly flavors like mango and cool mint, and partnered with ALTRIA to create and preserve the market for mint-flavored products—all because DEFENDANTS knew that flavors get young people hooked. Under the guise of youth smoking prevention, JLI sent representatives directly to schools to study teenager e-cigarette preferences.

7.      JLI and the MANAGEMENT DEFENDANTS reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for cigarettes because they cause young people to start smoking) with cutting-edge viral marketing campaigns and social media. They hired young models and advertised using bright, "fun" themes, including on media long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and educational tools to students in middle school and high school. JLI and the MANAGEMENT DEFENDANTS also employed young social-media "influencers" and celebrities popular with teenagers. When regulators and Congress caught onto JLI's relentless focus on children, JLI and the MANAGEMENT DEFENDANTS simply lied, even though they knew well that they had purposefully targeted youth in their marketing and those efforts had

been breathtakingly successful. JUUL products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018. The Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."

8.     JLI and the MANAGEMENT DEFENDANTS' misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company. In December 2018, ALTRIA paid $12.8 billion to acquire a 35% stake in JLI. ALTRIA's agreement to pull its competing e-cigarette product off the market was a non-negotiable condition of the deal demanded by JLI's lead negotiators Nicholas PRITZKER and Riaz VALANI, named Defendants herein, as well as CEO Ken Burns. JUUL's market dominance was thus established, positioning ALTRIA and JLI to share the profits. DEFENDANTS' conduct prompted the Federal Trade Commission to sue JLI and ALTRIA on April 1, 2020 alleging violations of the antitrust laws and seeking to unwind the JLI/ALTRIA transaction.

9.     But even well before ALTRIA announced its investment in JLI, the connections between the two companies ran deep. JLI and ALTRIA collaborated to grow the e-cigarette market and the number of users addicted to nicotine, including by sharing data and information and coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes. ALTRIA's investment in JLI is not merely a financial proposition, but a key element of DEFENDANTS' plan to stave off competition and regulation and keep their most potent and popular products on the market. Aside from profiting from reduced competition, JLI has benefitted from ALTRIA's expertise in designing and marketing addictive products, and in thwarting regulation.

6

10.     JLI, the MANAGEMENT DEFENDANTS, ALTRIA, and their co-Defendants created this public health crisis. At the heart of this disastrous epidemic are the concerted efforts of JLI, its co-conspirators, and all those in JUUL's supply and distribution chain to continuously expand their market share and profits by preying upon a vulnerable young population and deceiving the public about the true nature of the products they were selling. Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air. Worse, the flavors in JUUL products are themselves toxic and dangerous, and have never been adequately tested to ensure they are safe for inhalation. According to the most recent scientific literature, JUUL products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Yet JUUL products and advertising contain no health risk warnings at all. Many smokers, believing that JUUL would help them "make the switch," ended up only further trapped in their nicotine addiction. Older adults who switch to JUUL are more susceptible to cardiovascular and pulmonary problems, and CDC data shows that older patients hospitalized due to vaping lung related conditions had much longer hospital stays than younger patients. And a generation of kids is now hooked, ensuring long-term survival of the nicotine industry because, today just as in the 1950s, 90% of smokers start as children.

## PARTIES, JURISDICTION, and VENUE

11.     This action arises out of the personal injuries suffered by Plaintiff Jhaquille Hankerson as a direct and proximate result of his use of JUUL e-cigarette products.

12.     Jurisdiction of this Court is based on D.C. Code § 11-921. Jurisdiction over Defendants rests on D.C. Code § 13-423 based on their business activities in the District of Columbia and their acts or omissions causing injury to Plaintiff.

13.     This action is further brought under the North Carolina Unfair and Deceptive Trade Practices Act (UDTPA), N.C. Gen. Stat. § 75-1.1 et seq., the common law of North Carolina, and other applicable laws to recover damages and other relief, including the costs of suit and reasonable attorneys' and expert fees, for the injuries Plaintiff sustained as a result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacturing, packaging, promoting, marketing, distributing, labeling, and/or sale of JUUL electronic cigarette products ("JUUL Products" or "JUUL Products").

14.     Venue is proper in this Court as, at all relevant times, Defendants conducted business in the District of Columbia and tested, manufactured, labeled, licensed, marketed, distributed, promoted and/or sold JUUL Products in the District of Columbia.

15.     Plaintiff Jhaquille Hankerson is a 27-year-old adult male living in Cary, North Carolina. Plaintiff voluntarily consents to personal jurisdiction in this Court.

16.     Plaintiff used JUUL Products on a continuous basis starting approximately in March 2016, when he was 22 years old. He was unable to quit using JUUL products until February 2020 due to significant nicotine addiction caused by their use. Plaintiff continues to struggle with nicotine addiction due to JUUL, and now uses around a cigarette a week.

17.     Defendant JUUL Labs Inc. ("JLI") is a corporation with its principal place of business at 1000 F St NW, Washington, DC 20004. At all relevant times, upon information and belief, JLI was engaged in the business of manufacturing, formulating, marketing, promoting, selling, and/or distributing JUUL Products. At all relevant times, upon information and belief, JLI regularly transacted, solicited, and conducted business in the District of Columbia, including marketing, promoting, selling, and/or distributing the JUUL Products. CT Corporation is JLI's

registered agent for service of process in DC. CT Corporation's service of process location in DC is 1015 15th St NW, Washington, DC 20005.

18.     Defendant ALTRIA GROUP, INC ("AGI") is a Virginia corporation, having its principal place of business at 6601 W Broad St. Richmond, VA 23230. AGI is one of the world's largest producers and marketers of tobacco products, manufacturing and selling combustible cigarettes for more than a century.

19.     Upon information and belief, AGI has, at all relevant times, engaged in the business of designing, developing, manufacturing, formulating, distributing, selling, marketing, and/or introducing into interstate commerce, and into the District of Columbia, either directly or indirectly through third parties or related entities.

20.     Defendant ALTRIA ENTERPRISES LLC ("AE") is a wholly-owned subsidiary of AGI. AE is a Virginia limited liability company with its principal place of business at 6601 W Broad St. Richmond, VA 23230. AE is a party to the purchase agreement between AGI and JLI. AE purchased AGI's stake in JLI on AGI's behalf.  AGI and AE are referred to collectively herein as "ALTRIA."

21.     Defendant PHILIP MORRIS USA, INC. ("Philip Morris"), is a wholly owned subsidiary of Altria. Philip Morris is a Virginia corporation with its principal place of business at 6601 W. Broad Street, Richmond, VA 23230-1723. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years. Philip Morris performs direct marketing support services for JLI under the Services Agreement to assist JLI in selling, marketing and promoting JUUL Products. This included, among other things, placing JUUL

9

Product inserts in millions of packs of L&M, Parliament, and Marlboro cigarettes and utilizing Philip Morris's extensive consumer market database for targeted direct marketing purposes.

22.     Defendant JAMES MONSEES ("MONSEES") is a resident of San Francisco, CA. living at 89 Belgrave Ave. San Francisco, CA 94117. MONSEES co-founded JLI with Adam BOWEN. MONSEES previously served as the Chief Executive Officer for JLI and has been a member of the Board of Directors until stepping down in March of 2020. MONSEES maintains an ownership interest in JLI despite stepping down from his official positions within the company.

23.     Defendant Adam BOWEN ("BOWEN") is a resident of San Francisco, CA. BOWEN co-founded JLI with MONSEES. BOWEN has been Chief Technology Officer for JLI and a member of the Board of Directors. BOWEN maintains an ownership interest in JLI.

24.     Defendant NICHOLAS PRITZKER ("PRITZKER") is resident of San Francisco, CA. PRITZKER was an early investor in JLI and has been a member of JLI Board of Directors for many years. PRITZKER's family has a long history in the tobacco industry as the former owners of Conwood Sales Company, LLC, which manufactured chewing tobacco. Conwood was sold to R.J. Reynolds, the second largest tobacco company in the United States.

25.     Defendant HOYOUNG HUH ("HUH") is a resident of the San Francisco, CA . HUH has been a member of the JLI Board of Directors since 2015.

26.     Defendant RIAZ VALANI ("VALANI") lives in Santa Clara County, CA. VALANI has been on JLI's Board of Directors since 2011.

27.     Defendants MONSEES, BOWN, PRITZKER, HUH, and VALANI are collectively referred to as the "MANAGEMENT DEFENDANTS."

28.     Collectively, all Defendants are referred to as "DEFENDANTS."

29.     References to any individual or collective group of Defendants includes and subsumes any and all actions by agents, apparent agents, servants, employees, and representatives of the same.

## FACTUAL ALLEGATIONS

I.     **Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time."**

30.     JLI's co-founder JAMES MONSEES described the cigarette as "the most successful consumer product of all time . . . an amazing product.[1] In 1965, 42% of adults smoked cigarettes. This statement, which ignores the fact that cigarettes have caused more deaths than any other human invention, contained a kernel of truth. When U.S. smoking rates peaked in the mid-1960s, cigarettes were everywhere; people smoked on airplanes, in movie theatres, at the office, and at sports games. Movie stars and sports heroes smoked. Cigarette advertising wallpapered American life, glamorizing smoking as sophisticated, cool, and the thing to do. But in reality, of course, this "successful" product has long been the world's leading cause of preventable death.

31.     Citing "some problems" inherent in the cigarette, MONSEES and JLI co-founder ADAM BOWEN set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[2] MONSEES saw "a huge opportunity for products that speak directly to those

---

[1] Kathleen Chaykowski, Billionaires-to-be: Cigarette Breakers–JAMES MONSEES and Adam BOWEN Have Cornered the US E-Cigarette Market with Juul. Up Next: The World, Forbes India (Sept. 27, 2018, 3:10:35 PM IST), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1; Gabriel Montoya, Pax Labs: Origins with James MONSEES, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-MONSEES/.

[2] Josh Mings, Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods, Solid Smack (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods/.

consumers who aren't perfectly aligned with traditional tobacco products."[3] Successfully capitalizing on this opportunity would mean not only billions of dollars in short-term revenue but lucrative acquisition by a cigarette industry power player.

32.     BOWEN and MONSEES capitalized on that opportunity by deliberately creating an extremely potent nicotine product that looked nothing like cigarettes. But achieving widespread adoption of their highly addictive product required resources and expertise beyond those possessed by BOWEN, MONSEES or others at JLI.

33.     When it became clear that BOWEN and MONSEES could not achieve their vision of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life through JLI themselves, the MANAGEMENT DEFENDANTS planned a fundamental shift in roles to allow PRITZKER, HUH, and VALANI to direct and take control of JLI and use it to commit some of DEFENDANTS' most unlawful acts.

34.     In October 2015, MONSEES stepped-down from his role as CEO of JLI to become Chief Product Officer and, in his stead, PRITZKER, HUH, and VALANI formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth.

35.     Before installation of, TYLER GOLDMAN as JLI's new CEO in August 2016, Defendants PRITZKER, HUH, and VALANI used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[4]

---

[3] *Id.*
[4] Julie Creswell & Sheila Kaplan, How Juul Hooked a Generation on Nicotine, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

36.     But the MANAGEMENT DEFENDANTS could not create and monopolize a massive new market for JUUL on their own and knew their cause could be assisted if they could convert Altria, a competitor, into an ally. They began that effort in the Spring of 2017. While Defendants JLI, BOWEN, MONSEES, HUH, and VALANI are relative newcomers to the tobacco industry, ALTRIA has manufactured and sold "combustible" cigarettes for more than a century. Additionally, Defendant PRITZKER has been long familiar with the tobacco industry from his family's ownership of chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Notwithstanding their different histories, JLI and the MANAGEMENT DEFENDANTS invited ALTRIA into the fold as an ally with ample resources to further expand the market of nicotine-addicted e-cigarette users and to keep litigation and regulation at bay. While JLI, MONSEES, and BOWEN publicly claimed to be out to "disrupt" the industry, they privately negotiated and ultimately relinquished a 35% ownership stake in the company to a cigarette giant.

37.     Cigarette companies have long known that profitable growth requires a pipeline of "replacement" customers. ALTRIA, after decades of tobacco litigation and regulation, had little ability to recruit new smokers in the ways that had driven PHILIP MORRIS' success through most of the 1900s. In 2017, ALTRIA's combustible cigarette products were facing increasing regulatory pressures. In late July 2017, ALTRIA's stock value plummeted shortly after the FDA announced that it would reduce the amount of nicotine allowed in cigarettes with an eye toward reaching non-addictive levels.[5] In late 2017, ALTRIA, and other major cigarette companies, also finally complied with a consent decree from the 1990s tobacco litigation that

---

[5] See Dan Caplinger, ALTRIA Group in 2017: The Year in Review, The Motley Fool (Dec. 18, 2017), https://www.fool.com/investing/2017/12/18/ALTRIA-group-in-2017-the-year-in-review.aspx.

required them to issue corrective advertising statements that highlighted the addictiveness and health impacts of smoking cigarettes.

38.     Due in large part to this litigation and regulation, cigarette use has been declining in the United States in the last decade, especially among youth.[6]

39.     ALTRIA had undertaken its own efforts at marketing an e-cigarette product, launching the MarkTen product nationwide in 2014. ALTRIA was clear in its intent to dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at the time of MarkTen's launch.[7] The original MarkTen was a "cigalike," designed to mimic the look and feel of a combustible cigarette. ALTRIA had also been acquiring small companies in the vaping industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."[8] In 2016, ALTRIA acquired a vape product called Cync, from Vape Forward.[9] Cync is a small vapor device that uses prefilled pods in a variety of flavors, similar to the JUUL.

40.     In February 2017, ALTRIA told investors at the 2017 Consumer Analyst Group

---

[6] Current Cigarette Smoking Among Adults In the United States, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm ; Youth and Tobacco Use, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm.
[7] Melissa Kress, MarkTen National Rollout Hits 60,000 Stores, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.
[8] Mike Esterl, ALTRIA To Launch MarkTen E-Cigarette Nationally, Wall St. J. (Feb. 19, 2014), https://www.wsj.com/articles/ALTRIA-to-launch-markten-e-cigarette-nationally-1392832378; Senator Richard J. Durbin et al., Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth at 12 (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.
[9] Remarks by Jody Begley, 2017 ALTRIA Investor Day (Nov. 2, 2017), http://media.corporate-ir.net/media_files/IROL/80/80855/2017InvestorDay/Remarks_and_Reconciliations.pdf.

of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made excellent progress toward its long-term aspiration of becoming a leader in e-vapor."[10] In his remarks, ALTRIA's current CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year. It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations." He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately $2.5 billion."[11] In 2017, ALTRIA's MarkTen e-cigarettes had a market share of only 13.7%, well behind JLI's growing market share of 40%.[12] Thus, despite its public statements to the contrary, ALTRIA knew the popularity of JUUL stood in the way of Altria becoming the dominant force in the e-cigarette market.

41.     In ALTRIA's words, the company followed "JUUL's journey rather closely" from its early beginnings.[13]

42.     Facing these obstacles, ALTRIA's best bet for maintaining its sales by increasing users addicted to nicotine was to partner with JLI (1) to maintain or increase the number of users hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first

---

[10] Remarks by Marty Barrington, ALTRIA Group, Inc.'s (ALTRIA) Chairman, CEO and President, and other members of ALTRIA's senior management team, 2017 Consumer Analyst Group of New York (CAGNY) Conference (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.

[11] *Id.*

[12] Richard Craver, Vuse falls further behind Juul on e-cig sales, Winston-Salem J. (Dec. 14, 2017), https://www.journalnow.com/business/vuse-falls-further-behind-juul-on-e-cig-sales/article_ed14c6bc-5421-5806-9d32-bba0e8f86571.html.

[13] Olivia Zaleski & Ellen Huet, JLI Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.

scheme.

43.     ALTRIA first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" beginning in the Spring of 2017.[14] By the Fall of 2017, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA had agreed to and had taken coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

44.     PRITZKER and VALANI, together with Burns, were the lead negotiators on the Altria deal. On July 30, 2018, in advance of a meeting between the lead negotiators from JLI and Altria, PRITZKER emailed Howard Willard an opening term sheet for discussions, and made clear that an end to competition from Altria's e-cigarette products was a key term of any deal. On August 1, 2018, the companies' negotiators met at the Park Hyatt Hotel in Washington, D.C., to discuss terms. PRITZKER, VALANI, and Burns attended for JLI. Willard and Billy Gifford, Altria's CFO, attended for Altria.

45.     In December 2018, Altria made a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This arrangement was profitable for both companies, as well as Defendants MONSEES, BOWEN, PRITZKER, HUH, and VALANI. JLI employees received $2 billion in bonuses, which, split among the Company's 1,500 employees, was approximately $1.3 million per employee,[15] and Altria received millions of loyal teen customers.

---

[14] Letter from Howard Willard III, ALTRIA's Chairman and Chief Executive Officer to Senator Richard Durbin, et. al. (Oct. 14, 2019).
[15] Olivia Zaleski, Juul Employees to Get $2 Billion Bonus in Altria Deal, BLOOMBERG (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-altria-deal.

46.     In July 2018, JLI's valuation was approximately $15 billion.[16] But, in December 2018, ALTRIA's investment of $12.8 billion for a 35% stake in the company reflected a valuation of approximately $38 billion—more than two and a half times the valuation just five months earlier. Defendants MONSEES, BOWEN, PRITZKER, HUH, and VALANI thus saw the value of their investments in JLI skyrocket as a result of the ALTRIA agreement, allowing them to cash out via a special dividend and bonus, as well as through stock sales that were not available to other of JLI's minority shareholders.[17]

47.     This investment further intertwined JLI and ALTRIA. According to the terms of its investment, ALTRIA may appoint one third of JLI's board. And in October 2019, JLI's CEO resigned to be replaced by another career ALTRIA executive, K.C. Crosthwaite. The key JLI negotiators of the ALTRIA deal (including PRITZKER and VALANI), and other officers and directors including BOWEN, MONSEES, and HUH, would have been instrumental in bringing Crosthwaithe on board at JLI. Crosthwaite had most recently served as the vice president and chief growth officer of Altria Client Services LLC, overseeing the company's work to assist ALTRIA's companies, including with digital marketing, packaging design & innovation, product development, and safety, health, and environmental affairs. Crosthwaite knows the cigarette industry's playbook all too well, having previously served as the president and CEO of Phillip Morris USA, the vice president and general manager at Marlboro—the leading cigarette brand among youth, and the vice president of strategy and business development of at Altria Client Services LLC.

---

[16] https://www.theverge.com/2018/7/3/17529442/juul-vapes-nicotine-electronic-cigarettes-addiction-funding

[17] Tiffany Kary, JUUL Founders Sued for Self-Dealing Over Altria's $12.8 Billion, Bloomberg (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-dealing-over-altria-s-12-8-billion.

48.     In addition, Joe Murillo, who headed regulatory affairs for ALTRIA, and served as President and General Manager of Nu Mark, LLC (ALTRIA's e-cigarette business), became JLI's chief regulatory officer in October 2019.

49.     Both before and after ALTRIA's investment, JLI, through its employees and officers, provided ALTRIA with critical information regarding the design and nicotine content of the JUUL product, the labeling of the JUUL product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor preferences, and regulatory strategies. ALTRIA, for its part, guided JLI and the MANAGEMENT DEFENDANTS in these areas and helped them devise and execute schemes to maintain and expand the e-cigarette market.

50.     JLI, the MANAGEMENT DEFENDANTS, and ALTRIA worked together to implement their shared goal of growing a new market in the image of the combustible cigarette market through a multi-pronged strategy to: (1) create an highly addictive product that consumers would not associate with cigarettes and that would appeal to the lucrative youth market, (2) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit, (3) actively attract young users through targeted marketing, and (4) use a variety of tools to delay regulation of e-cigarettes, including false and deceptive statements to the public and regulators.

II.     **DEFENDANTS' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction.**

A.     **DEFENDANTS Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction.**

51.     The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in

the product. Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly addictive and the key ingredient that drives addiction to cigarettes. Nicotine's addictive properties are similar to heroin and cocaine.[18]

52.     Route of administration and speed of delivery are key to understanding nicotine's addictive potential. Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report on nicotine addiction, wrote: "After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration."[19]

53.     Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by smoking ... results in high levels of nicotine in the central nervous system with little time for development of tolerance. The result is a more intense pharmacologic action. The short-time interval between puffing and nicotine entering the brain also allows the smoker to titrate the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[20]

54.     Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-

---

[18] *See e.g.*, U.S. Dep't of Health and Human Services. Nicotine Addiction: A Report of the Surgeon General. DHHS Publication Number (CDC) 88-8406, (1988).
[19] Neal L. Benowitz et al., Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, 192 Handb. Exp. Pharmacol., 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.
[20] *Id.*

affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

55.     Children are particularly vulnerable to nicotine addiction, as DEFENDANTS know well. As described by the United States Surgeon General, "Tobacco use is a pediatric epidemic." Nine out of ten smokers begin by age 18 and 80% who begin as teens will smoke into adulthood.[21]

56.     The above statements apply equally, if not more so, to e-cigarettes. Further, the Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[22] The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control, deficits in attention and cognition, and mood disorders.[23] A highly addictive, psychoactive substance that

---

[21] Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.
[22] Know The Risks: E-Cigarettes & Young People, https://e-cigarettes.surgeongeneral.gov/ knowtherisks.html.
[23] Menglu Yuan et al., Nicotine and the Adolescent Brain, 593 J. of Physiology 3397 (2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/; U.S Surgeon General and U.S. Centers for Disease Control & Prevention, Office on Smoking and Health, Know the Risks: E-Cigarettes and Young People (2019), https://e-cigarettes.surgeongeneral.gov/.

targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[24]

57.    In 2014, the United States Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products and sustain permanent and chronic injuries from use.

58.    It took five decades of public health initiatives, government intervention, impact litigation, consumer education and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

59.    By 2014, the number of adults that reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.[25] By 2014, teen smoking also hit a record low.[26] In June 2014, the Centers for Disease Control and Prevention ("CDC") reported that "in achieving a teen smoking rate of 15.7 percent, the United States has met its national Healthy People 2020 objective of reducing

[24] Natalia A. Goriounova & Huibert D. Mansvelder, Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function, 2 Cold Spring Harbor Persp. Med. 12 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.
[25] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, Trends in Cigarette Smoking Among High School Students—United States, 1991-2001, Morbidity and Mortality Weekly Report (MMWR) 51(19); 409-412 (May 17, 2002), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5119a1.htm; Teresa W. Wang et al., Tobacco Product Use Among Adults—United States, 2017, Morbidity and Mortality Weekly Report (MMWR) 67(44); 1225-1232 (Nov. 9, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/pdfs/mm6744a2-H.pdf; U.S. Dep't of Health and Human Services. 2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.
[26] Press Release, Centers for Disease Control and Prevention, Cigarette smoking among U.S. high school students at lowest level in 22 years (June 12, 2014), https://www.cdc.gov/media/releases/2014/p0612-YRBS.html .

adolescent cigarette use to 16 percent or less."

60.     The United States Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free."[27]

61.     Where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, DEFENDANTS saw an opportunity.

> **B.      Following the Cigarette Industry Playbook, DEFENDANTS Sought to Market a Product that would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes**

62.     Seeking to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (i.e. well-established link to death and disease), JLI engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of consumer addiction than ever before. JLI marketed that highly-addictive device as healthy, safe, cool and available in kid-friendly flavors.

63.     In doing so, JLI followed the cigarette industry's playbook. MONSEES admitted that when creating JLI, he and BOWEN carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement [hereinafter the Master Settlement Agreement] between the state Attorneys General of forty-six states, five U.S. territories, the District of Columbia and the four largest cigarette manufacturers

---

[27] U.S. Dep't of Health and Human Services. LET'S MAKE THE NEXT GENERATION TOBACCO-FREE: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking and Health, https://www.hhs.gov/sites/default/files/consequences-smoking-consumer-guide.pdf.

in the United States. "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[28]

64.     In a thesis presentation BOWEN and MONSEES gave in 2004, MONSEES candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[29] JLI researched how cigarette companies engineered their products and chemically manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[30] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

65.     Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in way that would be easy to ingest—without the nausea, cough, or other aversive side effects that many new smokers experienced. In the 1970s, R.J. Reynolds ("RJR") scientists eventually found a solution: Combine the high-pH nicotine with a low-pH acid. The result was a neutralized compound referred to as nicotine salt. In a 1973 RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical

---

[28] Montoya, *supra*.
[29] Jordan Crook, This is the Stanford Thesis Presentation That Launched Juul, Tech Crunch (Feb. 27, 2019, 7:51 am PST), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/.
[30] *Id.*

manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive. A young RJ Reynolds chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."[31] Perfetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salt. As described herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

66.     JLI also engaged former cigarette industry researchers to consult on the design of their product. As MONSEES noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to ALTRIA's R&D facility, it's empty."[32] The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."[33]

67.     One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device (2) the JUUL pod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL" or "JUUL product"). The JUUL e-cigarette device is a thin, sleek

---

[31] Thomas A. Perfetti, Smoking Satisfaction and Tar/Nicotine Control (Dec. 7, 1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-salts-investigation.pdf.
[32] David Pierce, This Might Just Be the First Great E-Cig, WIRED (Apr. 21, 2015, 8:00 AM), www.wired.com/2015/04/pax-juul-ecig/.
[33] *Id.*

rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUUL pods that contain liquid that includes nicotine, flavoring and other additives. Each JUUL pod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL pod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUUL pod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[34]

68.    JLI sells the JUUL pods in packs of four or two pods, and until recently, in a variety of enticing kid-friendly flavors. Many of the flavors have no combustible cigarette analog, including mango, "cool" cucumber, fruit medley, "cool" mint, and crème brûlée. Figure 1 shows the JLI device and a JLI "Starter Kit" with four flavored JUUL pods:[35]

69.    JLI attempted to distinguish JUUL products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[36]

---

[34] E-cigarettes and vapor products, King County, https://www.kingcounty.gov/depts/health/tobacco/data/e-cigarettes.aspx.
[35] See Appendix 1 at Image 1.
[36] U.S. Food & Drug Administration Warning Letter to JUUL Labs, (September 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.

70.     JLI even took this message to school children: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[37]

71.     This was not just a rogue employee. Internal messaging around JUUL, crafted by the executives, emphasized that JUUL was safer than smoking. In a "Marketing Update" presentation dated March 26, 2015, a message from then-Chief Marketing Officer Scott Dunlap stated that "[v]aporization technology is fundamentally disruptive, because it is safer, faster, more effective and less intrusive than alternatives."  More than a year later, on April 28, 2016, Tim Danaher sent Tyler Goldman a slide deck aimed at investors which he said that "James [MONSEES] owns" and "will pull / update the relevant slides."  The deck claimed that "PAX Labs' new delivery system is faster, safer, more effective and less intrusive than[,]" among other options, "[s]moking[.]"  The consistency of the wording in these presentations more than a year apart shows that this was standard company language.

72.     JLI's mission was not to improve public health. Rather, JLI sought to introduce a new generation of consumers to nicotine. JLI's business model was never about reducing addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[38]

73.     JLI, BOWEN, and MONSEES achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-

---

[37] *Id.*
[38] Kevin Roose, Juul's Convenient Smoke Screen, N.Y. Times (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.

cigarette system provided consumers with palatable access to high-concentrations of nicotine like never before. Since the JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700 percent in 2017 alone. By 2019, JLI owned three-quarters of the e-cigarette market.[39]

## C.  DEFENDANTS Sought to Position JLI for Acquisition by a Major Cigarette Company

74.    JLI, with the MANAGEMENT DEFENDANTS, worked to maintain and expand the number of nicotine-addicted users to ensure a steady and growing customer base. That growing customer base was crucial to JLI's and the MANAGEMENT DEFENDANTS' long term objective—lucrative acquisition by another company.

75.    JLI and the MANAGEMENT DEFENDANTS also recognized that their business goal—becoming part of the cigarette industry—was unlikely to endear them to the consumers that they needed to purchase their products. Years of anti-smoking campaigns have successfully stigmatized cigarette smoking. When MONSEES and BOWEN presented their thesis and product design to their classmates, they included a clip from a *South Park* episode showing the characters assembled at the Museum of Tolerance and shaming a smoker.[40]

76.    JLI needed to shape social norms such that the public attitude towards e-cigarettes would allow consumers to use their product without the stigma and self-consciousness smokers experienced.

77.    Part of this approach was consistently portraying JUUL as an enemy of the cigarette industry, with a publicly announced goal of eliminating the cigarette. This public

---

[39] Dick Durbin et al., Durbin & Senators to JUUL: You are More Interested in Profits Than Public Health, Durbin Newsroom (Apr. 8, 2019), https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-are-more-interested-in-profits-than-public-health.

[40] Montoya, *supra.*

message of eliminating cigarettes and challenging tobacco companies stands in direct contrast with JLI's actual business and investment strategy, which involved replicating in JUUL's new market the tobacco companies' historical success in the market for cigarettes and future acquisition by a major cigarette company.

78.     This goal was a motive that the JLI and the MANAGEMENT DEFENDANTS would return to in making decisions about the manufacture and marketing of JUUL products. BOWEN knew that to achieve the ultimate goal of acquisition, JLI and the MANAGEMENT DEFENDANTS would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

79.     JLI and the MANAGEMENT DEFENDANTS sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: first, by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction of, its users; and, second, by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people whose addiction would last the longest and be the most profitable for the DEFENDANTS.

### III.     JLI and BOWEN Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction.

80.     JLI was well-aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity. One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."[41] It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers.

---

[41] Internal Memo from T.L. Achey (Lorillard Tobacco Company) to Curtis Judge, Product Information (August 1978).

Claude Teague of R.J. Reynolds titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market." In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[42] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." As seen below, JLI heeded Dr. Teague's advice.

### A. JLI and BOWEN Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale.

81.     As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users, primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

82.     E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a palatable form. Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine. When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user. This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit." While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter

---

[42] Internal Memo from Claude Teague (R.J. Reynolds), Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market (Feb. 2, 1973).

newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.[43]

83.     Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day.[44] None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

84.     Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

85.     JLI's Initial Experiments Measured Non-Smokers "Buzz" Levels and Perceptions of Throat Harshness.

86.     JLI intentionally designed its product to minimize "throat hit" and maximize "buzz." The aim was to develop a nicotine salt formulation that maximized buzz, minimized harshness. "Employees tested new liquid-nicotine formulations on themselves or on strangers taking smoke breaks on the street. Sometimes, the mix packed too much punch – enough nicotine to make some testers' hands shake or send them to the bathroom to vomit . . . ."[45]

87.     A study by Anna K. Duell et al., which examined 4% benzoate solutions— the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit. The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley"

---

[43] Robert K. Jackler & Divya Ramamurthi, Nicotine Arms Race: JUUL and the High-nicotine Product Market, 28 Tobacco Control 623 (2019).
[44] *Id.*
[45] Chris Kirkham, Juul Disregarded Early Evidence it was Hooking Teens, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

flavor was 0.05 and in "Crème Brulee" was 0.07.[46] Given total nicotine content of 58 mg/ml and

56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine.

For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the

total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84, resulting in over

14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction

in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and

thus a greater abuse liability."

88.     Reducing throat hit is not necessary for a product aimed at smokers, who are

accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers,

especially youths. The cigarette industry has long recognized this; a published study of industry

documents concluded that "product design changes which make cigarettes more palatable, easier

to smoke, or more addictive are also likely to encourage greater uptake of smoking."[47] The Duell

study concluded that JLI's use of nicotine salts "may well contribute to the current use

prevalence of JUUL products among youth."[48]

89.     Reducing the harshness of nicotine also allows more frequent use of e-cigarettes,

for longer periods of time, and masks the amount of nicotine being delivered. By removing the

physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the

principal barrier to nicotine consumption and addiction. The Duell study further concluded that

JLI's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is

---

[46] U.S. Patent No. 9,215, 895; Anna K. Duell et al., Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy, 31 Chem. Res. Toxicol. 431, 432 (Fig. 3) (hereinafter "Duell Study").
[47] David A. Kessler, Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In, N.Y. Times (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.
[48] Duell Study at 433 (citing Willett, J. G., et al., Recognition, use and perceptions of JUUL among youth and young adults, Tobacco Control, 054273 (2018)).

"particularly problematic for public health."[49]

**B.**    **JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes.**

90.     JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [Juul's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a combustible cigarette." The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a combustible cigarette."[50]

91.     JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick"[51]that drives addiction and abuse.[52] Because nicotine yield is strongly correlated with tobacco consumption, a JUUL pod with more nicotine will strongly

---

[49] *Id.* at 431.

[50] U.S. Patent No. 9,215, 895 (filed Dec. 22, 2015).

[51] Internal Memo from Frank G. Colby (R.J. Reynolds), Cigarette Concept to Assure RJR a Larger Segment of the Youth Market, (Dec. 4, 1973).

[52] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease, A Report of the Surgeon General at 181 (2010),

correlate with higher rates of consumption of JUUL pods, generating more revenue for JUUL. In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

92.     JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists "didn't want to introduce a new product with stronger addictive power."109 For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold." For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]" But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."[53]

93.     All JUUL formulations at launch used the same amount of nicotine and benzoic acid as did the formulation that resulted in the highest nicotine blood levels were foreseeably exceptionally addictive, particularly when used by persons without prior exposure to nicotine.

**C.     JLI and the MANAGEMENT DEFENDANTS Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted.**

94.     The JUUL e-cigarette launched in 2015. After the launch, JLI and the MANAGEMENT DEFENDANTS continued to collect information about the addictiveness of JUUL. This information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness. This is consistent with a central goal of the product's design:

---

[53] Kirkham, *supra*.

capturing "users with the first hit."[54]

95.     It is believed that JLI, MANAGEMENT DEFENDANTS, and ALTRIA were aware of the highly addictive nature of JUUL Pods, that JUUL's flagship 5% JUUL pods were defective in design and manufacture, yet pushed this standard pod because it hooked users faster and kept them addicted to nicotine.

> **D.     JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection.**

96.     JLI knew that among its target audience, young people, cigarette smoking had become increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix.

97.     Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, a young user can, and do, use JUUL—in class or at home—without detection.

98.     The JUUL device is small and discrete. Fully assembled, the device is approximately 9.5cm long and 1.5cm wide. The JUUL device resembles a memory stick and can be charged in a computer's USB drive. This design also allows the device to be concealed in plain sight, camouflaged as a flash-drive, for use in public spaces, like schools. [55]

99.     Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and high-tech, which made it appealing to youth. JLI co-founder BOWEN drew on his experience as a

---

[54] Kirkham, *supra*.
[55] See Appendix 1 at Image 2.

design engineer at Apple to make JUUL resonate with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[56] These design aspects make children more likely to engage with the e-cigarette technology and trust in its safety.

100.    JUUL's design also included an LED light, which allowed users to active "party mode," whereby the LED light would flash a rainbow of colors when inhaling. Party mode on the JUUL is described by users to be "like an Easter egg in a video game[,]" and is another characteristic setting JUUL apart from other e-cigarettes and making it more appealing and "cool" to young users.[57]

> **E.    JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation.**
>
> > **1.    JLI Develops Flavored JUUL Products Appealing to Youth.**

101.    Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine. A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[58]

102.    In June 2015, JUUL came to market in four flavors including tabaac (later renamed Tobacco), fruut (later Fruit Medley), bruulé (later Crème Brulee), and miint (later mint). JUUL later offered other kid-friendly flavors, including cool mint, Cucumber, and

---

[56] How JUUL Made Nicotine Go Viral, Vox (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok.
[57] Jon Hos, Getting Your Juul Into Party Mode, Vape Drive (Jul. 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode; see Appendix 1 at Image 3.
[58] Gardiner Harris, Flavors Banned From Cigarettes to Deter Youth, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

mango.[59]

103.     In 2009, the FDA banned flavored cigarettes (other than menthol). "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban[60] In January 2020, the FDA banned flavored e-cigarette pods, other than "Tobacco" and "Menthol" flavors.

104.     Availability of e-liquids in appealing flavors increases rates of e-cigarette adoption by minors. A national survey found that 81% of youth aged twelve to seventeen who had ever used e-cigarettes used a flavored e-cigarette the first time they tried the product, and that 85.3% of current youth e-cigarette users used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth users said they used e-cigarettes "because they come in flavors I like."[61] In a recent study, 74% of youth surveyed indicated that their first-use of a JUUL was of a flavored JUUL pod.[62]

105.     Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine. Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

106.     Research also shows that when youth see advertisements for flavored e-cigarettes,

---

[59] See Appendix 1 at Image 4.
[60] Daniel J. DeNoon, FDA Bans Flavored Cigarettes: Ban Includes Cigarettes With Clove, Candy, and Fruit Flavors, WebMD (Sept. 22, 2009), https://www.webmd.com/smoking-cessation/news/20090922/fda-bans-flavored-cigarettes#2.
[61] 140 See Bridget K. Ambrose et al., Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014, 314 JAMA 1871 (2015).
[62] Karma McKelvey et al., Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes. JAMA Network Open (2018), https://doi:10.1001/jamanetworkopen.2018.3535.

they believe the advertisements and products are intended for them.[63]

107.    Instead of taking corrective action or withdrawing the kid-friendly flavors, JLI capitalized on their popularity with kids.

108.    JLI asserts it did not intend its flavors to appeal to underage consumers and claimed in response to a congressional inquiry it was not aware children used its products.[64]

109.    A former JUUL manager interviewed anonymously said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale…Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[65]

110.    DEFENDANTS additionally worked to cement the "mint" flavor with consumers as a key hook.

111.    JLI, the MANAGEMENT DEFENDANTS, and ALTRIA recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors. So, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape future regulation and preserve JLI's astronomical sales figures.

---

[63] D.C. Petrescu, et al. What is the Impact of E-Cigarette Adverts on Children's Perceptions of Tobacco Smoking? An Experimental Study, 26 Tob Control 421 (2016); Julia C. Chen-Sankey, et al. Perceived Ease of Flavored E-Cigarette Use and E-Cigarette Use Progression Among Youth Never Tobacco Users, 14 PLoS ONE 1 (2019).
[64] Lorraine Woeller, et al., Juul Tries to make friends in Washington as regulators circle, Politico (Dec. 8, 2018), https://www.politico.com/story/2018/12/08/juul-lobbying-washington-1052219.
[65] Matt Richtel & Sheila Kaplan, Did Juul Lure Teenagers and Get 'Customers for Life'?, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html (hereinafter "Richtel & Kaplan").

112.    To maximize the value of its mint line of JUUL pods, JLI, with the support of the

MANAGEMENT DEFENDANTS, chemically and socially engineered mint pods to be the most

popular "flavor" among youth, including through extensive surveillance of youth behavior and

preferences. This also included also enhanced the nicotine impact of the mint flavor by adding

excess nicotine to mint JUUL pods.[66]

113.    In April 2018, JLI received a document request from FDA on April 24, 2018,

seeking information about *inter alia* the design, flavoring, and marketing of JLI's products.[67]

114.    In response, JLI announced a commitment of $30 million to youth prevention

efforts and began sending JLI representatives to schools to present what were essentially

advertising campaigns for JUUL products. This conduct resulted in a Warning Letter from the

FDA's Center for Tobacco Products to JLI in September 2019.[68]

115.    With no genuine interest in youth prevention, and as detailed below, JLI, the

MANAGEMENT DEFENDANTS, and ALTRIA committed to work to preserve mint as a flavor

for as long as possible. Indeed, to further this goal, Defendants PRITZKER and VALANI poured

additional money into JLI a mere two months later as part of a $600 million funding round.[69]

116.    JLI's use of flavors not only unfairly targeted youth, but unsuspecting adults as

---

[66] See Duell AK, et al. Nicotine in tobacco product aerosols: 'It's déjà vu all over again' Tob Control, 5 (Dec. 17, 2019), https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/12/16/tobaccocontrol-2019-055275.full.pdf.
[67] Matthew Holman, Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc., U.S. Food & Drug Admin. (Apr. 24, 2018), https://www.fda.gov/media/112339/download.
[68] Juul Labs, Inc. Warning Letter, U.S. Food & Drug Admin. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019
[69] Alex Wilhelm, et al., JLI Raises $650M Of Its $1.25B Mega-Round, Crunchbase (July 10, 2018), https://news.crunchbase.com/news/juul-raises-650m-of-its-1-25b-mega-round/.

well. By positioning JUUL pods as a flavor-oriented product rather than a device to deliver a

highly addictive drug, JLI deceptively led consumers to believe JUUL pods were not only

healthy (or at least essentially harmless), but also a pleasure to enjoy regularly, without guilt or

adverse effect.

> **2.      JLI Used Toxic Flavorings and Raw Ingredients in JUUL Pods Without Ensuring They Were Safe For Inhalation and Without Providing Warnings to Plaintiffs of Potential Dangers.**

117.    It is well-established that flavoring additives and raw ingredients used in JUUL e-

liquids are known causes of lung injuries when inhaled in the workplace setting.[70]

118.    Safety and toxicity analyses in the context of flavored e-liquids have also been

published in the medical and scientific literature.

119.    In 2016, Tierney, et al., performed an analysis of the ingredients in several

popular flavors and brands of e-cigarettes. They found that the concentration of artificial flavor

chemicals in e-cigarette fluids are sufficiently high for inhalation exposure by vaping to be of

toxicological concern. Also, the researchers found that certain flavoring additives appeared to be

popular across all brands such as vanillin, ethyl vanillin, maltol and ethyl maltol, benzaldehyde

and benzyl alcohol, ethyl butyrate and ethyl acetate. A review of the JUUL master formulations

and ingredient lists for flavored JUUL pods identify many of these same popular toxic

ingredients studied by Tierney.[71]

120.    Talih, et al. analyzed the characteristics and toxicant emissions of JUUL and

found that JUUL aerosol contained numerous toxic carbonyl compounds including

---

[70] Flavorings-Related Lung Disease, Exposure To Flavoring Chemicals: What Are Flavorings?, National Institute for Occupational Safety and Health (October 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/exposure.html.
[71] Peyton A Tierney, et al., Flavour chemicals in electronic cigarette fluids, Tob Control, 25:e10-e15 (Apr. 15, 2015).

formaldehyde, acetaldehyde and acetone, all known carcinogens.[72]

121.    Omaiye, et al. performed an analysis of the ingredients in a number of chemical flavored JUUL pods and found that they were cytotoxic when exposed to human bronchial cells. The study found the following known harmful chemicals in the JUUL e-liquids including: 2-methoxyphenol; 2,3,5-Trimethylpyrazine; 2,5-dimethylpyrazine; isopulegol; ethyl maltol; benzaldehyde; 4-terpineol; maltol; hydrocoumarin; vanillin; ethyl vanillin; phenoethyl alcohol; benzyl alcohol; p-Cymene; corylone; and pulegone. They also found the following irritant chemicals included: p-Anisaldehyde; eucalyptol; piperidone; piperonal; linalool; methyl anthranilate; beta-Damascone; benzaldehyde PG acetal; gamma-terpinene; ethyl anthranilate; alpha-terpineol; delta-decalactone; gamma-octalatone; 3-Hecen-1-ol; ethyl isovalerate; beta-undecalactone; hexyl acetate; acetylpurazine; ethyl hexacanoate; ethyl 2-methylbutanoate; and menthol. In addition, they found the following environmentally hazardous chemicals included: thymol, ally hexanoate, alpha-pinene, beta-pinene, and limonene.[73]

122.    Another study published in 2019 examined the artificial flavoring additives in e-liquids in JUUL pods. The authors concluded that the cumulated data suggested that artificial flavors induce oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells. Specifically, JUUL crème brulee and cool cucumber caused epithelial barrier dysfunction in 16-HBE cells. Moreover, all flavors damaged DNA upon exposure in monocytes. The findings included increased mitochondrial superoxide generation, IL-8 inflammatory cytokine response, IL-8 inflammatory cytokine response in monocytes, and OGE2 response in

---

[72] Talih S, Salman R, El-Hage R, et al., Characteristics and toxicant emissions of JUUL electronic cigarettes, Tob Control, 28:678-680 (2019).
[73] Esther E. Omaiye, et al., High-Nicotine Electronic Cigarette Products: Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations, Chem Res Toxicol, 32(6): 1058-69 (June 17, 2019).

monocytes. All findings are a known cause of acute and chronic lung injuries, as well as other serious and significant injuries.[74]

123.    Despite the body of evidence demonstrating a significant risk associated with the flavoring additives used in JUUL e-liquids, DEFENDANTS failed to warn consumers or the public, including Plaintiffs of this risk thereby recklessly disregarding the safety of the millions of JUUL users throughout the country, including millions of teenagers and young adults who were non-smokers.

**IV.    DEFENDANTS Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe.**

124.    Having created a product designed to hook users to its nicotine, JLI had to mislead consumers into believing JUUL was something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL poses. DEFENDANTS devised and knowingly carried out a material scheme to defraud consumers by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL products, (b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party groups to spread false and misleading narratives about e-cigarettes, and JUUL in particular.

**A.    The DEFENDANTS Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content.**

125.    Every 5% strength JUUL pod package represents that one pod is equivalent to one pack of cigarettes. This statement is deceptive, false and misleading. As JLI's regulatory head

---

[74] Thivanka Muthumalage, et al., E-cigarette flavored pods induce inflammation, epithelial barrier dysfunction, and DNA damage in lung epithelial cells and monocytes, Scientific Reports, 9:19035 (Feb. 1, 2019).

explained internally to former CEO Kevin Burns in 2018, each JUUL pod contains "roughly twice the nicotine content of a pack of cigarettes."

126.    In addition, and as JLI and the MANAGEMENT DEFENDANTS know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain 10–15 mg of nicotine per cigarette and each cigarette yields between 1.0 to 1.4 mg of nicotine, meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, deliver at least 82% of the nicotine contained in a JUUL pod to the user. JLI's own internal studies suggest a nicotine transfer efficiency rate of closer to 100%.

127.    DEFENDANTS also knew that that the use of benzoic acid and nicotine salts in JUUL pods affects pH and facilitates "absorption of nicotine across biological membranes."[75] JUUL's e-liquid formulation is highly addictive not only because it contains a high concentration of nicotine, but because it contains a particularly potent form of nicotine, i.e., nicotine salts. DEFENDANTS knew this and ALTRIA was aware of the research showing the potency of nicotine salts from their many years in the tobacco business.

**B.      JLI and the MANAGEMENT DEFENDANTS Transmitted, Promoted and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Was False and Misleading.**

128.    The statements in JLI advertisements and on JUUL pod packaging that each JUUL pod contains about as much nicotine as a pack of cigarettes are deceptive, false and misleading. DEFENDANTS knew this.

129.    JLI and the MANAGEMENT DEFENDANTS caused deceptive, false and

---

[75] Neal L. Benowitz et al., Nicotine Chemistry, Metabolism, Kinetics and Biomarkers, 192 Handb. Exp. Pharmacol., 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.

misleading statements that a JUUL pod had an equivalent amount of nicotine as one pack of cigarettes to be distributed to consumers including Plaintiff. Defendants thus materially misrepresented the nicotine content of JUUL products to the consuming pubic including Plaintiffs.

130.    By no later than October 30, 2016 (and likely much earlier), the JLI Website – which, as discussed above, the MANAGEMENT DEFENDANTS on JLI's Board of Directors reviewed and approved – advertised that "[e]ach JUUL pod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs."[76] The language on the website would later change, but still maintained the same fraudulent misrepresentation – i.e., that "[e]ach 5% JUUL pod is roughly equivalent to one pack of cigarettes in nicotine delivery."[77]

131.    JLI and the MANAGEMENT DEFENDANTS directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUUL pods and their deceptive, misleading, and fraudulent statements regarding JUUL's nicotine content. Despite knowing these statements were untrue, JLI and the MANAGEMENT DEFENDANTS made no effort to retract or correct their lies.

132.    In addition to approving the JLI website, knowing that it contained deceptive, misleading and false statements, JLI (through its employees) and the MANAGEMENT DEFENDANTS also were directly responsible for the selling and distributing JUUL pod packaging that contained misrepresentations and omissions.

133.    JUUL pod packages that DEFENDANTS sold and distributed stated that JUUL

---

[76] JUULpod, JUUL Labs, Inc. (Oct. 30, 2016),
https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/.
[77] What is Vaping?, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/What-is-Vaping-How-to-Vape.

pods are "approximately equivalent to about 1 pack of cigarettes."[78] These statements, as well as the statements on the JLI website, are false and misleading.

134.    The statement on the JLI website, and in its marketing, promotions, advertisements and packaging, that each JUUL pod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is false and likely to deceive and mislead, because the actual amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes.

135.    ALTRIA greatly expanded the reach of this fraud by providing its retail and distribution might for JLI products, causing millions of JUUL pods sold and distributed with this packaging. JLI, the MANAGEMENT DEFENDANTS, and ALTRIA knew that these statements are false and misleading, but nevertheless utilized JUUL product packing, marketing and advertising to maintain their fraud.

136.    ALTRIA knew in 2017 that a JUUL pod delivered more nicotine than one pack of cigarettes. In 2017, ALTRIA launched its MarkTen Bold ENDS, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JLI was already on store shelves and was rapidly gaining market share with its 5% nicotine formulation, ALTRIA chose to bring a less potent 4% formulation to market.

137.    According to ALTRIA's own pharmacokinetic testing this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, ALTRIA's own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily

---

[78] JUUL Labs (@JUULVapor), Twitter (Feb. 14, 2018, 10:35 a.m.), https://twitter.com/JUULvapor/status/963844069519773698.

equal or exceed the nicotine delivery profile of a combustible cigarette.[79]

138.    Based on its own internal knowledge, ALTRIA knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data it received from JLI, ALTRIA's  due diligence undoubtedly included a careful examination of JLI's intellectual property, including the '895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

139.    Thus, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA knew that the statement on JUUL pod packaging that each JUUL pod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead. Neither ALTRIA, nor JLI or the MANAGEMENT DEFENDANTS has made any effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL pods. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving consumers.

140.    Not only have JLI, MANAGEMENT DEFENDANTS and ALTRIA misrepresented or concealed the actual amount of nicotine consumed via JUUL pods, but they also did not effectively or fully inform users about the risks associated with the potent dose of nicotine delivered by its products. Despite making numerous revisions to JUUL packaging since 2015, the packaging did not include nicotine addiction warnings until JLI was forced to add them in August 2018.

141.    Moreover, the form of nicotine JUUL pods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of

---

[79] *See* Appendix 1 at Image 5

reporting concentration by volume,[80] leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUUL pods in fact contain approximately the same nicotine as a solution that is 6% nicotine by volume.[81] JLI, ALTRIA and the MANAGEMENT DEFENDANTS did nothing to stop or correct this confusion about the nicotine content.

142.    The "5% strength" statement in DEFENDANTS' marketing, promotions and advertisements is also misleading. At least two independent studies testing multiple varieties of JUUL pods have likewise found significantly higher concentrations of nicotine than the 59 mg/mL JUUL's website represents, suggesting that the difference in the total nicotine content of a JUUL pod vs. a pack of combustible cigarettes could be even greater.

### C.    DEFENDANTS Used Food and Coffee Themes to Give False Impressions that JUUL Products Were Safe and Healthy.

143.    In late 2015, JLI and the MANAGEMENT DEFENDANTS employed a deceptive marketing scheme to downplay the harms of e-cigarettes with a food-based advertising campaign called "Save Room for JUUL."

144.    The campaign framed JUUL's addictive pods as "flavors" to be paired with foods. JLI described its crème brûlée nicotine pods as "the perfect evening treat" that would allow users to "indulge in dessert without the spoon." In one 2016 e-mail, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly-addictive nicotine vapor: "Have a sweet tooth?

---

[80] See, *e.g.*, https://www.whitecloudelectroniccigarettes.com/blog/nicotine-measurements/; American E-Liquids Manufacturing Standards Association, E-Liquids Manufacturing Standards, § 1.05 (2017) (quantifying e-liquid nicotine content in terms of volume), https://www.aemsa.org/wp-content/uploads/2017/03/AEMSA-Standards-v2.3.3.pdf.
[81] Vapor4Life, How Much Nicotine is In a JUUL? ("Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter)."), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/.

Try Brulee."[82] JLI similarly promoted the Fruit Medley pods using images of ripe berries. JLI described its "cool" mint pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint."[83] None of these advertisements disclosed that JUUL was addictive and unsafe.[84]

145.    In several caffeine-pairing advertisements, JUUL devices or pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.211 JLI's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.

146.    JLI's reference to coffee is no mere marketing gimmick, it reflects the larger effort to mislead customers into believing that JUUL is no more harmful than coffee; reinforcing the false and dangerous concept if a substance is "not harmful," then addiction to that substance cannot be harmful.[85]

147.    DEFENDANTS knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

> **D.    The "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device.**

148.    JLI, ALTRIA, and the MANAGEMENT DEFENDANTS recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus, JLI's staggering market share), was to mislead potential customers about the true nature of JUUL

---

[82] See Appendix 1 at Image 6.
[83] Erin Brodwin, $15 billion startup JUUL used 'relaxation, freedom, and sex appeal' to market its crème-brulee-flavored e-cigs on Twitter and Instagram but its success has come at a big cost, Business Insider (Oct. 26, 2018), https://www.businessinsider.com/juul-e-cigmarketing-youtube-twitter-instagram-social-media-advertising-study-2018-10; Stanford, Research into the Impact of Tobacco Advertising, tobacco.stanford.edu/tobacco_main/subtheme_pods.php.
[84] *See* Appendix 1 at Image 7.
[85] *See* Appendix 1 at Image 8.

products. DEFENDANTS knew that if it became public that JUUL was designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash. Therefore, JLI (with the knowledge and support of the MANAGEMENT DEFENDANTS) and ALTRIA repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device, and falsely and misleadingly used various communication methods to spread this subterfuge. JLI, the MANAGEMENT DEFENDANTS, and ALTRIA committed these deceptive, misleading and fraudulent acts intentionally and knowingly.[86] In making these representations, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA intended that consumers, the public, and regulators rely on misrepresentations that JUUL products were designed to assist smoking cessation.[87]

149.    The most blatant evidence of the cover-up scheme was the January 2019, $10 million "Make the Switch" television advertising campaign. This campaign, which was the continuation of JLI's web-based Switch campaign, was announced less than a month after ALTRIA announced its investment in JLI.

150.    The "Make the Switch" television ads featured former smokers aged 37 to 54 discussing how JUUL helped them quit smoking.[88] JLI, the MANAGEMENT DEFENDANTS, and ALTRIA committed acts of deceit and fraud when they caused the "Make the Switch" campaign to air on television with the fraudulent intent of deceiving and misleading the public, the United States Congress, and government regulators into believing that the company is and had been focused solely on targeting adult smokers. ALTRIA also committed acts of deceit and

---

[86] *See* Appendix 1 at Image 9.
[87] *See* Appendix 1 at Image 10.
[88] *See* Appendix 1 at Image 11.

fraud when they caused tens of thousands, if not millions, of written versions of the "Make the Switch" campaign to be distributed with packages of its combustible cigarettes.

151.    DEFENDANTS continually sought to frame JUUL products as smoking cessation devices in their public statements, on their websites, and in public testimony to Congress.

152.    DEFENDANTS' tacit message in their Switch advertisements is it's safe to switch because, unlike cigarettes, JUUL is harmless to your health.

153.    DEFENDANTS' false, deceptive and misleading "Make the Switch" campaign suggests that purchasing a JUUL will "switch" a smoker to a non-smoker.

154.    JLI also advertised misleading cost-savings calculators as part of its "Make the Switch" campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (i.e., a pack a day smoker is presumed to consume one JUUL pod a day). DEFENDANTS know that the calculator is misleading because smokers who switch to JUUL frequently increase their nicotine intake.

155.    JUUL labels and advertisements also marketed the product as an "alternative" to cigarettes, other advertisements similarly marketed the product as smoking "evolved."[89]

156.    The goal of these advertisements was to convey the deceptive, misleading and false impression that JUUL products could help consumers quit smoking and break nicotine addiction in a way that was healthy and safe. But, as noted above, that was simply not the case. DEFENDANTS never disclose to consumers that JUUL e-cigarettes and JUUL pods are at least as addictive as, if not more addictive, than combustible cigarettes. And each of JLI, the MANAGEMENT DEFENDANTS, and ALTRIA received this data and were aware of this fact.

157.    In addition, the notion that JUUL products are designed only for existing cigarette

---

[89] *See* Appendix 1 at Image 12.

smokers, and safer than combustible cigarettes is belied by JLI's own knowledge, marketing plan and intentions on several fronts. First, DEFENDANTS sought to grow a new group of consumers of nicotine products (e.g., "vapers"), not just to market to the shrinking number of existing cigarette smokers. Second, JLI and BOWEN designed the JUUL device to be easy to use for youth and others who have never smoked and to create and exacerbate nicotine addiction by encouraging ingestion of excessive amounts of nicotine. Third, as noted above, JLI's own internal testing revealed that JUUL products were often too intense for combustible cigarette smokers. Each of the MANAGEMENT DEFENDANTS knew this from their position on JLI's Board of Directors, and ALTRIA knew the same when it began to actively coordinate with JLI and the MANAGEMENT DEFENDANTS. Despite this knowledge, these DEFENDANTS made numerous deceptive, false and misleading public statements that JUUL was intended to be a cessation device.

158.    JUUL is not a product adults typically use to quit smoking. Researchers have found that as of 2018, only 7.9% of American adults had ever used USB shaped vape devices, like JUUL, and only 2% of adults currently used them.[90] And as mentioned above, youth were 16 times more likely to use the USB-shaped JUUL than adults.[91]

159.    DEFENDANTS ensured that JUUL was the opposite of a "tool[] to reduce or eliminate" nicotine consumption by designing the JUUL product to deliver nicotine in larger amounts and at a faster rate than even cigarettes.

---

[90] Kristy L Marynak et al., Use and reasons for use of electronic vapour products shaped like USB flash drivers among a national sample of adults, 28 Tob Control 685 (Nov. 2019), https://tobaccocontrol.bmj.com/content/28/6/685.

[91] D.M. Vallone et al., Prevalence and correlates of JLI use among a national sample of youth and young adults, Tob Control (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

160.    The "Make the Switch" campaign also does not disclose or warn about the risks of using multiple tobacco products, "dual use" or that the JUUL is not a smoking cessation product.

161.    In September 2019, the FDA issued two warning letters to JLI detailing its concern that JLI was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products," within the meaning of the Federal Food, Drug, and Cosmetics Act (FDCA), without prior approval.[92]

162.    The FDA warned JLI that its advertising slogans such as "99% safer," "much safer," and "a safer alternative" than cigarettes was "particularly concerning because [those] statements were made directly to children in school." It further noted concern that JLI's Switch advertising campaign "may also convey that switching to JUUL is a safer alternative to cigarettes."

E.    **JLI, ALTRIA, and Others in the E-Cigarette Industry Coordinated With Third-Party Groups To Mislead the Public About the Harms and Benefits of E-Cigarettes.**

163.    Through a collective and parallel effort of funding, leadership, and board membership, JLI, ALTRIA and others in the e-cigarette industry leveraged third-parties, ranging from industry-funded non-governmental organizations to online blogs more accessible to youth, to mislead the public about the impacts of consuming e-cigarettes.

164.    An assortment of lobbyists, trade associations, and online publications have coordinated with the e-cigarette industry, including JLI and ALTRIA, to promote a consistent message that consuming e-cigarettes is not harmful, that nicotine is not harmful, and that the impacts of e-cigarettes are greatly exaggerated. These organizations receive funding from the e-

---

[92] U.S. FDA Warning Letter, *supra*.

cigarette industry, feature executives on those companies' boards of directors, and in return, promote industry products, industry views, or fund "independent" studies of their own that reach the same conclusions as e-cigarette industry-funded research.

165.    DEFENDANTS coordinated and collaborated with these third-parties to receive favorable media attention, maintain a consistent narrative about JUUL products, and promote alternative facts about these products which were patently false. For example, some of the headlines DEFENDANTS collaborated to have published include ""Coming Soon: A JUUL to Help You Quit JUULing," "These Scientists Want to Kill Smokers' Hope (For Vaping)," and "UK Scientists to WHO: Your Vape Report Is Junk." These articles utilized misrepresentations and fraud to maintain DEFENDANTS' customer and new-customer base.

166.    DEFENDANTS further funded sham non-profit groups to push back against restrictions on the industry, drive public debate, shape public perceptions, and cause the creation of alternative scientific research. This process is done by creating the illusion of grassroots support for the industry and products– a technique informally known as "astroturfing."

167.    A 2017 report in The Verge detailed the e-cigarette industry's apparently coordinated efforts to use biased research to downplay the risks of consuming e-cigarettes.[93] For example, e-cigarette manufacturers routinely conduct studies focusing on the "good news" about e-cigarettes, i.e. they release less harmful aerosolized chemicals than combustible cigarettes, or that their aerosol lingers for less time indoors than combustible cigarettes. Industry-funded authors then regularly cite to each other's studies in their own research.

168.    On information and belief, JLI and ALTRIA, among others in the e-cigarette

---

[93] Liza Gross, Vaping companies are using the same old tricks as Big Tobacco The Verge (2017), https://www.theverge.com/2017/11/16/16658358/vape-lobby-vaping-health-risks-nicotine-big-tobacco-marketing.

industry, funnel their industry-funded studies to friendly pro-industry groups knowing that those entities will misrepresent the results as evidence that e-cigarettes are safe, or not harmful.

### F.   ALTRIA Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to Help JLI.

169.   ALTRIA's announcement that it intended to invest in JLI came less than two months after it told the FDA that ALTRIA "believe[s] that pod-based products significantly contribute to the rise in youth use of e-vapor products" and that it accordingly would be removing its own pod-based products from the market.[94]ALTRIA made the same representations to its investors.[95]

170.   Although ALTRIA claimed its investment in JLI had an altruistic motive—"we believed the transaction would give ALTRIA an unprecedented opportunity to share our experience in underage tobacco prevention with JUUL to help address youth usage," ALTRIA recently confirmed that JLI has not even availed itself of that experience. In ALTRIA's October 2019 letter to Senator Dick Durbin, ALTRIA CEO Howard Willard acknowledged that while ALTRIA "offered to JUUL services relating to underage prevention efforts," to date "JUUL has not accepted ALTRIA's offers of assistance in addressing underage vaping relating issues."282

171.   ALTRIA's representations that it intended to help JUUL curb the prevalence of underage use was false and misleading. As discussed below, ALTRIA coordinated with JUUL to capture and maintain the youth market.

### V.   DEFENDANTS Targeted the Youth Market.

172.   Having created a product, like combustible cigarettes, that sought to get users

---

[94] Willard Oct. 25, 2018 letter, *supra*.
[95] Transcript of Altria Group Inc. (MO) Q3 2018 Earnings Conference Call (Oct. 25, 2018) https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx.

addicted to nicotine, and while taking steps to ensure that consumers and regulators did not appreciate the true nicotine content or potential harm from using JUULs, to successfully sink their high-tech nicotine hook into American consumers, JLI, BOWEN, and MONSEES needed investors willing to adopt the tactics of the cigarette industry as their own. They found those investors in PRITZKER, HUH, and VALANI.

173.    Under the leadership of the MANAGEMENT DEFENDANTS, JLI marketed to nicotine to kids. JLI and the MANAGEMENT DEFENDANTS deployed a sophisticated viral marketing campaign that strategically laced social media with false and misleading messages to ensure their uptake and distribution among young consumers. JLI and the MANAGEMENT DEFENDANTS' campaign was wildly successful—burying their hook into kids and initiating a public health crisis.

### A.    JLI Emulated the Marketing of Cigarette Companies.

174.    For decades, cigarette companies spun smoking as signifier of adulthood. This turned smoking into a way for teenagers to project independence and enhance their image among their peers.

175.    Youth marketing was critical to the success of cigarette companies. In the 1950s, PHILIP MORRIS—now JUUL's corporate affiliate—intentionally marketed cigarettes to young people as a pool from which to "replace smokers" to ensure the economic future of the cigarette industry.[96]

176.    JLI and the MANAGEMENT DEFENDANTS sought to emulate this approach. Indeed, MONSEES admitted to using historical cigarette ads to inform JLI's own advertising

---

[96] *U.S. v. Philip Morris*, No. 99- 2496 (D.D.C. Aug. 17, 2006), ECF No. 5750 (Amended Final Opinion) at 972.

campaign.[97]

177.    The emulation is obvious. A side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.[98]

178.    JLI and the MANAGEMENT DEFENDANTS deployed this same strategy, but adapted it to modern advertising tactics.

**B.    JLI and the MANAGEMENT DEFENDANTS Intentionally Marketed JUUL to Young People.**

179.    The risk that children would use a new e-cigarette product was well-known and well-publicized in the months leading up to the launch of the JUUL e-cigarette.

180.    Seeking to enter the nascent youth market for e-cigarettes, from its inception, JLI intentionally targeted youth. In March 2015, MANAGEMENT DEFENDANTS supervised the advertising campaigns that would accompany the launch of JUUL.

181.    JLI professedly wanted kids to think JUUL was cool. And, in short order, the phrase "it's cool to JUUL" became an anthem among kids while youth e-cigarette use skyrocketed.

**C.    JLI Advertising Exploited Young People's Psychological Vulnerabilities.**

182.    Informed by decades of tobacco marketing, JLI ran a consistent, simple message: JUUL is used by young, popular, attractive, and stylish people.

183.    This was not the only marketing scheme JLI could have adopted. JLI had other options. In 2014, JLI engaged a Calgary-based advertising agency, Cult Collective Ltd. ("Cult"),

---

[97] Montoya, *supra*.
[98] *See* Appendix 1 at Image 13.

to complete a "diagnostic" evaluation of the JUUL brand and recommend the best advertising strategy to market the JUUL e-cigarette. While Cult recommended that JUUL position its e-cigarette technology as the focus of its advertisements, JLI opted for the "Vaporized" campaign, a much flashier and youth-enticing approach.[99]

184.    Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models, bold colors, and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool."

185.    The targeting of young consumers was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teen than mature adults."[100]

186.    The MANAGEMENT DEFENDANTS knew that the ads targeted the young, but "Juul's board of directors signed off on the company's launch plans[.]" In addition, "MONSEES, who was CEO at the time, personally reviewed images from the billboard photo shoot while it was in session." [101]

187.    As part of the Vaporized campaign, JLI advertised on a 12-panel display over Times Square. Billboard advertising of cigarettes has for years been unlawful under the tobacco Master Settlement Agreement.[102]

188.    The ads were also placed in nationally-distributed magazines, and the videos were

---

[99] Declan Harty, JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign', AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.
[100] Jackler, JUUL Advertising (2015-2018) at 7
[101] Ainsley Harris, How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?, Fast Company (Nov. 19, 2018),
[102] See Appendix 1 at Image 14.

displayed on screens at the top of point-of-sale JUUL kiosks provided by JUUL to retailers across the country. To the extent the Vaporized advertisements disclosed JUUL contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By comparison, cigarette advertisements must display a health warning in high contrast black and white, covering 20% of the image.

189.    Likewise, JLI's social media ads did not disclose any health risks of using JUUL until May of 2018, when they were required to warn of addiction. But even then, JUUL placed these warnings in areas that were only viewable if the social media user clicked on the "full version" of the JLI post, which is not how teens typically engage with social media advertising. Notably, on Twitter, a social media platform that is geared towards reading text, and on Facebook, where some users do read text, JLI typically did not include the disclaimer in its advertisements at all.

190.    JLI's Vaporized campaign was so effective it gained national attention on a 2015 episode of Late Night with Stephen Colbert, who ridiculed the notion that the young, dancing models were consistent with a target market of adult smokers.[103]

### D.    JLI Pushed the Vaporized Campaign Into Youth Targeted Channels.

#### 1.    JLI Placed Its Vaporized Ads on Youth Oriented Websites and Media.

191.    JLI engaged programmatic media buyers to place advertisements on websites attractive to children, adolescents in middle school and high school, and underage college students. These advertisements, which included the images of models from the Vaporized

---

[103] Stephen Colbert, Vaping Is So Hot Right Now, YouTube (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM

campaign, began appearing on websites as early as June 2015.[104] The chosen websites included: nickjr.com (the website for a children's television network run by Nickelodeon Group); the Cartoon Network's website at cartoonnetwork.com; allfreekidscrafts.com; hellokids.com; and kidsgameheroes.com.

192.    JLI also purchased banner advertisements on websites providing games targeted to younger girls, educational websites for middle school and high school students, and other teen-targeted websites.

193.    JLI knew what it was doing. While JLI could have employed age-gating on its social media accounts to prevent underage consumers from viewing its Vaporized advertisements, it chose not to do so. Even when it did implement age-gating, DEFENDANTS deliberately modified the system to ensure virtually all users, regardless of age, would be allowed past the gate.

194.    By 2016, an estimated 20.5 million U.S. middle and high school students were exposed to advertisements for e-cigarettes, including JUUL.[105]

### 2.    JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience.

195.    In the modern social media landscape, influencers capture consumers' attention and heavily steer consumer purchasing.

196.    A social media influencer is a user who has established credibility in a specific industry, has access to a huge audience and can persuade others to act based on their recommendations.

---

[104] *See* Appendix 1 at Image 15.
[105] Kristy Marynak et al., Exposure to Electronic Cigarette Advertising Among Middle and High School Students – United States, 2014-2016, CDC: Morbidity and Mortality Weekly Report (Mar. 16, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a3.htm.

197.    JLI utilized key influencers to boost sales to youth. JLI targeted influencers that were young and popular with adolescents. One influencer JLI targeted was Tavi Gevinson, who was nineteen years old in the summer of 2015. The year before, Rolling Stone magazine described Gevinson as "possibly the most influential 18-year-old in America."[106]

198.    JLI directly and indirectly worked to enlist influencers by sending them free JUUL e-cigarettes.

199.    JLI encouraged its distributors, wholesalers, and other resellers—either explicitly or implicitly— to hire affiliates and influencers to promote JLI's brand and products. Even if not paid directly by JLI, these Influencers profited from the promotion of JUUL products either because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-compatible products.

200.    For example, one YouTube user Donnysmokes (Donny Karle, age twenty-one) created a JUUL promotional video in 2017 that garnered roughly 52,000 views, many of which were from users under the age of eighteen. Since that time, Karle has made a series of videos, including one titled "How to HIDE & HIT Your JUUL at SCHOOL WITHOUT Getting CAUGHT." At least one JLI sales representative sent DonnySmokes a private message thanking him for promoting JUUL products on social media.

201.    As with much of the marketing strategy for JUUL, the practices described above are prohibited by the Master Settlement Agreement.

### 3.    JLI Used Viral Marketing Techniques Known to Reach Young People.

202.    JLI deployed "viral marketing" techniques to great success. Viral marketing are

---

[106] Alex Morris, Tavi Gevinson: A Power Teen's New Direction, Rolling Stone (Aug. 14, 2014, 3:57 PM), https://www.rollingstone.com/culture/culture-features/tavi-gevinson-a-power-teensnew-direction-232286/.

techniques which exploit pre-existing social networks to produce meteoric increases in brand awareness, through processes similar to the spread of an epidemic. Viral marketing effectively converts customers into salespeople, who, by sharing their use of a product (on social media or otherwise), repeat a company's representations and endorse the product within their network. The success of viral marketing depends on peer-to-peer transmission. Hence, a successful viral marketing campaign looks like a series of unrelated, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaigns.

203.    Social media platforms are the most effective way to launch viral marketing campaigns among young people. As of May 2018, among teenagers, 95% reported use of a smart phone, 85% use YouTube, 72% use Instagram, and 45% reported being online "constantly."[107]

204.    A key feature of JLI's viral marketing campaign was inviting user-generated content. This strategy revolves around prompting social media followers to provide their own JUUL-related content—e.g. post a selfie in your favorite place to use JUUL. The response provided by a user is then typically distributed—by the social media platform employed—into the user's personal network. In this way, brands can infiltrate online communities with personalized content that promotes their product (e.g. a picture of a friend using a JUUL e-cigarette at the beach). Within a few months of the JLI's commercial release in June 2015, a former JLI executive reportedly told the New York Times that JLI "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[108]

---

[107] Monica Anderson & Jingjing Jiang, Teens, Social Media & Technology 2018: Appendix A: Detailed Tables, Pew Research Center (May 31, 2018), https://www.pewresearch.org/internet/2018/05/31/teens-technology-appendix-a-detailed-tables/.
[108] Richtel & Kaplan, *supra*.

205.     JLI could have stepped in and attempted to stop the use of its trademark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL." It could have sought to shut down infringing accounts such as @doit4juul and @JUULgirls. It did not do so.

### E.     JLI Targeted Youth Retail Locations.

206.     Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to point of sale tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed.

207.     For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales. JLI knows that nicotine naïve young people frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL increased the likelihood that these people would purchase its product.

208.     JLI marketed its products extensively in convenience stores, employing video and product displays with bright colors and young adults using and displaying the JUUL device. The retail marketing worked and by late-2017 JUUL became the most popular e-cigarette sold in convenience stores according to Nielsen data.

209.     Like all in-store cigarette advertising, JLI's point of sale materials played a major role in driving youth addiction. JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the JUUL store locator and offering discounts. And JLI actively encouraged its retailers to leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

**F.    JLI Hosted Parties to Create a Youthful Brand and Gave
Away Free Products to Get New Consumers Hooked.**

210.    JLI sponsored at least twenty-five live social events for its products in California,
Florida, New York and Nevada. The invitations to JUUL's events did not indicate that the JUUL
was intended for cigarette smokers, contained nicotine, or was addictive. Instead, the invitations
traded on PAX Lab, Inc.'s reputation as a manufacturer of marijuana vaporizers and promised
attendees "free #JUUL starter kit[s]," live music, or slumber parties. Photographs from these
events indicate that they drew a youthful crowd. Product promotion through sponsored events
was a long-standing practice for cigarette companies, but is now prohibited.[109]

211.    At these live social events, JLI gave attendees free JUUL "Starter Kits," which
contain a JUUL device and 4 JUUL pods of various flavors. JLI gave away samples at music
events without age restrictions, including Outside Lands in San Francisco's Golden Gate Park.
JLI also held sampling events in stores. Giving away free samples is prohibited conduct for a
cigarette company under the Master Settlement Agreement.

212.    JLI further recruited young "brand ambassadors" to staff these events and
required a dress code that included skinny jeans, high-top sneakers or booties, and an iPhone in a
JUUL-branded case.[110]

213.    The effect—and purpose—of JLI's Vaporized giveaways was to flood major
cities with products that would hook thousands of new users, and to generate buzz for the brand
among urban trendsetters who would then spread JLI's message to their friends via word of
mouth and social media.

---

[109] *See* Appendix 1 at Image 16.
[110] *See* Appendix 1 at Image 17.

G.   **The MANAGEMENT DEFENDANTS Directed And Participated In The Youth Marketing Schemes.**

1.   **The MANAGEMENT DEFENDANTS, And In Particular BOWEN, MONSEES, PRITZKER, HUH, And VALANI, Oversaw The Youth Marketing Scheme.**

214.   The MANAGEMENT DEFENDANTS were well aware that JUUL branding was oriented toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine.[111]

215.   After launch, executives and directors discussed whether to rein in the advertising. That decision was rejected. Youth sales were a large potential source of revenue.

216.   As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people had no problem with 500 percent year-over-year growth." And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.[112]

217.   As efforts increased to crack-down on DEFENDANTS' blatant targeting of underage consumers, DEFENDANTS reoriented JUUL advertising from the explicitly youth-oriented Vaporized campaign to a more subtle approach to appeal to the young. The advertising's key themes continued to include pleasure/relaxation, socialization/romance, and flavors—all of which still appealed to teenagers.

218.   The MANAGEMENT DEFENDANTS continued to direct and approve misleading marketing campaigns long after launch. For example, JLI deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns and ads cross-promoting mango

---

[111] *See* Appendix 1 at Image 18.
[112] Kirkham, *supra*.

and mint. Through their positions on the JLI Board of Directors, the MANAGEMENT

DEFENDANTS were directly responsible for this marketing, as they had "final say" over all of

JLI's marketing activities. In other words, JLI and the MANAGEMENT DEFENDANTS

controlled the messaging around JUUL products.

219.    Notably, none of JLI's early advertisements, including those of the "Vaporized"

campaign and others targeted to youths, disclosed health risks from consuming JUUL products

or that JUUL contains high amounts of nicotine; indeed, those advertisements did not advertise

JUUL's nicotine content whatsoever.

220.    JLI and the MANAGEMENT DEFENDANTS knew of course that JUUL

contained an ultra-high concentration of nicotine, and that ultra-high concentration of nicotine

was designed to addict. They also knew that e-cigarette products, including JUUL, would expose

users to increased health risks, including risks to their lungs and cardiovascular system. Despite

that knowledge, JLI and the MANAGEMENT DEFENDANTS took affirmative actions, the

natural consequence of which was the approval and transmission of these false and misleading

> **2.    PRITZKER, HUH, And VALANI Were Able to Direct
> and Participate in the Youth Marketing Because They
> Seized Control of the JLI Board of Directors.**

221.    Although BOWEN and MONSEES were the visionaries behind JLI and the most

hands-on in its early stages, by the time JLI was pushing its marketing campaigns in early-to

mid-2015, JLI (through the individuals running the company), BOWEN, MONSEES,

PRITZKER, HUH, and VALANI were each intimately involved in the planning and execution of

activities.

222.    At the same time the MANAGEMENT DEFENDANTS had approved the early

JLI marketing campaigns that were intentionally targeting youth, the MANAGEMENT

DEFENDANTS were planning a fundamental shift in roles to allow PRITZKER, HUH, and

VALANI to take charge of the instrumentalities of JLI, including its employees and resources.

223.    Specifically, in October 2015, MONSEES stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, PRITZKER, HUH, and VALANI formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL products, including to youth. The MANAGEMENT DEFENDANTS, and in particular HUH, wanted to continue their fraudulent marketing, knowing that these ads were also targeted to youth, arguing the company could not be blamed for youth nicotine addiction.

224.    Over the next year, until the installation of a new CEO in August 2016 Defendants PRITZKER, HUH, and VALANI endeavored to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They cleaned house at JLI by firing senior leaders and effectively taking control of the company. Despite any potential internal misgivings about their fraudulent conduct, notably, none of MANAGEMENT DEFENDANTS terminated their relationship with JLI during this time period.

> **H.    JLI and the MANAGEMENT DEFENDANTS Knew Their Efforts Were Wildly Successful in Building a Youth Market and Took Coordinated Action to Ensure That Youth Could Purchase JUUL Products.**
>
> **1.    JLI's Strategy Worked.**

225.    The MANAGEMENT DEFENDANTS knew that the JUUL marketing campaigns they directed and approved were successful in targeting youth. As Reuters has reported, "the first signs that JUUL had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where they could buy more JUULs, along with the cartridge-like disposable 'pods' that contain the

liquid nicotine."[113]

226.   After the Vaporized campaign, retail stores began selling out of JUUL products and JLI had a difficult time trying to meet demand coming from its online ordering platform.

227.   At JLI, it was common knowledge that JUULs were being sold to children.

### 2.   JLI Closely Tracked Its Progress in Reaching Young Customers through Social Media and Online Marketing.

228.   Tracking the behaviors and preferences of youth under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products. Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers.

229.   While traditional approaches to youth tracking (e.g., interviews conducted face-to-face or over the telephone) were difficult in years past, modern technology has removed many of those hurdles. With e-mail, social media and online forums, JLI can track and JLI has consistently tracked and monitored its target youth market, often surreptitiously.

230.   Using the tools available to them, JLI would have known that its viral marketing program was a resounding success, and in particular with young people.

231.   Between 2015 and 2017, JUUL-related posts on Twitter increased exponentially, which is the exact result to be expected from an effective viral marketing campaign. Its growth on Instagram was likely even more rapid.

232.   A 2018 study of JLI's sales and presence on social media platforms found that JLI grew nearly 700%, yet spent "no recorded money" in the first half of 2017 on major advertising

---

[113] "Juul disregarded early evidence it was hooking teens," REUTERS
https://www.reuters.com/investigates/special-report/juul-ecigarette/ (accessed June 25, 2021).

channels, and spent only $20,000 on business-to-business advertising.[114] The study also found

JUUL products being marketed across platforms in an apparently coordinated fashion, including

smaller targeted campaigns and affiliate marketing, all of which caused the authors to question

whether JLI was paying for positive reviews and JUUL-related social media content.

233.    A 2019 study found that as much as half of JUUL's Twitter followers were aged

thirteen to seventeen.[115]

234.    By April 2018, searching "JUUL" on YouTube yielded 137,000 videos with

forty-three videos having over 100,000 views. Of these, a huge number were plainly related to

underage use, including: 1,730 videos on "hiding JUUL in school," on "JUUL in school

bathroom," and on "hiding JUUL at home."

235.    In 2018, JLI was internally collecting hundreds of social media posts—directed at

JLI—informing them of their wild popularity with young people and in many cases requesting

that they do something to stop it.

> I.    **JLI Utilized a Traditional Gatekeeping Technologies for Screening Underage Users to Instead Build, Utilize, and Further Market to an Internal Database of Youth Consumers.**

236.    JLI, ALTRIA, and the MANAGEMENT DEFENDANTS coordinated internally

and with outside vendors to manipulate traditional age-gatekeeping internet technology to

affirmatively target underage consumers.

237.    First, DEFENDANTS loosened restrictions on its websites to allow virtually

anyone, including virtually all underage individuals, to pass age-testing processes which are

---

[114] Jidong Huang et al., Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market, Tob Control (May 31, 2018),
[115] Steven Reinberg, Study: Half of Juul's Twitter followers are teens, young adults, United Press International HealthDay News, (May 20, 2019, 5:31 PM)
https://www.upi.com/Health_News/2019/05/20/Study-Half-of-Juuls-Twitter-followers-are-teens-young-adults/1981558384957/.

traditionally designed to prevent underage users from accessing restricted web content. Despite these alterations, DEFENDANTS' websites continued to misleadingly give the appearance that it had appropriate age restrictions to prevent underage users from accessing content.

238.    Second, JLI utilized data from underage users it knew should have been denied access to its website to build a marketing e-mail list, a data set that would prove highly valuable to ALTRIA.

239.    In the summer of 2017, JLI engaged a company called Tower Data to determine the ages of the persons associated with e-mail addresses on its e-mail marketing list. According to this analysis, approximately 269,000 e-mail addresses on JLI's e-mail marketing list were not associated with a record of an individual who had "passed" JLI's age verification process. Additionally, approximately 40,000 e-mail addresses on JLI's e-mail marketing list were associated with records of individuals who had "failed" JLI's own age verification process. Tower Data informed JLI that 83% of the approximately 420,000 e-mail addresses on JLI's marketing list could not be matched with the record of an individual at least eighteen years of age.[116]

240.    Despite knowing that their marketing list included minors, JLI continued to use that marketing list to sell JUUL products, and then shared that list with ALTRIA to use for its marketing purposes.

J.      **JLI Engaged in a Sham "Youth Prevention" Campaign.**

241.    By April 2017, JLI had determined that the publicity around its marketing to children was a problem. While ostensibly aimed at reducing youth sales, JLI's youth prevention

---

[116] Janice Tan logo, E-cigarette firm JUUL sued for using programmatic buying to target adolescents, Marketing (Feb. 14, 2020), https://www.marketing-interactive.com/e-cigarette-firm-juul-sued-for-using-programmatic-buying-to-target-adolescents.

program actually served to increase, not reduce, sales to children.

242.     JLI paid schools for access to their students during school time, in summer
school, and during a Saturday School Program that was billed as "an alternative to 'traditional
discipline' for children caught using e-cigarettes in school."[117] JLI created the curriculum for
these programs, and, like the "Think Don't Smoke" campaign by PHILIP MORRIS, which
"insidiously encourage[d] kids to use tobacco and become addicted Philip Morris
customers[,]"[118] JLI's programs were shams intended to encourage youth vaping, not curb it.
According to testimony before Congress, during at least one presentation, "[n]o parents or
teachers were in the room, and JUUL's messaging was that the product was 'totally safe.' The
presenter even demonstrated to the kids how to use a JUUL." Furthermore, JLI "provided the
children snacks" and "collect[ed] student information from the sessions." [119]

### K.     The FDA Warned JUUL and Others That Their Conduct is Unlawful.

243.     Throughout 2018, FDA put JLI and others in the e-cigarette industry on notice
that their practices of marketing to minors needed to stop. It issued a series of Warnings Letters
and enforcement actions:

244.     On February 24, 2018, the FDA sent a letter to JLI expressing concern about the
popularity of its products among youth and demanding that JLI produce documents regarding its
marketing practices.[120]

---

[117] Subcommittee on Economic and Consumer Policy Memo (July 25, 2019),
oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[118] William V. Corr, American Legacy Foundation Study Shows Philip Morris 'Think Don't
Smoke' Youth Anti-Smoking Campaign is a Sham, Campaign for Tobacco Free Kids (May 29,
2002), https://www.tobaccofreekids.org/press-releases/id_0499.
[119] Subcommittee on Economic and Consumer Policy Memo, *supra*.
[120] Matthew Holman, Letter from Director of Office of Science, Center for Tobacco Products, to
Zaid Rouag, at JUUL Labs, Inc., U.S. Food & Drug Admin. (Apr. 24, 2018),
https://www.fda.gov/media/112339/download.

245.    In April 2018, the FDA conducted an undercover enforcement effort, which resulted in fifty-six warning letters issued to online retailers, and six civil money complaints to retail establishments, all of which were related to the illegal sale of e-cigarettes to minors. Manufacturers such as JLI were also sent letters requesting documents regarding their marketing and sales methods.[121]

246.    In May 2018, the FDA again issued more warning letters to manufacturers, distributors, and retailers of e-liquids for labeling and advertising violations; these labels and advertisements targeted children and resembled children's food items such as candy or cookies.

247.    In September 2018, the FDA engaged in several other regulatory enforcement actions, issuing over 1300 warning letters and civil money complaints to e-cigarette and e-liquid retailers and distributors. On September 12, 2018, the FDA sent letters to JLI and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[122] The FDA additionally requested manufacturers to enhance their compliance monitoring mechanisms, implement stricter age verification methods, and limit quantities and volume of e-cigarette products that could be purchased at a time.

248.    Finally, in October 2018, the FDA raided JLI's headquarters and seized more than a thousand documents relating to JLI's sales and marketing practices.[123]

249.    Siddharth Breja, who was senior vice president for global finance at JLI, "claims

---

[121] Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization, U.S. Food & Drug Admin. (Jan. 2020), https://www.fda.gov/media/133880/download.
[122] Letter from U.S. FDA to Kevin Burns, U.S. Food & Drug Admin. (Sept. 12, 2018), https://www.fda.gov/media/119669/download
[123] Laurie McGinley, FDA Seizes Juul E-Cigarette Documents in Surprise Inspection of Headquarters, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documentssurprise-inspection-headquarters/.

that after the F.D.A. raided Juul headquarters in October 2018, seeking internal documents, Mr. Burns instructed Mr. Breja and other executives not to put anything relating to regulatory or safety issues in writing, so that the F.D.A. could not get them in the future."[124]

**L.    In Response to Regulatory Scrutiny, DEFENDANTS Misled the Public, Regulators, and Congress that JLI Did Not Target Youth.**

250.    To shield their youth-driven success from scrutiny, ALTRIA, JLI, and the MANAGEMENT DEFENDANTS' had a long-running strategy to feign ignorance over JLI and the MANAGEMENT DEFENDANTS' youth marketing efforts and youth access to JLI's products. They were well aware that JLI's conduct in targeting underage users was reprehensible and unlawful, and that if it became widely known that this was how JLI obtained its massive market share, there would be public outcry and calls for stricter regulation or a ban on JLI's products.

251.    Given the increasing public and regulatory scrutiny of JLI's market share and marketing tactics, a dis-information campaign was urgently needed to protect the DEFENDANTS' bottom line. For this reason, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA hid JLI's conduct by vociferously denying that JLI had marketed to and targeted youth and instead claiming to engage in youth prevention. DEFENDANTS continued to make these statements while and after actively and successfully trying to market to and recruit youth non-smokers. These false statements were designed to protect JLI's market share, and ALTRIA's investment, by concealing JLI's misconduct.

252.    For example, after 11 Senators sent a letter to JLI questioning its marketing

---

[124] Sheila Kaplan and Jan Hoffman, Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html.

approach and kid-friendly e-cigarette flavors like fruit medley, creme brulee and mango, JLI visited Capitol Hill and told senators that it never intended its products to appeal to kids and did not realize they were using the products. JLI's statements to Congress—which parallel similar protests of innocence by tobacco company executives—were false.

253.    JLI also engaged in fraud when it made public statements in media interviews and press releases seeking to disavow the notion that it had targeted and sought to addict teens.

254.    As the JLI Board of Directors had "final say" over all of JLI's marketing efforts, these statements regarding JLI's marketing efforts can be imputed to the MANAGEMENT DEFENDANTS, who were therefore directly responsible for the messaging over the marketing of JUUL products.

255.    However, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA realized that attempting to shift public opinion through fraudulent statements was not enough to achieve their goal of staving off regulation. To accomplish this goal, they would also need to deceive the FDA and Congress. And so they set out to do just that through

256.    Each of the following statements constitutes an act of fraud. JLI, MONSEES, and ALTRIA made these statements, with the intent to deceive the public, the FDA, and Congress as to the DEFENDANTS' true intentions of hooking underage users:

**JLI Public Statements:**

257.    "It's a really, really important issue. We don't want kids using our products." (CNBC Interview of JLI's Chief Administrative Officer, December 14, 2017).[125]

258.    "We market our products responsibly, following strict guidelines to have material

---

[125] Angelica LaVito, Nearly one-quarter of teens are using pot, CNBC (Dec. 14, 2017), https://www.cnbc.com/2017/12/13/marijuana-and-nicotine-vaping-popular-among-teens-according-to-study.html (Interview with Ashely Gould, JUUL Chief Administrative Officer).

directly exclusively toward adult smokers and never to youth audiences." (JLI Social Media Post, March 14, 2018).[126]

259.    "Of course, we understand that parents and lawmakers are concerned about underage use of JUUL. As are we. We can't restate this enough. As an independent company that is not big tobacco, we are driven by our mission and commitment to adult smokers." (JLI CEO Kevin Burns Letter to JUUL Community on Reddit, July 18, 2018).[127]

260.    "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . Our intent was never to have youth use JUUL products." (JLI Website, November 12, 2018).[128]

261.    "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018).[129]

262.    "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the

---

[126] Robert K. Jackler et al., JUUL Advertising Over Its First Three Years on the Market, Stanford Research Into the Impact of Tobacco Advertising (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (citing a JUUL social media post from Mar. 14, 2018).
[127] A Letter to the JUUL Community from CEO Kevin Burns (July 18, 2018), Reddit, https://www.reddit.com/r/juul/comments/8zvlbh/a_letter_to_the_juul_community_from_ceo_ke vin/.
[128] JUUL Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of Ken Burns, former CEO of JUUL).
[129] *Id.*

challenges they're going through." (CNBC Interview of JLI CEO, July 13, 2019).[130]

263.    "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." (JLI Website, August 29, 2019).[131]

### JAMES MONSEES Public Statements:

264.    Selling JUUL products to youth is "antithetical to the company's mission." (JAMES MONSEES' Statement to New York Times, August 27, 2019)[132]

265.    "We have never marketed to youth and we never will." (JLI Statement to Los Angeles Times, September 24, 2019).[133]

266.    "As scientists, product designers and engineers, we believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. Our goal is to maximize the positive and reduce the negative." (JLI Website, March 6, 2020).[134]

### JLI Statements to FDA:

267.    "JUUL was not designed for youth, nor has any marketing or research effort since

---

[130] Angelica LaVito, As JLI grapples with teen vaping 'epidemic,' CEO tells parent 'I'm sorry', CNBC (July 13, 2019), https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html.

[131] Our Actions to Combat Underage Use, JUUL Labs, Inc. (Aug. 29, 2019), https://newsroom.juul.com/ouractions-to-combat-underage-use/ (JUUL statement in response to lawsuits).

[132] Matt Richtel & Sheila Kaplan, Did Juul Lure Teenagers and Get 'Customers for Life'?, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teenmarketing.html.

[133] Michael Hiltzik, Column: Studies show how JLI exploited social media to get teens to start vaping, L.A. Times (Sept. 24, 2019), https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens (statement made on behalf of JUUL).

[134] Our Mission, JUUL Labs, Inc. (2019), https://www.juul.com/mission-values

the product's inception been targeted to youth." (Letter to FDA, June 15, 2018).[135]

268.    "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." (Letter to FDA, June 15, 2018).[136]

**ALTRIA Statements to the FDA:**

269.    "[W]e do not believe we have a current issue with youth access to or use of our pod-based products, we do not want to risk contributing to the issue." (Letter from ALTRIA CEO to FDA Commissioner Scott Gottlieb, October 25, 2018).[137]

270.    "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." (Letter to FDA Commissioner Gottlieb, 10/25/18)[138]

**JLI Statements to Congress:**

271.    "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage use." (Testimony of JAMES MONSEES, July 25, 2019).[139]

272.    "Our product is intended to help smokers stop smoking combustible cigarettes." (Ashley Gould, JLI Chief Administrative Officer, Testimony before House Committee on

---

[135] Letter from JUUL's Counsel at Sidley Austin to Dr. Matthew Holman, FDA at 2 (June 15, 2018).
[136] *Id.* at 3.
[137] Letter from Howard A. Willard III, ALTRIA's Chairman and Chief Executive Officer to Scott Gottlieb, M.D., Commissioner, U.S. FDA (Oct. 25, 2018).
[138] *Id.*
[139] Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy, 116th Cong. 1 (2019) (statement of James MONSEES, Co-Founder, JUUL Labs, Inc.)., https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-MONSEESJ-20190725.pdf.

Oversight and Reform, July 25, 2019).[140]

**ALTRIA Statements to Congress:**

273.    "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." (Letter from ALTRIA CEO to Senator Durbin, October 14, 2019).[141]

*    *    *    *

274.    This disinformation scheme was successful. While certain groups such as the American Medical Association were calling for a "sweeping ban on vaping products," no such ban has been implemented to date. Accordingly, JLI's highly addictive products remain on the market and available to underage users.

275.    ALTRIA Provided Services to JLI to Expand JUUL Sales and Maintain JUUL's Position as the Dominant E-Cigarette.

**M.    Before ALTRIA'S Investment in JLI, ALTRIA and JLI Exchanged Market Information Pertaining to Key Decisions.**

276.    In late 2017, ALTRIA purchased a minority interest in Avail Vapor ("Avail"), a chain of high-end vape stores, and JLI entered a distributor agreement with that same chain of

---

[140] Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy, 116th Cong. (2019) (statement of Ashley Gould, Chief Administrative Officer, JUUL Labs, Inc.), https://www.cspan.org/video/?462992-1/hearing-cigarettes-teen-usage-day-2&start=6431 (beginning at 01:53:25).
[141] Letter from Howard Willard III, ALTRIA's Chairman and Chief Executive Officer to Senator Richard Durbin, et. al. (Oct. 14, 2019).

stores.

277.    Through its investment in Avail, ALTRIA had access to sales data for JUUL products long before the companies exchanged diligence in connection with ALTRIA's investment in JLI. Although JLI represented to Congress that "[JLI's] data [from Avail] was not available to ALTRIA,"[142] statements in a ALTRIA's 2019 letter to Congress suggest otherwise.

278.    In that letter, ALTRIA admitted that it possessed JUUL sales data that corresponds to the very same time period in which JLI began selling its products at Avail stores, starting in late 2017.[143] That sales data showed that JLI was dominating the e-cigarette market during this time period. At that time, sales of ALTRIA's own e-cigarettes trailed behind JUUL in market share. ALTRIA sought to grow JLI's market dominance and young customer base. JLI, in the regulatory crosshairs, needed ALTRIA's experience and its influence in Washington.

279.    ALTRIA recognized that JLI had, against the backdrop of steadily declining cigarette sales, created the right product to addict a new generation to nicotine. JLI faced existential threats, however, from regulatory and congressional scrutiny, and public outrage over the growing vaping epidemic.

280.    JLI, ALTRIA, and the MANAGEMENT DEFENDANTS thus began to coordinate their activities in 2017 through Avail Vapor. This back-channel, and the information it provided ALTRIA, allowed ALTRIA to take actions to benefit itself, JLI, and the MANAGEMENT DEFENDANTS without drawing the scrutiny of the public and regulators that they knew would inevitably follow a formal announcement of a partnership between JLI and

---

[142] Examining Juul's Role in the Youth Nicotine Epidemic, Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy, 116th Cong. 28 (2019) (Responses of JUUL Labs, Inc. to Questions for the Record).
[143] Willard Oct. 14, 2019 letter, *supra*.

ALTRIA.

### N.   JLI, the MANAGEMENT DEFENDANTS and ALTRIA Coordinated to Market JUUL in Highly-Visible Retail Locations.

281.    JLI, the MANAGEMENT DEFENDANTS, and ALTRIA's coordination continued in other ways throughout 2018 as they prepared for ALTRIA's investment in JLI.

282.    A key aspect of this early coordination was ALTRIA's acquisition of shelf-space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products. By acquiring shelf space, ALTRIA took steps to ensure that JUUL products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.

283.     ALTRIA's investment was not for its own e-cigarette products. ALTRIA spent approximately $100 million in 2018 to secure shelf-space at retailers for e- cigarette products—purportedly for the MarkTen e-cigarette that ALTRIA stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small scale.

284.    ALTRIA's payments for shelf space were a mixture of "cash and display fixtures in exchange for a commitment that its e-cigarettes would occupy prime shelf space for at least two years."[144] In reality, this shelf-space was intended for JLI's JUUL products.

285.    ALTRIA's purchase of shelf space in 2018 and its subsequent provision of that space to JLI shows how ALTRIA, JLI, and the MANAGEMENT DEFENDANTS were coordinating even before ALTRIA announced its investment in JLI. ALTRIA's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising,

---

[144] Jennifer Maloney & John McKinnon, ALTRIA-JLI Deal Is Stuck in Antitrust Review, Wall St. J. (Jan. 17, 2020), https://www.wsj.com/articles/ALTRIA-juul-deal-is-stuck-in-antitrust-review-11579257002.

JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them -- retail establishments.

<strong>O.    ALTRIA Contributes to the Success of JLI's and the MANAGEMENT DEFENDANTS' Scheme Through a Range of Coordinated Activities.</strong>

286.    While JLI and ALTRIA remain separate corporate entities in name, following its equity investment in JLI, ALTRIA and JLI forged even greater significant, systemic links – i.e., shared leadership, contractual relationships, financial ties, and continuing coordination of activities.

287.    In 2019, two key ALTRIA executives became JLI's CEO and head of regulatory affairs, respectively.

288.    K.C. Crosthwaite, who was president of ALTRIA Client Services when the company carried out a study that would later be used by ALTRIA to shield JUUL's mint pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was ALTRIA's chief growth officer.

289.    Joe Murillo, who launched the MarkTen line at ALTRIA and more recently headed regulatory affairs for ALTRIA, is now JLI's chief regulatory officer.561 A 24-year career ALTRIA executive, Murillo previously ran ALTRIA's e-cigarette business, Nu Mark, before ALTRIA pulled its products from the market following its JLI deal.

290.    In addition to its effective takeover of JLI, ALTRIA provides services to JLI in furtherance of their common goal of expanding the number of nicotine-addicted e-cigarette users, in the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs." These services include, among other things:

         a.      "Piloting a distribution program to provide long haul freight, warehouse

storage and last mile freight services."

b.      "Making available [ALTRIA's] previously contracted shelf space with

certain retailers," thus allowing JUUL products to receive prominent placement

alongside a top-rated brand of combustible cigarettes, Marlboro, favored by

youth.

c.      "Executing direct mail and email campaigns and related activities . . . ."

d.      "Leveraging ALTRIA's field sales force to . . . provide services such as

limited initiative selling, hanging signs, light product merchandising, and surveys

of a subset of the retail stores that ALTRIA calls upon."

e.      "Providing regulatory affairs consulting and related services to [JUUL] as

it prepares its PMTA application."[145]

291.    ALTRIA also worked with JLI to cross-market JUUL and Marlboro cigarettes.

For example, ALTRIA offered coupons for JUUL starter kits inside packs of Marlboro

cigarettes.[146]

292.    ALTRIA's investment in JLI was not only a financial contribution; rather, it was

an important aspect of JLI, ALTRIA, and the MANAGEMENT DEFENDANTS' plan to

continue growing the user base, stave off regulation, and keep JLI's most potent and popular

products on the market and available to kids and the public at large. ALTRIA is and was working

to actively help expand sales of JLI's products. ALTRIA's investment brings legal and

regulatory benefits to JLI, by helping with patent infringement battles and consumer health

claims and helping to navigate the regulatory waters and FDA pressure.

---

[145] Williard Oct. 14, 2019 letter, *supra*.
[146] Reddit, Points for us! https://www.reddit.com/r/juul/comments/d50jku/points_for_us/; see Appendix 1 at Image 19.

293.     ALTRIA also brings lobbying muscle to the table, which has played an important role in JLI, ALTRIA, and the MANAGEMENT DEFENDANTS' scheme of staving off regulation by preventing new federal or state legislation targeting JUUL or the e-cigarette category more broadly. ALTRIA "has a potent lobbying network in Washington [D.C.] and around the country."[147] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where ALTRIA ends and JLI begins."[148] While an ALTRIA spokesman has denied that there was any contractual services agreement for lobbying between JLI and ALTRIA, he admitted that he did not know what informal advice and conversations ALTRIA has had with JLI about lobbying efforts.

VI.     **ALTRIA Knew JLI was Targeting Youth and, Together with the Management DEFENDANTS, Exercised Control Over JLI to Protect and Expand Youth Sales and Defraud The Public About Their Actions.**

A.     **Before ALTRIA's Investment in JLI, ALTRIA Knew JLI Was Targeting Youth.**

295.     ALTRIA was directly informed as early as 2015 that a youth addiction crisis was on the horizon.  In a February 26, 2015 letter, the National Association of Attorneys General wrote to Denise Keane, ALTRIA's then-Executive Vice President and General Counsel, regarding the "rapidly increasing use of electronic cigarettes by our youth."[149]  The letter highlighted three primary concerns: (1) that a "significant number of youth may become addicted to nicotine by using electronic cigarettes"; (2) that studies indicated youth use of e-cigarettes may be associated with other serious physical dangers; and (3) that shifts in youth preference for

---

[147] Shelia Kaplan, In Washington, JLI Vows to Curb Youth Vaping. Its Lobbying in States Runs Counter to That Pledge., N.Y. Times (Apr. 28, 2019), https://www.nytimes.com/2019/04/28/health/juul-lobbying-statesecigarettes.html.
[148] Id.
[149] ALGAT0000088472.

and us of e-cigarettes coincided with "an explosion in marketing and advertising" of the products.[150]

296.    As stated above, according to Howard Willard, ALTRIA first contacted JLI about a commercial relationship in early 2017, with "confidential discussions" spearheaded by PRITZKER and VALANI, on the one hand, and senior executives of ALTRIA and Altria Client Services LLC on the other, beginning in the Spring of 2017.[151]  These continued for eighteen months, culminating in ALTRIA's December 2018 equity investment in JLI.

297.    While at first blush, these meetings between ALTRIA and Altria Client Services LLC and PRITZKER and VALANI about potential investment—described in detail below— might seem like ordinary business activity, they were anything but. For nearly 18 months, ALTRIA and Altria Client Services dangled the carrot of a multi-billion dollar payout in front of PRITZKER and VALANI—months in which PRITZKER, VALANI, and the other MANAGEMENT DEFENDANTS committed numerous acts of fraud to grow the business of JLI in order to satisfy ALTRIA's expectations. And at the same time, ALTRIA and Altria Client Services were actively courting PRITZKER and VALANI with that promised payout, they were gathering information on JLI that confirmed ALTRIA would be purchasing a company with a proven track-record of sales to youths.

298.    Even before 2017, ALTRIA and Altria Client Services—as with anyone paying attention to the e-vapor industry at the time—were well aware that JLI had been targeting kids with its youthful marketing. As noted above, JLI's "Vaporized" campaign had made its way into the national zeitgeist, with Stephen Colbert noting that the advertising appealed "to the youths."

---

[150] *Id.*
[151] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

So, not only did ALTRIA and Altria Client Services know JLI was targeting kids at the time it reached out to begin negotiations, it also knew that such targeting was highly successful. A May 23, 2017 presentation by Altria Client Services observed that "[l]ines outside of vape shops and/or calls to vape shops regarding stock [of JUUL] are common" and that JLI's sales revenue was growing at an exponential rate.[152]

299.    In November 2017, ALTRIA's e-cigarette subsidiary Nu Mark hired Brand Riffs, a market research agency, to conduct an "Exploratory Qualitative Research Report" on JUUL products.[153]  The report, which focused on users age 21-54, concluded that many study respondents started using JUUL not by purchasing a JUUL product themselves, but by using a friend's.[154]  It also found that most respondents were "immediately drawn to JUUL" because of "two design motivations:" its "discreetness" and "simple, sleek, aesthetic," which enabled users to "vape at work or in other places where vaping/smoking was less likely to be approved behavior."[155]

300.    And beginning no later than January 2018, ALTRIA received explicit warnings about the youth appeal of the JUUL product. During a January 3, 2018 meeting between David Wise, Steven Schroeder, and Zane Underwood of Altria (Underwood was in communication with KC Crosthwaite at the time) and Avail Vapor[156] CEO James Xu and Avail Vapor scientists at ALTRIA's Headquarters—specifically, in the "Library" conference room—the Altria representatives requested granular data that Avail had on the sale of JUUL and JUUL pods. The

---

[152] ALGAT0002412177.
[153] ALGAT0003012781.
[154] *Id.*
[155] *Id.*
[156] As discussed below, JLI had a partnership with Avail Vapor in which Avail gathered detailed data on the sale of JUUL products. Also discussed below, ALTRIA was a minority owner of Avail at the time.

ALTRIA representatives asked for, and Avail's representatives provided, data on the number of sales of certain flavor pods, purchasing patterns, and the demographics of JUUL users. With regard to the demographics of JUUL users, the Avail representatives showed the ALTRIA representatives a ski slope diagram indicating that the vast majority of JUUL purchasers at Avail stores were 18 or 19 years old.

301.     James Xu of Avail Vapor, who was intimately familiar with JUUL sales and tracked data related to such sales closely, repeatedly warned ALTRIA executives of the youth appeal of JUUL. And in November 2018, Xu presented the demographics data on JUUL directly to KC Crosthwaite (and David Wise), thus providing further evidence that ALTRIA and Altria Client Services knew of JLI's role in the youth vaping epidemic prior to ALTRIA's investment in JLI.

302.     On July 31, 2018, ALTRIA had an internal discussion about "consumer focus insights."[157]  The associated presentation summarized data collected by the Adult Tobacco Consumer Tracker, specifically highlighting that young adult vapers ages 19-29 were responsible for the market's growth, while all other age groups had experienced a decline.[158] The concluding slide made the message preceding data abundantly clear: "Key Takeaways: Category is expending [sic]; young adult [sic] are driving the growth."[159]

303.     Notwithstanding their own observations about JUUL's success with a young demographic, the data ALTRIA received from Avail which concerned the same, and Xu's repeated warnings, ALTRIA and Altria Client Services aggressively pursued a deal with PRITZKER and VALANI throughout 2018. Thus, for ALTRIA and Altria Client Services, the

---

[157] ALGAT0003359749.
[158] *Id.*
[159] *Id.*

large youth make-up of JLI's market share was a feature—not a flaw—of the company that it

sought to acquire. It is no surprise then that, even in the face of these warnings and knowledge,

Altria continued to aggressively pursue an investment or potential acquisition of JLI.

### B.   ALTRIA Worked with PRITZKER and VALANI to Secure Control of JLI and to Exploit JLI for Their Mutual Benefit.

304.   The initial discussions between ALTRIA (and Altria Client Services) and JLI's

leadership began no later than the week of April 16, 2017 when JLI's then-CEO Tyler Goldman

and Defendant JAMES MONSEES met with Steven Schroder, David Wise, and K.C.

Crosthwaite of Altria Client Services in San Francisco. Crosthwaite, who would later become

CEO of JLI, was at the time the Vice President of Strategy and Business Development for Altria

Client Services. Goldman spoke again with Schroeder, Crosthwaite and Wise on April 27, 2017

to discuss "preliminary thoughts on potential ways to work together."[160]

305.   Internal documents from the time show that ALTRIA was eyeing JLI as an

acquisition target. A May 23, 2017 presentation prepared by Altria Client Services for AGI titled

"Project Mule: Review of E-vapor Closed-System Opportunities" identified JLI (then PAXLabs)

as one of two "Potentially Attractive Options."[161] Among the attractive features of JLI was that

JUUL had "early market success," had "projected sales to reach ~$300 million at year-end

2017." But ALTRIA knew that aggressive growth would be necessary, writing that "[g]enerating

an attractive return would require consistently strong EBITDA growth." The presentation also

viewed as attractive features that JLI offered "mint, berry, tobacco, and cream varieties" with

"[i]ndications of additional flavor pods in potential pipeline," and that there "[l]ines outside of

vape shops and/or calls to vape shops regarding stock are common." The presentation also

---

[160] JLI01369848.
[161] ALGAT0002412177.

revealed that ALTRIA (through an unidentified subsidiary, though likely Altria Client Services) had tested "all five flavors" of JUUL pods and was aware of the amount of "[n]icotine per puff" in a JUUL pod. Altria Client Services' conclusions about the popularity of JUUL were consistent with the narrative JLI was presenting to potential investors. JLI's pitch deck to investors at the time boasted that "Viral Marketing Wins," and that JUUL's super potent nicotine formulation was "cornering" the consumables market with the highest customer retention rate of any e-cigarette.[162]

306.    In a May 31, 2017 presentation prepared by Altria Client Services titled "Closed Tank for AS Analysis," Altria Client Services stated that "Nu Mark [a subsidiary of Altria Group, Inc.] and S&BD [a division of Altria Client Services] have engaged in discussions with Pax Labs (Juul) . . . regarding a potential transaction."[163] Altria Client Services noted that it was seeking "a meeting of senior management of both firms in the next few weeks to explore potential interest in a transaction." Notably, to Altria Client Services, the "senior management" of JLI was interchangeable with DEFENDANTS PRITZKER and VALANI, as later in the same presentation Altria Client Services stated that it was "[s]eeking a meeting between Altria management and Pax lead investors to discuss deal interest."

307.    From the very beginning of their negotiations, it was clear to ALTRIA and Altria Client Services that they were operating within a closing window in which JLI's sales to youths could continue unabated. In this same May 23, 2017 presentation, Altria Client Services focused on the "significant risk" of unfavorable regulations to "this rapidly growing product segment" given that no PMTAs had been granted for closed-pod products.[164] And as set forth below,

---

[162] INREJUUL_00349529.
[163] ALGAT0002412181.
[164] *Id.*

ALTRIA and Altria Client Services were well aware of the public scrutiny of JLI's youth marketing efforts, which could only lead to unfavorable regulatory action. ALTRIA and Altria Client Services had to convince PRITZKER and VALANI to let ALTRIA acquire or buy into JLI before it was too late.

308.    In a June 2017 internal presentation prepared by Altria Client Services in anticipation of the meeting with PRITZKER and VALANI on a potential deal involving a minority stake in JLI with a call option (i.e., the ability to acquire JLI at a later date), which ALTRIA had codenamed "Project Tree," Altria Client Services identified PRITZKER and VALANI as "control[ling] majority of voting power [of JLI] and 44% of economic interests." Altria Client Services' stated goal was to "build relationship/rapport" with PRITZKER and VALANI at their first meeting and to convey "Altria's strengths and potential strategic contributions," which included "[e]xpertise building premium and iconic brands," a "[b]est in class distribution and sales force," "[e]xperience and resources to navigate a complex [regulatory] environment," "[r]esources to navigate and respond to evolving [government affairs] landscape," and a "[s]trategic relationship with Philip Morris international."[165] More important, though, is that the presentation made clear that ALTRIA and Altria Client Services sought to appeal to PRITZKER and VALANI's personal interest as investors, and not just the contributions that ALTRIA and its subsidiaries could make for the business of JLI, noting that its potential deal would "[p]rovide return on percentage of equity invested to date; provide opportunity for upside on equity retained."[166]

---

[165] ALGAT0002834151.
[166] *Id.*

309.     From the very beginning of their relationship, ALTRIA and Altria Client Services communicated to PRITZKER and VALANI—who, in turn, communicated to DEFENDANTS BOWEN, MONSEES, and HUH—that they would profit handsomely by accepting ALTRIA's investment and following its lead in growing the business of JLI. Of course, and as set forth herein, this growth would be pursued through fraud and deceit to both the public and regulators.

310.     Beyond controlling the "majority of voting power" of JLI, PRITZKER, and VALANI were the perfect choice to liaise with ALTRIA and Altria Client Services on behalf of the MANAGEMENT DEFENDANTS. PRITZKER has been long familiar with the tobacco industry from his family's ownership of chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. And VALANI, for his part, was intimately familiar with the business of JLI. He was the company's first "angel investor" and was a regular presence within the halls of JLI (then Pax Labs) well before the company even had a working product.[167] Notably, PRITZKER and VALANI are the only DEFENDANTS who have admitted to using non-discoverable messaging services to communicate regarding JLI business. PRITZKER and VALANI both used the "Confide" messaging application, which allows users to send encrypted, ephemeral and screenshot proof messages.[168] And PRITZKER and VALANI both used Signal, which provides state-of-the-art end-to-end encryption for phone calls and messages.[169]

---

[167] Alex Norcia, JUUL Founders' First Marketing Boos Told Us the Vape Giant's Strange, Messy Origins, VICE (Nov. 5, 2019), https://www.vice.com/en/article/43kmwm/juul-founders-first-marketing-boss-told-us-the-vape-giants-strange-messy-origins.
[168] Riaz VALANI's Responses and Objections to Plaintiffs' First Set of Interrogatories; Nicholas PRITZKER's Responses and Objections to Plaintiffs' First Set of Interrogatories.
[169] Id.

311.    ALTRIA was an ideal model for growing JLI. ALTRIA, including through its

subsidiaries, has decades of experience targeting kids through youth-appealing marketing images

and themes.[170] It also had decades of experience using flavors to hook kids, and still does so in

many international markets.[171] And ALTRIA has decades of experience misleading and lying to

the public about their efforts to target kids through marketing and flavors, and making similar

fraudulent representations to regulators in order to delay or deter regulations.[172] Yet, because it

was a party to the Master Settlement Agreement, many of the tactics used by JLI to target kids

were unavailable to ALTRIA. So ALTRIA and Altria Client Services found a new way, drawing

on ALTRIA's storied history of unlawful activity to partner to the MANAGEMENT

DEFENDANTS in JLI's fraud at every turn. The result was bundles of cash for the

MANAGEMENT DEFENDANTS, a new generation of youth customers for ALTRIA and its

subsidiaries, and a public left reeling from a rapidly growing youth vaping epidemic.

312.    On July 28 or 29, 2017, JLI executives Tyler Goldman, Zach Frankel, and

DEFENDANTS VALANI and PRITZKER met with ALTRIA leadership, including Howard

Willard (then CEO) and Billy Gifford (then Vice Chairman and CFO), and specifically discussed

a potential minority investment.[173]  Meeting minutes reflect that with such a partnership, "altria

could help with: 1. Access to distribution and sales team 2. FDA + regulatory engagement as

well as whole gov't affairs org [and] 3. Expertise in brand building and maintenance."[174] In

---

[170] Hafez, N., & Ling, P. M. (2005). How Philip Morris built Marlboro into a global brand for
young adults: implications for international tobacco control. *Tobacco Control*, 14(4), 262-271.
Retrieved from https://escholarship.org/uc/item/5tp828kn.

[171] Campaign for Tobacco Free Kids, *The Facts about Philip Morris International: Company Is
Cause of the Tobacco Problem, Not the Solution* (November 15, 2017), *available at*
https://www.tobaccofreekids.org/assets/images/content/PMI_bad_acts.pdf.

[172] *See, e.g.*, *United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006).

[173] JLI01129881.

[174] *Id.*

return for this support, ALTRIA "Would invest at 'EXCESS OF TOBACCO MULTIPLES'"
and "Provide Access to other Altria Resources" including "Distribution across 150k doors that
matter."[175] In the meantime, ALTRIA pushed JLI to "develop … very good digital reach."[176]
ALTRIA dangled the potential for using its "database of adult tobacco consumers to target juul"
products.[177] VALANI followed up on this meeting with an email on July 31, 2017 connecting
Gifford with PRITZKER, "convey[ing] our warm regards to Howard," and offering to "come to
Richmond" in order "to continue our discussion."[178]

313.    DEFENDANTS PRITZKER and VALANI traveled to Richmond less than a
month later for an August 25, 2017 meeting with Howard Willard and William Gifford.[179] Altria
Client Services, in an internal presentation dated September 2017, would report that either at this
meeting or the July 2017 meeting, PRITZKER and VALANI "asked Altria to consider three
questions to be addressed at the next meeting being scheduled for mid-late September." Those
questions focused on the transaction structure and how ALTRIA would assign a value JLI,
including its international prospects.[180]

314.    This presentation also reveals that PRITZKER and VALANI were open to a deal,
and that they had "high value expectations," even though the presentation later notes that
PRITZKER and VALANI conveyed that JLI "does not need capital."[181] Taken together, these
observations make clear that PRITZKER and VALANI sought a massive payday for themselves
and were not looking out for the strategic interests of JLI as a corporation. JLI did "not need" the

---

[175] *Id.*
[176] *Id.*
[177] *Id.*
[178] *Id.*
[179] *Id.*
[180] ALGAT0000112523.
[181] *Id.*

massive capital infusion that ALTRIA's investment would ultimately provide. It was the investors—i.e., PRITZKER, HUH, VALANI, BOWEN, AND MONSEES—who stood to benefit. It was that promise of an impending personal payout that incentivized and motivated the MANAGEMENT DEFENDANTS to accept ALTRIA's and Altria Client Services' influence and control. If their fraudulent schemes were successful, they would reap billions of dollars for themselves, regardless of what ended up happening to JLI itself. In this way, ALTRIA and Altria Client Services were able to influence JLI well before ALTRIA formalized its investment in December 2018.

315.    Communications between ALTRIA, Altria Client Services, PRITZKER, and VALANI were frequent and their meetings continued at a regular pace over the next year and a half. For example, on December 15, 2017, Howard Willard, William Gifford, and Jay Moore (Senior Vice President of Business Development, Altria Client Services) met with the Project Tree investors (DEFENDANTS PRITZKER and VALANI) again, this time in White Plains, New York at the Andaz 5th Avenue Hotel.[182]

316.    In January 2018, ALTRIA created a comprehensive internal presentation to inform employees about JUUL's path to success.[183]  It noted that one of JUUL's "key differentiators" was that the company declined to "play by industry orthodoxies", such as by using social media to promote its products.[184]  It also quoted co-founders BOWEN AND MONSEES' early recognition that "[a]s smokers, they knew a viable alternative to cigarettes would have to offer a nicotine level found in no other alternative on the market."[185]  The

---

[182] ALGAT0000025589; ALGAT0000041165.
[183] ALGAT0000997542.
[184] Id.
[185] Id.

presentation also praised JUUL because it had "[b]rought in a CEO who had connections to Silicon Valley, tech companies, and influencers."[186]

317.    By no later than January 25, 2018, Howard Willard directly involved K.C. Crosthwaite, who had transitioned from Altria Client Services to become President and CEO of Defendant PHILIP MORRIS USA, in the negotiations with JLI. For example, on January 25, 2018, Howard Willard sent a presentation about "Project Tree" (Altria's investment in JLI) to K.C. Crosthwaite and the two men agreed to discuss the matter the next morning.[187] By June 2018, Crosthwaite would be rewarded through a promotion to Senior Vice President, Chief Strategy & Growth Officer for both Altria Client Services and AGI and would assist Willard in quarterbacking the JLI deal.

318.    ALTRIA and Altria Client Services and PRITZKER and VALANI continued their correspondence between December 2017 and July 2018. An internal Altria Client Services presentation references a letter ALTRIA received regarding the proposed deal in April 2018.[188] On April 13, 2018, Howard Willard sent an email to PRITZKER, VALANI, and JLI's then-CEO Kevin Burns, "getting back to you" and requesting a call "early next week" in which ALTRIA would share its plans for a "win/win partnership that enables us to fully collaborate" and to "deliver maximum value in the long run." ALTRIA also wanted to discuss the "critical item[]" of "strategy alignment and chemistry between our respective operating teams in supportive [sic] of a productive partnership that can create substantial value."[189] Prior to this call, PRITZKER, VALANI, and Burns on the one hand and ALTRIA (and/or Altria Client Services) on the other

---

[186] *Id.*
[187] ALGAT0000036407; ALGAT0000111921.
[188] ALGAT0002817348.
[189] JLIFTC00639178.

shared "volume forecast for [JLI's] business."[190] The call between Willard, PRITZKER, VALANI, and Burns took place on April 16, 2018, prior to which Willard sent the JLI parties a "Payment Structure Proposal" and noted that legal counsel need to "connect to assess antitrust risk."[191] The Payment Structure Proposal provided various scenarios for a potential 50.1% investment by ALTRIA in JLI, each of which contemplated billions of dollars in "Investor Value" for JLI's investors (i.e., the MANAGEMENT DEFENDANTS).[192] VALANI forwarded this document to attorney Jorge A. del Calvo at Pillsbury Winthrop Shaw Pittman LLP who then forwarded the document to DEFENDANTS BOWEN and MONSEES.[193]

319.    Willard followed up on this call with a May 3, 2018 Proposal Letter to PRITZKER, VALANI, and Burns.[194] The Proposal Letter also contemplated a 50.1% investment that contemplated majority of payment to be made after antitrust approval and a separate "earn-out payment" of "up to $3.5 billion" to the "selling JUUL shareholders"; Willard described the valuation as "compelling to your investors, particularly taking into account the substantial regulatory and legal contingencies relating to eVapor generally and JUUL products specifically."[195] Notably, Willard wrote that ALTRIA was "open to discussing the exact terms of [the earn-out] payment **but prefer to discuss it in person**."[196] The letter goes on to further state that ALTRIA was "prepared to discuss offering a series of liquidity events for the current JUUL investors with respect to their residual 49.9% ownership interest."[197] This letter is yet another

---

[190] JLIFTC00638936; ALGAT0005452943.
[191] ALGAT0004031391.
[192] JLIFTC01082372.
[193] JLIFTC01082370.
[194] ALGAT0004030132.
[195] ALGAT0004031645-46.
[196] *Id.* (emphasis added).
[197] *Id.*

example of the ways in which ALTRIA sought to influence PRITZKER and VALANI and indirectly control JLI, with the promise of a multi-billion dollar payment if they were to get JLI to go along with an ALTRIA investment. Willard emphasized that they were aligned on a "strategic vision as to how to grow the JUUL business rapidly." ALTRIA sought to control the JLI business, with Willard writing that "we would require that, following the first two payments outlined above, Altria (a) owns a majority of the JUUL equity and voting rights and (b) **has the right to control generally the JUUL business.**"[198]

320.   ALTRIA and Altria Client Services viewed these meetings, and VALANI in particular, as a "back-channel" to communicate with the decision-makers behind JLI—i.e., the MANAGEMENT DEFENDANTS. In a presentation by Altria Client Services in June 2018 to ALTRIA Management regarding preparations for a July 13, 2018 meeting with PRITZKER and VALANI, Altria Client Services considered a "[b]ack-channel with Riaz and / or [Goldman Sachs] in advance of meeting."[199]

321.   ALTRIA and Altria Client Services were pursuing this "back-channel" even though the lawyers for JLI and ALTRIA had grown concerned over PRITZKER and VALANI's roles in the negotiations. On April 26, 2018, PRITZKER sent an email to Howard Willard, copying VALANI, regarding a "standstill" in the negotiations. PRITZKER wrote: "[O]ur lawyers are apparently at a standstill over the standstill (in the NDA). I understand that you want the continuing right to talk to Riaz and me. That's just fine, and we are both happy to talk to y'all any time, but it needs to be limited to in our capacity as directors: we need to avoid any appearance of conflict. I can't imagine this makes a difference. If not, can you intercede so we

---

[198] *Id.* (emphasis added).
[199] ALGAT0002817356.

can get this going, and if so perhaps you could give us a call to explain." This email makes clear that Willard wanted unfettered access to his back-channel of PRITZKER and VALANI, and that ALTRIA and Altria Client Services had not been communicating with PRITZKER and VALANI "in [their] capacity as directors."[200] Again, ALTRIA and Altria Client Services were appealing to PRITZKER and VALANI's personal financial interest, which inevitably affected the actions they took as directors of JLI.

322.    Howard Willard responded that he conveyed "our joint view" to ALTRIA's counsel and then suggested a meeting on May 6, 2018 involving lawyers for both sides. Willard also set up a separate dinner or breakfast for himself and PRITZKER.[201] VALANI was not available on this date, so the meeting was rescheduled, and the back-channeling continued.[202]

323.    The parties met again in July 2018. According to the June 2018 presentation by Altria Client Services, at the July 13, 2018 meeting with PRITZKER and VALANI, ALTRIA and Altria Client Services planned to push for a deal in which ALTRIA would be able to "appoint[] majority of board" of JLI and have control of "board decisions by majority vote (including hiring/removal of CEO)." Altria was planning on structuring part of its payment for its ownership in JLI to include a separate "PMTA payment" of "$1 - $3 Billion" which Altria Client Services conceded was, in part "to compensate Tree [JLI] investors for potential upside in the business."[203]

---

[200] ALGAT0000113109.
[201] *Id.*
[202] ALGAT0000113121.
[203] *Id.*

324.     The same presentation revealed that ALTRIA or Altria Client Services was planning on engaging with JLI regarding its "Youth vaping prevention plan" by August 10, 2018, with ALTRIA or Altria Client Services preparing its own plan for JLI.[204]

325.     The July 13, 2018 meeting was attended by Howard Willard, Billy Gifford, and K.C. Crosthwaite.[205]

326.     At some point after negotiations had been ongoing between ALTRIA, Altria Client Services, PRITZKER, and VALANI, Kevin Burns, then-CEO of JLI, joined the negotiations. By this point, PRITZKER and VALANI had already pushed ALTRIA and Altria Client Services to offer terms highly favorable to the individual investors in JLI, regardless of the true benefit to the company. And by virtue of their control of JLI, the MANAGEMENT DEFENDANTS ensured that Kevin Burns went along with the deal.

327.     On August 1, 2018, PRITZKER, VALANI, and Burns met with Howard Willard and William Gifford at the Park Hyatt Hotel in Washington, D.C., to further discuss the terms of an impending deal.[206]  Following this meeting, VALANI and PRITZKER were working the machinery of JLI to obtain the information that ALTRIA needed to consummate their deal. On August 7, 2018, Tim Danaher (CFO of JLI) sent Burns, VALANI, and PRITZKER a "Summary Cap Table," which Burns forwarded to Howard Willard with a comment that he would "call you tomorrow." Howard Willard forwarded this email to K.C. Crosthwaite, who at this point was intimately involved at the negotiations between ALTRIA, PRITZKER, and VALANI.[207]

---

[204] *Id.*
[205] *Id.*
[206] ALGAT0003443977.
[207] ALGAT0003352121; ALGAT0003352122.

328.    Around this time, K.C. Crosthwaite also made explicit ALTRIA's goal to influence and control JLI. In a presentation by Crosthwaite to AGI at the Board of Directors' Strategy Session on August 22, 2018, Crosthwaite indicated that Altria should keep pursuing their "strategic investment in JUUL" because it would give ALTRIA "[s]ignificant ownership and influence in U.S. e-vapor leader."[208] This presentation reveals that Altria sought to require JLI to seek "Altria approval" of its "Youth vaping prevention plan."

329.    The negotiations between JLI, ALTRIA, and Altria Client Services continued full steam from August 2018 through the announcement of the investment in December 2018. In an August 14, 2018 email from PRITZKER to Howard Willard and Billy Gifford, copying Kevin Burns and VALANI, PRITZKER wrote that "Riaz [VALANI] met with Dinny [Devitre, Altria Group Board of Directors, Chair of Finance Committee] and that the two of you and maybe Dinny as well may be interested in meeting with us in San Francisco this Saturday."[209] Willard responded that he, Billy Gifford, K.C. Crosthwaite and Dinny Devitre would attend the meeting. PRITZKER responded that lawyers should attend, though Kevin Burns emailed him separately that he "wouldn't add lawyers to the meeting but would put them in back rooms for support," and that it "[l]ooks like we are a go pending Riaz's meeting today." In advance of the Saturday meeting, Willard set up a separate call with PRITZKER to discuss the remaining negotiating points. Burns and VALANI were aware of, and possibly included in, this call.[210] So, in August 2018, information was being exchanged between ALTRIA and Altria Client Services and JLI at

---

[208] ALGAT0003327931.
[209] JLI01389789.
[210] JLI01389792.

a rapid pace, and numerous meetings between VALANI, PRITZKER, and ALTRIA and/or Altria Client Services were taking place.[211]

330.     On October 25, 2018, Howard Willard, Billy Gifford, KC Crosthwaite, and Murray Garnick participated in a call with PRITZKER, and possibly VALANI and Kevin Burns, to discuss the ongoing negotiations.[212] PRITZKER, VALANI, and Burns also met privately with Howard Willard and other ALTRIA (and Altria Client Services) executives on October 28, 2018 for a dinner at Dinny Devitre's home to discuss the deal, while sending their lawyers to a separate meeting that same night.[213]  That same night, attorneys for both companies met for dinner.[214]  Another meeting between the principals took place on October 29, 2018.[215]

331.     Also on October 25, 2018, the day Altria and PRITZKER, VALANI and Burns held a call to discuss the deal, Howard Willard shared with PRITZKER and VALANI the letter that ALTRIA had sent to the FDA, which was a key part of the MANAGEMENT DEFENDANTS' and ALTRIA's scheme to deceive regulators and keep youth-appealing Mint Juul pods on the market long after other flavors were removed, as set forth below.[216]

332.     Over the following six weeks prior to the announcement of ALTRIA's investment in JLI, K.C. Crosthwaite became even more hands on, leading the aggressive diligence efforts on behalf of ALTRIA and Altria Client Services. October 30, 2018, K.C. Crosthwaite sent JLI a preliminary diligence list which requested a list of all material intellectual property, including all patents (which, notably, would have included the '895 patent revealing that JLI's nicotine

---

[211] *See also, e.g.,* ALGAT0005581879 (August 19, 2018 email from Murray Garnick noting that "KC is calling Kevin today  to explore a meeting Thursday afternoon at the Ranch or SF.")
[212] JLI10518738.
[213] *Id.*
[214] JLI10518738.
[215] ALGAT0005034057.
[216] JLIFTC00653389.

content was misrepresented to the public; of course, ALTRIA already knew this because it had undertaken its own testing of the nicotine strength of JUUL pods, as set forth above). It also included requests for "materials related to underage use prevention, underage product appeal, and underage use." JLI agreed to produce this information by November 9, 2018.[217] Crosthwaite and Kevin Burns, as well as others from ALTRIA, Altria Client Services, and JLI, held a call to discuss these diligence requests on November 2, 2018.[218] In December 2018, ALTRIA employees were on the ground in San Francisco to carry out the final stages of the due diligence process.[219]

333.    By this point, PRITZKER and VALANI had brought in other senior leadership of JLI to get the deal across the finish line. Kevin Burns, Tim Danaher, Bob Robbins (President, JUUL Americas), Jerry Masoudi (Chief Legal Officer), Mark Jones (Associate General Counsel), Ashley Gould, and DEFENDANTS BOWEN and MONSEES attended meetings with ALTRIA and Altria Client Services from November 15, 2018 through November 17, 2018.[220] As set forth below, the deal was finally consummated—and PRITZKER, VALANI, HUH, BOWEN, and MONSEES handsomely rewarded—in December 2018.

### C.    ALTRIA Participated in and Directed the Fraudulent Acts of JLI Designed to Protect the Youth Market for JUUL.

#### 1.    ALTRIA Participated in and Directed JLI's "Make the Switch" Campaign.

334.    Altria did not simply take in information regarding JLI's youth sales passively while it pursued ownership of JLI. It also worked to ensure that the MANAGEMENT

---

[217] JLI01374739; JLI01374736.
[218] JLI01374736.
[219] 5191006003.
[220] ALGAT0003776795.

DEFENDANTS would take steps to continue JUUL's exponential sales growth and to stave off any regulation that might hinder that growth.

335.    Specifically, ALTRIA worked behind the scenes to bolster JLI's public narrative claiming that JUUL was a cessation device intended for adult smokers. Well before JLI launched the "Make the Switch" campaign in January 2019, ALTRIA was pushing the narrative that e-vapor products could help adult smokers "switch" off of combustible cigarettes. In an October 25, 2018 letter from Howard Willard to the FDA—sent while ALTRIA was finalizing the terms of its deal with PRITZKER, VALANI, and Burns—Willard touted that "We believe e-vapor products present an **important opportunity to adult smokers to switch from combustible cigarettes**."[221] As noted below, Howard Willard shared this letter with PRITZKER and VALANI the same day he sent it to the FDA.

336.    Moreover, ALTRIA's partners within JLI—VALANI and PRITZKER—were involved in reviewing and approving the "Make the Switch" Campaign, allowing ALTRIA to influence the marketing efforts of JLI. For example, on December 27, 2018, Kevin Burns forwarded an email from Chelsea Kania to PRITZKER and VALANI with "assets for the ["Make the Switch"] campaign including 20/60 radio spots and 30/60 tv spots," and the next day VALANI directed which videos should be aired as part of the campaign.[222]

### D.    ALTRIA Participated in and Directed JLI's Fraudulent Scheme to Keep Mint on the Market.

337.    ALTRIA and Altria Client Services also came to the bargaining table with PRITZKER and VALANI armed with important knowledge – that flavors would be crucial to

---

[221] Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, at 1 (Oct. 25, 2018) (emphasis added).
[222] JLI10071280; JLI10071228.

JLI's continued ability to target and sell to youth users and wanting to ensure JLI proactively and fraudulently protect those flavors.

338.    Within weeks of the FDA's July 2017 notice of proposed rulemaking ("ANPR") regarding ENDS flavor regulations, Gal Cohen proposed that JLI and others "build a coalition and common agenda to influence or challenge FDA's approach" to regulating flavors.[223] Foreshadowing their joint effort to portray Mint as a traditional tobacco or menthol flavor (as opposed to a flavor that appealed to kids), Cohen asked whether ALTRIA and JLI might respond to the FDA with "a common approach and understanding," and asked if the companies might find "a damage limitation option" concerning the regulation of ENDS flavors.[224]

339.    Ashley Gould, copying BOWEN, responded that the "Consensus seems to be there is a value in participating in a discussion. *Less sure that participating in a joint effort to influence FDA makes sense, so please don't commit to that at the meeting*." In the same email, Gould seemingly reversed course and gave Cohen the go-ahead to meet with ALTRIA (or Altria Client Services) in pursuit of a damage limitation option "(but maybe best if the group is smaller)."[225]

340.    Cohen attended a September 15, 2017 Global Tobacco Networking Forum ("GTNF") industry event with James Xu, CEO of Avail Vapor, and Altria Client Services' Phil Park. The small group Gould recommended seems to have materialized, as a September 27, 2017 email from Cohen notes that "Clive Bates organized a group that met on Friday with reps from Altria etc. . . they want to help drive standards definitions."[226]

---

[223] JLI10678579.
[224] *Id.*
[225] *Id.*
[226] JLI10679070.

341.    Through this meeting, ALTRIA knew that JLI would be a good partner because it shared a similar vision of preserving flavors. Indeed, ALTRIA (or Altria Client Services) went into this meeting with Cohen expecting to find a willing partner on flavors. As noted above, a May 2017 presentation from Altria Client Services touted that JLI offered "mint, berry, tobacco, and cream varieties" with "[i]ndications of additional flavor pods in potential pipeline."[227]

342.    The following year, 2018, when it became clear that the FDA was increasing scrutiny of the e-vapor industry, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA publicly defended mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies—which had been made available to ALTRIA and Altria Client Services as part of due diligence for its ultimate investment in JLI—indicated that mint users are not former menthol smokers and that mint pods were as popular with teens as Mango pods. By fighting to keep mint as the last flavor on the market, the cigarette industry could continue to appeal to non-smokers, including youth. JLI and the MANAGEMENT DEFENDANTS coordinated with ALTRIA to pursue a fraudulent scheme to persuade the FDA into leaving the mint flavor on the market, willingly sacrificing other flavors in the process as a purported show of commitment to youth prevention.

343.    ALTRIA's specific fraudulent acts with regard to this fraudulent scheme are detailed further below.

E.      **JLI, the MANAGEMENT DEFENDANTS and ALTRIA Coordinated to Market JUUL in Highly-Visible Retail Locations.**

344.    JLI, the Management DEFENDANTS, and ALTRIA's coordination continued in other ways throughout 2018 as they prepared for ALTRIA's equity investment in JLI.

---

[227] ALGAT0002412177.

345.     A key aspect of this early coordination was ALTRIA's acquisition of shelf-space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL products. By acquiring shelf space, ALTRIA took steps to ensure that JUUL products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.[228]

346.     ALTRIA's investment was not for its own e-cigarette products. ALTRIA spent approximately $100 million in 2018 to secure shelf-space at retailers for e-cigarette products—purportedly for the MarkTen e-cigarette that ALTRIA stopped manufacturing in 2018, and its pod-based MarkTen Elite, which it launched on a small scale in only 25,000 stores.[229]  By comparison, the 2014 launch of the original MarkTen resulted in product placement in 60,000 stores in the first month in the western United States alone.[230] Yet ALTRIA's payments for shelf space were a mixture of "cash and display fixtures in exchange for a commitment that its e-cigarettes would occupy prime shelf space for at least two years."[231]

347.     In reality, ALTRIA spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JLI's massive, ill-gotten market share.
[232]

---

[228] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General,* Centers for Disease Control & Prevention 161, 164 (2012), https://www.ncbi.nlm.nih.gov/books/NBK99237/.

[229] Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, N.Y. Times (Oct. 25, 2018), https://www.nytimes.com/2018/10/25/health/altria-vaping-ecigarettes.html.

[230] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[231] Jennifer Maloney & John McKinnon, *Altria-JLI Deal Is Stuck in Antitrust Review*, Wall St. J. (Jan. 17, 2020), https://www.wsj.com/articles/altria-juul-deal-is-stuck-in-antitrust-review-11579257002.

[232] *Id.*

348.   When ALTRIA later announced its $12.8 billion investment in JLI, part of the agreement between the two companies was that ALTRIA would provide JLI with this premium shelf space.[233]

349.   ALTRIA's purchase of shelf space in 2018 and its subsequent provision of that space to JLI shows how ALTRIA, JLI, and the MANAGEMENT DEFENDANTS were coordinating even before ALTRIA announced its investment in JLI.  ALTRIA's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them—retail establishments.[234]

### F.   ALTRIA Works with the MANAGEMENT DEFENDANTS to Direct JLI's Affairs and Commit Fraud.

350.   In December 2018 ALTRIA formalized its relationship with JLI's leadership by making a $12.8 billion equity investment in JLI through AGI and is wholly-owned subsidiary, AE,[235] the largest equity investment in United States history. This arrangement—which ALTRIA viewed as an opportunity to create the "Leading Global Tobacco Company"[236]—was profitable for both ALTRIA as well as DEFENDANTS MONSEES, BOWEN, PRITZKER, HUH, and VALANI. Each of the MANAGEMENT DEFENDANTS received millions or billions of dollars: MONSEES received approximately $641 million, BOWEN received approximately $594 million, HUH received approximately $67 million, VALANI received approximately $105 million personally and $2.6 billion through his company, Global Asset Capital, and PRITZKER

---

[233] *Id.*
[234] Laura Bach, *Where Do Youth Get Their E-Cigarettes?*, Campaign for Tobacco Free Kids (Dec. 3, 2019), https://www.tobaccofreekids.org/assets/factsheets/0403.pdf.
[235] Archive00760162.
[236] ALGAT0002850450.

received approximately $1.8 billion through his company, Tao Capital Partners.[237] In turn, ALTRIA and its subsidiaries received millions of loyal teen customers, customers ALTRIA was no longer able to get through the sale of its own cigarette products. The MANAGEMENT DEFENDANTS' payout reflects their active role in JLI's growth, not just a return on their investment.

351.    The investment also brought with it a radical shift in ALTRIA's public stance on JUUL's responsibility for the health crisis facing the nation's youth.  In October 2018, ALTRIA CEO Howard Willard stated the company position clearly to its employees: "JUUL has created a youth usage epidemic.  We cannot allow that to continue."[238]  But one year later in October 2019, when CNBC reporter Angelica Levito asked Willard whether JUUL had mishandled the youth vaping epidemic, his response was markedly different: "You know, I would not say that. I think that when the increased youth use of e-vapor products was identified, frankly the increase started before JUUL was a very significant product in the market."[239]

352.    ALTRIA was willing to make such a large investment in JUUL because it was under pressure to deliver returns for shareholders despite the fact that combustible cigarette sales had been steadily declining since their peak in 1981.  And while the risk of unfavorable FDA regulation of tobacco products loomed large in ALTRIA's mind,[240] the company calculated that under any number of regulatory scenarios, its enterprise value would be billions of dollars higher if it partnered with JUUL than if it maintained the "status quo."[241]

---

[237] JLI11387060.
[238] ALGAT0004053356.
[239] https://www.youtube.com/watch?v=5kPJAYqXOYU&feature=youtu.be
[240] ALGAT0002832820 ("FDA regulations have been the key catalyst for the decline in Altria's share price…")
[241] ALGAT0002832820.

353.    In July 2018, JLI's valuation was approximately $15 billion.[242] But, in December 2018, ALTRIA's investment of $12.8 billion for a 35% stake in the company reflected a valuation of approximately $38 billion—more than two and a half times the valuation just five months earlier. DEFENDANTS MONSEES, BOWEN, PRITZKER, HUH, and VALANI thus saw the value of their investments in JLI skyrocket as a result of the ALTRIA agreement, allowing them to cash out via a special dividend and bonus, as well as through stock sales that were not available to other of JLI's minority shareholders.[243] From the $12.8 billion paid into JLI by ALTRIA, approximately $12.6 billion was paid out immediately to JLI's investors and employees.[244] And of that $12.6 billion, an astonishing (approximately) $4.4 billion went directly to DEFENDANTS PRITZKER and VALANI and investment funds they represented.[245] Significant sums—hundreds of millions of dollars each—went to DEFENDANTS MONSEES and BOWEN as well.[246]

354.    While PRITZKER, VALANI, and ALTRIA carefully structured the deal to avoid the appearance of ALTRIA's control of JLI, for fear of drawing regulatory and public scrutiny, the structure does not tell the whole story. ALTRIA and Altria Client Services had been involved in directing the affairs of JLI indirectly long before its investment, and ALTRIA's involvement was even more direct following the investment. And although ALTRIA took only a 35% share initially, it retained the option to buy JLI outright in 2022. This promise of a future purchase

---

[242] https://www.theverge.com/2018/7/3/17529442/juul-vapes-nicotine-electronic-cigarettes-addiction-funding.

[243] Tiffany Kary, *JUUL Founders Sued for Self-Dealing Over Altria's $12.8 Billion*, Bloomberg (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-dealing-over-altria-s-12-8-billion.

[244] JLI11387060

[245] JLI11387060, JLI11623544

[246] JLI11623544

gave it significant influence over the actions of JLI's leadership—i.e., the MANAGEMENT DEFENDANTS who stood to profit even more handsomely from an ultimate acquisition by Altria.

355.   While JLI and Altria remain separate corporate entities in name, following its equity investment in JLI, the Altria DEFENDANTS worked with the Management DEFENDANTS, and PRITZKER and VALANI in particular, to forge ALTRIA and JLI forged even greater significant, systemic links, i.e., shared leadership, contractual relationships, financial ties, and continuing coordination of activities with JLI's leadership. Because ALTRIA and its subsidiaries could no longer market ALTRIA's products to children or lie to adults about the safety, addictiveness, or health effects of its own cigarettes as result of prior tobacco litigation and regulation, ALTRIA took even greater control of JLI in order to accomplish both of these goals through that company.

356.   Around April 15, 2019, ALTRIA (including Howard Willard, William Gifford, and K.C. Crosthwaite) and JLI leadership (including Defendant PRITZKER), celebrated the closing of the deal at Stag's Leap, a Napa Valley winery.[247]

### 1.   Altria Installs Its Own Executives into Leadership Positions to Direct the Affairs of JLI.

357.   To exercise its influence and control of JLI, ALTRIA worked with PRITZKER and VALANI to install two key ALTRIA executives into leadership positions at JLI: K.C. Crosthwaite and Joe Murillo:

a.   K.C. Crosthwaite, who was Vice President of Altria Client

Services when the company carried out a study that would later be

---

[247] ALGAT0003889812.

used by Altria to shield JUUL's Mint pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was Altria's and Altria Client Services's Chief Growth Officer and played a major role in Altria's investment in JLI, and had experience in the marketing of tobacco products from his time as president of Philip Morris USA.

b.       Joe Murillo, who launched the MarkTen e-cigarette line at Altria (as President and General Manager of Nu Mark LLC) and more recently headed regulatory affairs for Altria (as Senior Vice President of Regulatory Affairs of Altria Client Services) , is now JLI's chief regulatory officer.[248] A 24-year career Altria executive, Murillo previously ran Altria's e-cigarette business, Nu Mark, "before Altria pulled its e-cigarettes off the market as part of its deal with J[UUL]."[249]

358.    As mentioned above, K.C. Crosthwaite played a major role in ALTRIA's investment in JLI. Crosthwaite frequently communicated with AGI senior management about Altria's investment. For example, on January 25, 2018, AGI CEO, Howard Willard sent a presentation about "Project Tree" (ALTRIA's investment in JLI) to K.C. Crosthwaite (who was, at the time, President of DEFENDANT PHILIP MORRIS USA) and the two men agreed to discuss the matter the next morning.[250] Then in July 2018, Crosthwaite (who, at the time, had

---

[248] Jennifer Maloney, *JLI Hires Another Top Altria Executive*, Wall St. J. (Oct. 1, 2019), https://www.wsj.com/articles/juul-hires-another-top-altria-executive-11569971306.  /
[249] *Id.*
[250] ALGAT0000036407; ALGAT0000111921.

transitioned to his role as Senior Vice President and Chief Growth Officer of Altria Client Services and AGI) was also listed as one of three "meeting participants," along with Willard and AGI CFO, Gifford, for a July 13, 2018 meeting with JLI's leadership about the deal between ALTRIA and JLI.[251] In addition, Crosthwaite led AGI's due diligence efforts,[252] signed the investment exclusivity agreement on behalf of AGI shortly before the deal was publicly announced,[253] and was listed as the ALTRIA point of contact for any "notices, requests and other communications" regarding the Services Agreement between AGI and JLI.[254]

359.    While working on this investment, ALTRIA, and Crosthwaite himself, discussed their goal to influence and control JLI. For example, in a presentation by Crosthwaite to AGI at the Board of Directors' Strategy Session on August 22, 2018, Crosthwaite indicated that ALTRIA should keep pursuing their "strategic investment in JUUL" because it would give ALTRIA "[s]ignificant ownership and influence in U.S. e-vapor leader."[255]

360.    After the deal was official, in January 2019, ALTRIA appointed Crosthwaite to the JLI Board of Directors.[256] Crosthwaite was required to be a non-voting observer until the FTC gave the ALTRIA investment in JLI clearance, which has yet to occur. ALTRIA planned to use this role to help guide JLI. According to Crosthwaite, ALTRIA was focusing on "ensur[ing] JUUL maintains long-term leadership in global E-vapor by leveraging Altria's best-in-class infrastructure and providing guidance through board participation."[257]

---

[251] ALGAT0002817348.
[252] JLI01374736; JLI01416851.
[253] JLI01392046.
[254] Archive00760280.
[255] ALGAT0003327931-33.
[256] JLI01416851.
[257] ALGAT0002856951.

361.    However, despite his now official role, Crosthwaite continued to meet privately with PRITZKER and VALANI. For example, on January 16, 2019, PRITZKER asked Crosthwaite if he would meet with VALANI and PRITZKER after the JUUL Board meeting later that month. Crosthwaite promptly reported back to Willard that he "agreed to have dinner with Nick and Riaz on the 31st after the JUUL BOD meeting."[258]

362.    Crosthwaite continue to be involved in meetings between ALTRIA and the MANAGEMENT DEFENDANTS as his time as an "observer" on the JLI Board went on. On March 26, 2019, Willard, Gifford, and Crosthwaite and a few other ALTRIA employees flew to San Francisco to attend a dinner with the JLI leadership, including BOWEN, MONSEES, PRITZKER, VALANI, and others.[259] After the dinner, PRITZKER emailed Willard, Gifford, and Crosthwaite, telling them that "[w]e truly appreciate our partnership, and look forward to an even deeper collaboration in the future."[260]

363.    To facilitate that "deeper collaboration" and its control of JLI, ALTRIA decided to install one of its own career executives, Crosthwaite, as the head of JLI. In furtherance of that goal, in April 2019, Howard Willard told PRITZKER that he believed JLI would benefit from "a new direction."[261] That same month, PRITZKER invited Crosthwaite to PRITZKER's house in San Francisco for a weekend visit.[262] During this visit, according to JLI, Crosthwaite expressed concerns about JLI's leadership's ability to guide JLI, and PRITZKER and Crosthwaite discussed Crosthwaite potentially joining JLI in some capacity.

---

[258] ALGAT0000114034.
[259] ALGAT0000080766.
[260] ALGAT0003889812.
[261] JLI01416851.
[262] JLI01416851.

364.    As the summer approached, JLI admits that "various Board members" continued to communicate with Crosthwaite and that "the Board valued his perspective on JLI's business," in other words, ALTRIA's perspective on JLI's business.[263] In his discussions with the Board, Crosthwaite continued to express a view that JLI would benefit from a change in leadership. [264]

365.    While ALTRIA had not yet officially installed Crosthwaite as JLI's CEO, that did not prevent them from giving JLI's leadership, and specifically PRITZKER and VALANI, advice and direction about how to run the company. On May 26, 2019, PRITZKER emailed Willard asked whether he was "coming to the youth/PMTA meeting in DC June 14" and "[i]f so, do you think we can find a time for you, Riaz, and I to get together separately?" Willard responded "Yes and yes. We can arrange the plan next week."[265]

366.    Similarly, on July 9, 2019, Willard emailed VALANI, PRITZKER, JLI's then-CEO Kevin Burns and cc'd Crosthwaite giving JLI advice and feedback on their "Youth Vaping Prevention Plan." Willard stated that the "plan represents a modest improvement rather than an impressive 'new day.'" Willard also gave them advice and direction, telling them to "[k]eep working on it, but do not make a big announcement at this time" but that their proposed "internal changes sound reasonable and appropriate."[266]

367.    In June 2019, Howard Willard spoke to PRITZKER and VALANI again, along with Frankel (who "[s]erves as Mr. VALANI's second board seat"[267]). Willard reiterated that he believed JLI would be benefit from a new direction.[268] Willard conveyed explicitly that "JLI

---

[263] JLI01416851.
[264] JLI01416851.
[265] ALGAT0003285214.
[266] ALGAT0003279064.
[267] JLI00417815.
[268] JLI01416851.

could benefit from Mr. Crosthwaite's leadership."[269] Willard "expressed his view that Mr. Crosthwaite's unique experience would make him a strong leader for JLI." [270]

368.    After this conversation, on July 22, 2019, a draft press release was created and sent to Crosthwaite announcing Crosthwaite as JLI's new CEO.[271] The draft press release states that Crosthwaite was "most recently a JUUL Board Advisor" and includes a quote from Defendant MONSEES, explaining that "Adam [BOWEN] and [MONSEES] . . . have had the pleasure of getting to know K.C. through our partnership with ALTRIA and have already benefitted tremendously from his strategic insights as a Board observer."[272] This document was sent to Crosthwaite by Carina Davidson, the President of communications firm Abernathy MacGregor, with whom ALTRIA works regularly.[273] Crosthwaite reviewed the documents and discussed it with Davidson, including asking her to "tone down the language re: Kevin" Burns, JLI's then-CEO, who Crosthwaite would be replacing.[274]

369.    On August 23, 2019, VALANI met with Crosthwaite again to discuss "business and non-business topics."[275]

370.    Throughout the month of September, Defendant VALANI and Defendant PRITZKER continued to meet with ALTRIA about Crosthwaite taking over leadership of JLI. For example, on September 11, 2019, VALANI and PRITZKER spoke with Willard, about "the challenges facing JLI" and Willard "expressed concern about Mr. Burns' [JLI's then-CEO]

---

[269] JLI01416851.
[270] JLI01416851.
[271] ALGAT0005389689.
[272] ALGAT0005389689.
[273] ALGAT0005389689; ALGAT0005389687; *see also, e.g.*, ALGAT0003360382, ALGAT0003778898.
[274] ALGAT0005410667.
[275] JLI01416851.

leadership" and "expressed his opinion that JLI would benefit from a new direction." [276] As mentioned above, Willard had previously suggested Crosthwaite be installed in a leadership role. Four days later, on September 15, 2019, Crosthwaite met with VALANI and Frankel "to further discuss the possibility of Mr. Crosthwaite joining JLI."[277] During this meeting Crosthwaite told VALANI and Frankel that he also wanted them to consider hiring Joe Murillo, then the head of regulatory affairs for ALTRIA, as Chief Regulatory Officer for JLI. [278]

371.    On September 17, 2019, VALANI met with Crosthwaite in New York to further discuss Crosthwaite taking over as the formal leader of JLI.[279] VALANI and Frankel met with Crosthwaite again on September 18, 2019, in New York. [280] On September 19, 2019, BOWEN, MONSEES, PRITZKER, and VALANI met with Crosthwaite for dinner in San Francisco. [281] On September 20, 2019, PRITZKER and VALANI met with Crosthwaite again in San Francisco to discuss the details of Crosthwaite's leadership role.[282]

372.    On September 22, 2019, PRITZKER, VALANI, and Frankel spoke to Crosthwaite over the phone about taking over leadership at JLI.[283] Crosthwaite continued to express the view that JLI would benefit from leadership changes and reiterated his view that JLI should hire Murillo, should Crosthwaite join JLI. While Crosthwaite expressed some doubts

---

[276] JLI01416851.
[277] JLI01416851.
[278] JLI01416851.
[279] JLI01416851.
[280] JLI01416851.
[281] JLI01416851.
[282] JLI01416851.
[283] JLI01416851.

about his position, the parties agreed to continue to discuss the matter.[284] Ultimately, the Board

met that day and resolved to offer Crosthwaite a leadership position at JLI.[285]

373.    On September 24, 2019, JLI's Board of Directors voted to accept the resignation

of current JLI CEO Kevin Burns, approve Crosthwaite's appointment as CEO of JLI and appoint

him to the Board.[286] That same day, Crosthwaite told "JLI to begin preparations on an offer of

employment for Murillo."[287]

374.    Crosthwaite formally took over as CEO of JLI on September 25, 2019.[288] Murillo

accepted a position as JLI's Chief Regulatory Officer on September 29, 2019 and began work on

October 7, 2019.[289] ALTRIA's plan was a success.

> **2.    ALTRIA Furthered the JLI Enterprise by Participating in and Directing the Marketing and Distribution of JUUL Products.**

375.    In addition to installing its own executives as senior leadership at JLI, after its

investment, ALTRIA worked with JLI's leadership to assist JUUL's growth through marketing

and distribution, despite its knowledge that JUUL's growth was based on selling to minors and

lying to adults about JUUL products. ALTRIA helped JUUL thrive in the areas of "direct

marketing; sales, distribution and fixture services; and regulatory affairs."[290] This included, among

other things:

    a.    "Piloting a distribution program to provide long haul freight, warehouse

        storage and last mile freight services."

---

[284] JLI01416851.
[285] JLI01416851.
[286] JLI01416851. Pursuant to JLI's by-laws, the Company's CEO is automatically appointed to the Board.
[287] JLI01416851.
[288] JLI01416851.
[289] JLI01416851.
[290] Letter from Howard Willard III, Altria Senator Durbin, et. al., at 11 (Oct. 14, 2019).

b. "Making available [ALTRIA's] previously contracted shelf space with certain retailers," thus allowing JUUL products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth.

c. "Executing direct mail and email campaigns and related activities. . . ."

d. "Leveraging Altria's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon."

e. "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."[291]

376. ALTRIA had envisioned itself providing such support since as early as 2017. In a July 11, 2017 presentation, ALTRIA noted that "Juul is not widely distributed but captures significant share in stores selling."[292] ALTRIA knew that its generations-old distribution network would be an enticing resource for JUUL in order to significantly expand its retail presence in the geographic markets where JUUL was not yet strongly represented.

377. In an attempt to legitimize its support of JUUL's growth and despite public and regulatory concern, ALTRIA entered into a number of formal agreements with JLI. These agreements included collaboration with DEFENDANT PHILIP MORRIS USA. Each agreement listed AGI as the "Provider" and was managed by Theodore J. Edlich IV of Altria Client Services as the "Provider Manager."[293]

378. In each agreement, JLI agreed to "cooperate fully with the Altria Company in its performance of the Services, including without limitation, by timely providing all information,

---

[291] *Id.* at 13.
[292] ALGAT0004996494.
[293] *See, e.g.*, JLI10490204.

materials, resources, decisions, and access to personnel and facilities necessary for the proper performance of the Services by the Altria Company."[294]

379.    In exchange, Altria Group Distribution Company agreed to distribute and sell JUUL products across the country greatly expanding JUUL's retail footprint. While JUUL products have typically been sold in 90,000 U.S. retail outlets, ALTRIA's products reach 230,000 U.S. outlets.   In ALTRIA's own words, ALTRIA "commit[ed] to limit Altria's support for expanding retail distribution of JUUL to only tobacco, menthol and mint flavors and to no more than 20,000 additional stores in 2019."[295] Divided evenly, this "limit[ed]" support amounted to an additional 400 stores per state.  Altria Group Distribution Company also brings its logistics and distribution experience (although, after increasing public scrutiny, ALTRIA announced on January 30, 2020 that it would limit its support to regulatory efforts beginning in March 2020[296]).   As ALTRIA stated to the FTC in 2019, ALTRIA "believe[d] that its extensive and mature distribution infrastructure [could] accelerate JLI's sales growth, thus providing further returns on Altria's investment in the company."[297] Under the terms of the deal, "JLI [had] the option to utilize [Altria's] first-class distribution services that took decades to develop and has the capabilities to distribute an expanded cigarette product to 90 percent of targeted stores in approximately three weeks."[298]

380.    Specifically, Altria Group Distribution Services agreed to:

---

[294] *See, e.g.*, JLI10490204.
[295] ALGATO004055961.
[296] Nathan Bomey, *Marlboro maker Altria distances itself from vaping giant JLI amid legal scrutiny*, USA Today (Jan. 31, 2020), https://www.usatoday.com/story/money/2020/01/31/juul-altria-distances-itself-e-cigarette-maker-amid-scrutiny/4618993002/.
[297] 8490000866.
[298] *Id.*

a. Market JUUL products in 1,073 Speedway stores initially, followed by a second wave of 1,937 stores, provide key account assistance and field sales force management, and install Point of Sale materials for JUUL products;[299]

b. Sell and execute pre-books/pre-orders for JUUL products for 83 Chain accounts and up to 51 distributors;[300]

c. Provide territory sales managements, key retail account assistance, and field sales force management to perform a "full reset" (including merchandising JUUL products to replace Nu Mark products and installing JUUL graphics and other marketing materials) in up to 40,399 stores, including Circle K, 7-Eleven, Chevron, Sheetz, Speedway, Wawa, Giant Eagle, Walmart, and many more;[301]

d. Provide sales support at 77,806 stores by improving out of stock and distribution gaps, providing labor and Field Sales Force services to handle merchandising, account management, tracking insights, and conduct inventory management;[302]

e. Conduct supply chain management for distribution of JUUL products, as well as line haul freight, public warehouse storage in San Bernardino, CA, last mile fright to customers, and shipping to distributions (including Circle K, Core Mark, and McLane) in Nevada, Arizona, and California;[303]

---

[299] JLI10490204.
[300] JLI01339886.
[301] JLI01339886.
[302] JLI01339878.
[303] JLI01339918.

f.      Provide distribution assistance, including freight from DCL to Richmond, Virginia and warehouse storage and handling of JUUL products;[304]

g.      Provide sales support for JUUL products including working in tens of thousands of stores number of stores to provide insights and conduct surveys, update and install point of sale marketing, address "inventory opportunities," including out of stock issues and distribution gaps, check prices and advertising the price in the store, and selling in new initiatives at the headquarters or store level, including new product launches, fixture merchandising, and training store personnel, and store and ship JUUL point-of-sale materials to support JUUL sales;[305]

h.      Bring JLI into Altria Group Distribution Company's Retail Council in June 2019, including giving opening remarks, three breakout group sessions, and a trade show booth;[306] and

i.      Distribute JUUL products and provide supply chain management for distribution to Arizona, California, Hawaii, Nevada, Texas, Louisiana, and Oklahoma (including line haul freight, public warehouse storage and handling in San Bernardino, California and Fort Worth, Texas, and last mile freight to customers);[307]

---

[304] JLI01339903.
[305] JLI01339937; JLI01339930; JLI01339980. The November to December 2019 agreement also included AGDC's assistance in removing the companies' "Make the Switch" campaign materials, which were the subject of a warning letter by the FDA.
[306] JLI01339973.
[307] JLI01339955.

381.    Through these distribution services, Altria Group Distribution Services, and Altria Client Services (as the "Provider Manager") used the mail and wires to transmit JUUL collateral and packaging that contained the false representation that a single JUUL pod was equivalent to a pack of cigarettes: a representation which, as discussed above, ALTRIA and Altria Client Services knew was false.

382.    Altria Group Distribution Company also worked to sell Mint JUUL products in particular. For example, Altria Group Distribution Company led a "market blitz" for JUUL products starting in February 2019. [308] As part of this blitz effort, JLI employees recognized that "Mint growth is huge – may need double space for certain SKUs to avoid out of stock situations," but that "sales are low" for Classic Tobacco.[309]

383.    Similarly, a March 18, 2019 Altria Group Distribution Company presentation of its work to sell JUUL showed that it was pushing Mint more than Menthol and Virginia Tobacco combined. The re-order form for 7-Eleven included seven choices, four of which were for Mint JUUL pods.[310] In the presentation, Altria Group Distribution Company also indicated that Mint was flying off the shelves and that the Mint 5% 4-pack in particular was out of stock 25% of the time. [311]

384.    Crosthwaite, when he was still formally working for ALTRIA and Altria Client Services, was directly involved in supervising the distribution of JUUL products, including Mint. For example, a senior director at Altria Group Distribution Company notified Crosthwaite that certain JUUL products, including Mint 5% JUULpods, were experiencing "inventory constraints"

---

[308] JLI01010641.
[309] JLI01010641.
[310] ALGAT0000772561.
[311] ALGAT0000772561.

which "may be relevant to [Crosthwaite's] conversation with Kevin Burns," JLI's then-CEO.[312] Crosthwaite forwarded the email to Burns, asking him "Assume your guys are all over this?"[313]

385. As ALTRIA's counsel put it, "The benefits of this arrangement [were] dramatic: ALTRIA helped JLI achieve the company's largest wholesale order of refill shipments in JLI's history in February 2019" by providing critical fixture and sales support to approximately 78 retail chain accounts.[314] When listing JUUL Performance Results in March 2019, Altria Group Distribution Company included a quote from "Alex Cantwel, VP JUUL Strategy" reporting "We just had our largest refill kit order in history. Thank you and your team for all the work."[315]

386. Altria Client Services, for its part, not only served as the "provider manager" for each of the formal agreements between JLI and various "Altria Compan[ies]", but also agreed to work with JLI's regulatory affairs employees on the PMTA application for JUUL and directly market JUUL to millions of customers.

387. For example, to assist with PMTA, Altria Client Services agreed to:

a.     Study JUUL products, including conducting pre-clinical (chemistry, toxicology and biological sciences), clinical, aerosol, modeling and simulation, sensory and population research (perception, behavior, population modeling, consumer research and post-market surveillance) and assist with JLI's regulatory affairs problems by providing with strategy and engagement, regulatory intelligence and insight, advocacy and regulatory narrative writing and submissions;[316]

---

[312] JLI01392499.
[313] JLI01392499.
[314] 8490000866.
[315] ALGAT0002940950.
[316] JLI01339882; JLI013398976.

b.    Study and consult with JLI for examination of consumer perception, behavior, and intentions relating to JUUL products, such as whether consumers comprehend JUUL's e-vapor communications (instructions for use, labeling and safety warning) and the impact of exposure to JUUL promotional materials among users and on users on, the likelihood of switching, dual use, initiation, and cessation of tobacco products, appeal of JUUL, absolute risk perceptions associated with use of JUUL, risk perceptions relative to other tobacco products, NRTs and quitting, and general harm perceptions associated with the use of JUUL;[317]

c.    Study and consult with JLI on preclinical in vivo inhalation exposure of JLI's 1.7% Glacial Mint flavor product and its effect on rats;[318]

d.    Study and consult with JLI on chemical profiling analysis of Golden Tobacco, Virginia Tobacco, Mango, Mint, and Menthol JUUL products in 1.7, 3, and 5 nicotine strength;[319] and

e.    Study and consult with JLI on population modeling, including on assessing the population health impact to the U.S. population with the introduction of JUUL products, focusing on tobacco use prevalence and all-cause mortality;[320]

f.    Conduct JUUL topical literature reviews relating to e-vapor products, including collecting and summarizing these articles into a literature review summaries and create evidence tables on information about initiation, cessation,

---

[317] JLI01426119
[318] JLI01426125
[319] JLI01426135.
[320] JLI01426141.

relapse, patterns of use, abuse liability, gateway, perceptions, chemistry, and health effects topics;[321]

g.      Develop, execute, and document exposure characterization for JUUL's classic tobacco product;[322]

h.      Study and consult with JLI on passive vaping modeling, including modeling of second and third hand exposures to e-vapor and cigarette smoke aerosols;[323]and

i.      Provide access to and use of Altria's product testing services, including its Smoking Machine Vitrocell 1/7, Vitrocell 24/28 system, and Vitrocell Ames 48 System.[324]

388.    Altria Client Services also market JUUL products by sending out mailers, emails, and coupons to millions of people across the United States. For example, Altria Client Services agreed to:

a.      Work with JLI to develop the final creative design for direct mail campaigns, execute the plans, and mail the JUUL advertisements and coupons to 1.5 million people in March 2019, 1 million people in May 2019, 2.5 million people in September 2019, and 3.8 million people in December 2019;[325]

---

[321] JLI01339943.

[322] JLI01426146.

[323] JLI01426130.

[324] JLI01339988.

[325] JLI01339912; JLI01339915; JLI01339967; JLI01339970. In the December 2019 agreement, but not the March, May, or September agreement, ACS claimed to "reserve the right not to send any mailing of portion thereof where all [JUUL] vapor products cannot be legally sold." JLI013339970.

b.      Work with JLI to develop the final creative design for an email campaign and send out direct marketing via email, including three email campaigns with a combined total audience of 515,000, including coupons of JUUL;[326]

389.    ALTRIA also worked with JLI to cross-market JUUL and Marlboro cigarettes. As memorialized in an agreement between Philip Morris USA, Inc. and JLI, "the Altria Company" worked with JLI to design inserts to put in ALTRIA's cigarettes and eventually distributed coupons for JUUL starter kits in 20 million packs of L&M and Parliament brand cigarettes and 30 million packs of Marlboro cigarettes:[327]



390.    Both the inserts distributed by Philip Morris and the mail and email advertisements sent by Altria Client Services were advertisements for JLI's fraudulent "Make the Switch" campaign described above.

391.    In order to help JUUL expand and be able to keep selling to kids and lying to adults, ALTRIA and Altria Client Services also directed JLI in combatting legal and regulatory

---

[326] JLI01339927.
[327] *Points for us!*, Reddit (Sept. 16, 2019), https://www.reddit.com/r/juul/comments/d50jku/points_for_us/ (depicting an image of a Marlboro carton with a JUUL starter kit coupon inside); JLI01339874.

challenges, helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure. For example, in 2019, internal documents from Altria Client Services confirm that ALTRIA was engaged in ongoing efforts to provide "services and insight to accelerate JUUL's U.S. performance" and "actively engage FDA and other stakeholders to address youth vaping."[328]

392.     ALTRIA also brings lobbying muscle to the table, which worked to prevent new federal or state legislation targeting JUUL or the e-cigarette category more broadly. ALTRIA "has a potent lobbying network in Washington [D.C.] and around the country."[329] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where Altria ends and JLI begins."[330] While an ALTRIA spokesman has denied that there was any contractual services agreement for lobbying between JLI and ALTRIA, he admitted that he did not know what informal advice and conversations ALTRIA has had with JLI about lobbying efforts. Crosthwaite admitted internally that ALTRIA would be "collaborat[ing] on regulatory matters" with JLI (likely through Altria Client Services).[331] And ALTRIA installed Joe Murillo, then the head of regulatory affairs for ALTRIA and a 24-year ALTRIA veteran with extensive experience in e-cigarette regulations, as Chief Regulatory Officer for JLI. Indeed, since ALTRIA worked with the MANAGEMENT DEFENDANTS to assume

---

[328] ALGAT0002856956.
[329] Shelia Kaplan, *In Washington, JLI Vows to Curb Youth Vaping. Its Lobbying in States Runs Counter to That Pledge.*, N.Y. Times (Apr. 28, 2019), https://www.nytimes.com/2019/04/28/health/juul-lobbying-states-ecigarettes.html.
[330] *Id.*
[331] ALGAT0002856953.

some control over JLI, JLI's spending on lobbying has risen significantly. JLI spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.[332]

393.    Contrary to public statements, ALTRIA's investment in JLI was not only a financial contribution nor were these agreements about just "services"; rather, they were manifestations of ALTRIA's and the MANAGEMENT DEFENDANTS' plan to continue selling JUUL to kids and lying to adults about JUUL products, all while staving off regulation and public outcry.  Internal documents show that ALTRIA did not consider itself a mere non-voting minority investor or service provider.  Instead, it viewed itself as JLI's "valued partner" and wanted to ensure it could "completely unlock partnership benefits," "guide [JLI's] strategic direction through board engagement," including "providing strategic advice and expertise," and "collaborate on youth vaping."[333] According to an Altria Group Distribution Company presentation, Altria Group Distribution Company should be "viewed as more than a vendor but as a strategic partner in supporting JUUL's mission."[334]

394.    ALTRIA's services agreements with JLI  obscured ALTRIA's takeover of large portions of JUUL's distribution and marketing.  ALTRIA's goal was always to expand the reach and sales of JUUL products, despite the knowledge of their lies and youth targeting. According to the Altria Client Services employees working with KC Crosthwaite on summarizing AGI's 2019 "Strategic Initiatives", AGI CEO Howard Willard "investment thesis from the beginning" was that Altria could accelerate JUUL growth "as it gains more prominent shelf space" and "category

---

[332] *Client Profile: JUUL Labs*, Center for Responsive Politics, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2019&id=D000070920 (last visited Apr. 4, 2020).
[333] ALGAT0002856956.
[334] ALGAT0000772561.

management."[335] And importantly, as noted above, ALTRIA gives JLI access to shelf space that it had obtained under fraudulent pretenses. This is not just any shelf space; it is space near ALTRIA's (PHILIP MORRIS USA's) blockbuster Marlboro cigarettes, and other premium products and retail displays. The arrangement allows JLI's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

395.   ALTRIA's   investment   and   collaboration   with   the   MANAGEMENT DEFENDANTS was not just about investing in a legitimate business or selling to adult smokers. Instead, ALTRIA used its relationship with the MANAGEMENT DEFENDANTS and with JLI to continue selling to youth and lying to the public, just as it had done in the past.  Despite its knowledge of JUUL's youth targeting, when announcing its investment, ALTRIA explained that its investment in JLI "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JLI expand its reach and efficiency."[336] ALTRIA sought to achieve this goal through "strategic guidance," "board influence," and marketing and distribution assistance.[337] And with the help of the MANAGEMENT DEFENDANTS, and PRITZKER and VALANI in particular, ALTRIA has successfully ensured that JUUL would maintain and expand its market share—a market share that, based on ALTRIA's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth e-cigarette use.

---

[335] ALGAT0002856953.
[336] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018),
https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.
[337] ALGAT0004641801.

VII.    **JLI, ALTRIA, and Others Have Successfully Caused More Young People to Start Using E-Cigarettes, Creating a Youth E-Cigarette Epidemic and Public Health Crisis**

396.    DEFENDANTS' tactics have misled the public regarding the addictiveness and safety of e-cigarettes generally, and JUUL products specifically, resulting in an epidemic of e-cigarette use among youth in particular.

397.    DEFENDANTS' advertising and third-party strategy, as discussed above, ensured that everyone from adults to young children, would believe JUULing was a cool, fun, and safe activity.

398.    To this day, JLI has not fully disclosed the health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of people in harm's way.

A.    **DEFENDANTS' Caused Consumers to be Misled into Believing that JUUL was Safe and Healthy.**

399.    In 2016, the National Institute on Drug Abuse issued findings regarding "Teens and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring, rather than nicotine.[338]

400.    Several years later, despite the ongoing efforts of public health advocates, a 2018 study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained unaware that JUUL products contain nicotine. The study further found that respondents were less likely to report that e-cigarettes were harmful to their health or that people can get addicted to e-cigarettes[339]

---

[338] Teens and E-cigarettes, National Institute on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/teens-e-cigarettes.
[339] Jeffrey G. Willett et al., Recognition, Use and Perceptions of Juul Among Youth and Young Adults, 28 Tob Control 054273 (2019).

## B.    Use of JUUL by Minors Has Skyrocketed.

401.    On December 28, 2018, the University of Michigan's National Adolescent Drug

Trends for 2018 reported that increases in adolescent e-cigarette use from 2017 to 2018 were the

"largest ever recorded in the past 43 years for any adolescent substance use outcome in the

U.S."[340]

402.    As of that time, approximately 3.6 million middle and high school students were

consuming e-cigarettes regularly, and one in five 12th graders reported used an e-cigarette

containing nicotine in the last 30 days.[341] As of late 2019, 5 million students reported active use

of e-cigarettes, with 27.5% of high school students and 10.5% of middle school students using

them within the last thirty days and with most youth reporting JLI as their usual brand.[342]

403.    The Secretary of the U.S. Department of Health and Human Services declared

that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-

cigarette use [is rising]."[343] Then FDA Commissioner Dr. Gottlieb described the increase in e-

cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for

an "epidemic" of nicotine use among teenagers.[344] The rapid—indeed infectious—adoption of e-

cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to

[340] National Adolescent Drug Trends in 2018, University of Michigan Institute for Social Research (Dec. 17, 2018), http://monitoringthefuture.org/pressreleases/18drugpr.pdf.
[341] See Jan Hoffman, Addicted to Vaped Nicotine, Teenagers Have no Clear Path to Quitting, N.Y. Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotineteenagers.html.
[342] National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youth-andtobacco/; see Appendix 1 at Image 20.
youth-tobacco-use-results-national-youth-tobacco-survey
[343] Jan Hoffman, Study Shows Big Rise in Teen Vaping This Year, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html
[344] Press Release, FDA Launches New, Comprehensive Campaign to Warn Kids About the Dangers of E-Cigarette Use as Part of Agency's Youth Tobacco Prevention Plan, Amid Evidence of Sharply Rising Use Among Kids, U.S. Food & Drug Administration (Sept. 18, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm.

tobacco products." Dr. Gottlieb identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."[345]

404.    The following graph illustrates JLI's responsibility for the nationwide youth e-cigarette epidemic. While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth. Through that same timeframe, youth e-cigarette rates nearly doubled from more than 11.% in 2017 to more than 20% in 2018. Through October 5, 2019 (the last date for which data was available), rates of youth e-cigarette use continued to increase, tracking the growth of JUUL.[346]



---

[345] Press Release, FDA Unveils New Steps to Protect Youth by Preventing Access to Flavored Tobacco Products, Announces Plans to Ban Menthol in Cigarettes and Cigar, U.S. Food &Drug Administration (Nov. 15, 2018), www.fda.gov/tobacco-products/ctp-newsroom/fda-unveils-new-steps-protect-youth-preventing-access-flavored-tobacco-products-announces-plans-ban.
[346] Nielsen: Tobacco All Channel Data; National Youth Tobacco Survey (2019), https://www.fda.gov/tobacco-products/youth-andtobacco/youth-tobacco-use-results-national-youth-tobacco-survey.

405. The unique features of the JUUL e-cigarette—high nicotine delivery, low harshness, and easy-to-conceal design—have caused patterns of addiction with no historical precedent. It is not uncommon for fifteen-year-old students, even those who live at home with their parents, to consume two or more JUUL pods a day.

## VIII. JUUL Thrived Due to Extensive Efforts to Delay Meaningful Regulation of its Products

### A. E-Cigarette Manufacturers Successfully Blocked the Types of Regulations that Reduced Cigarette Sales, Creating the Perfect Opportunity for JLI.

406. One of the main reasons e-cigarettes like JUUL were so appealing from an investment and business development perspective is that, unlike combustible cigarettes, e-cigarettes were relatively unregulated. This regulatory void was not an accident; the cigarette industry, and then the e-cigarette industry, spent significant resources blocking, frustrating, and delaying government action.

407. In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act (TCA). The TCA amended the Federal Food, Drug, and Cosmetic Act to allow the FDA to regulate tobacco products.

408. Although the TCA granted the FDA immediate authority to regulate combustible cigarettes, it did not give the FDA explicit authority over all types of tobacco products—including those that had not yet been invented or were not yet popular. To "deem" a product for regulation, the FDA must issue a "deeming rule" that specifically designates a tobacco product, such as e-cigarettes, as falling within the purview of the FDA's authority under the TCA.

409. The TCA also mandated that all "new" tobacco products (i.e., any product not on the market as of February 15, 2007) undergo a premarket authorization process before they could be sold in the United States.

410.     Four years later, on April 25, 2014, the FDA finally issued a proposed rule deeming e-cigarettes for regulation under the Tobacco Act ("2014 Proposed Rule").

411.     Once issued, the e-cigarette industry, together with its newfound allies, parent companies, and investors—the cigarette industry and pro-e-cigarette lobbyists—set to work to dilute the rule's effectiveness. The New York Times reported that ALTRIA was leading the effort to dilute, diminish, or remove e-cigarette regulations.[347]

412.     In 2015, ALTRIA lobbied Capitol Hill with its own draft legislation to eliminate the new requirement that most e-cigarettes already on sale in the United States be evaluated retroactively to determine if they are "appropriate for the protection of public health." In effect, ALTRIA lobbied to "grandfather" all existing e-cigarette brands, including JUUL, into a lax regulatory regime.

413.     By thwarting and delaying regulation, or by ensuring what regulation did pass was laced with industry-friendly components, the e-cigarette industry, including DEFENDANTS, hobbled the FDA—and by extension—Congress's efforts to regulate e-cigarettes. Simultaneously, the e-cigarette industry continued to market their products to youth, and it coordinated to sow doubt and confusion about the addictiveness and health impacts of e-cigarettes.

414.     Even after the FDA issued its final deeming rule in 2016, e-cigarette industry lobbying continued to pay dividends to companies like JLI. In 2017, when Dr. Scott Gottlieb took over as the FDA Commissioner, one of his first major acts was to grant e-cigarette companies a four-year extension to comply with the deeming rule, even as data indicated sharp

---

[347] Eric Lipton, A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?, Nytimes.com (2020), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-ALTRIA.html.

increases in teen e-cigarette use. Gottlieb had previously served on the board of Kure, a chain of

e-cigarette lounges in the United States.[348]

> **B.      JLI, the MANAGEMENT DEFENDANTS, and ALTRIA Successfully Shielded the Popular Mint Flavor from Regulation.**

415.      JLI, the MANAGEMENT DEFENDANTS, and ALTRIA had a two-fold plan for

staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on the

market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of

JLI's role in the youth vaping epidemic.

416.      First, JLI, the MANAGEMENT DEFENDANTS, and ALTRIA publicly defended

mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated

that mint users are not former menthol smokers. Second, by fighting to keep mint as the last

flavor on the market, the cigarette industry could continue to appeal to non-smokers, including

youth. JLI and the MANAGEMENT DEFENDANTS coordinated with ALTRIA to pursue a

fraudulent scheme to convince the FDA into leaving the mint flavor on the market, sacrificing

other flavors in the process.

417.      On August 2, 2018, JLI met with the FDA to discuss a proposed youth-behavioral

study regarding the prevalence of use, perceptions of use, and intentions to use JUUL and other

tobacco products among adolescents aged 13-17 years (the "Youth Prevalence Study").[349]

418.      On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study

to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had

---

[348] Zeke Faux & Dune Lawrence, Vaping Venture Poses Potential Conflict for Trump's FDA
Nominee, Bloomberg (2017), https://www.bloomberg.com/news/articles/2017-04-19/vaping-
venture-poses-potential-conflict-for-trump-s-fda-nominee.
[349] Letter from Joanna Engelke, JUUL Labs, Inc., to David Portnoy, Ph.D., M.P.H., FDA Center
for Tobacco Products (Sept. 12, 2018).

ever used a JUUL, and that only 0.8% of youth had used a JUUL in the last 30 days. Specifically, the study found that 47% of youth who reported use of a JUUL device in the last 30-days professed to using mango most often, with only about 12% reporting the same for mint. JLI's study was a sham. JLI, the MANAGEMENT DEFENDANTS, and ALTRIA knew their reported data was inconsistent. JLI's report featured responses to a carefully selected survey question—which single flavor youth used most often?—that obscured the widespread use of mint JUUL pods among youth.

419.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to ALTRIA, JLI and other e-cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[350]

420.    With ongoing deal talks hidden from public awareness, ALTRIA and JLI secretly coordinated their actions to prevent FDA from taking action to regulate the mint flavor.

421.    DEFENDANTS' plan centered on efforts to deceive the FDA that (1) mint was more akin to Tobacco and Menthol than other flavors; and (2) kids did not prefer mint.

422.    JLI knew that non-smoking youth liked mint as much as any flavor. Most importantly, JLI knew that mint was the most popular JUUL pod. Though other flavors might draw new customers, JLI's most addictive "flavor" predictably became its most popular.

423.    The characterization of mint as an adult tobacco product was also fraudulent because JLI studies that teens viewed mint as favorably as mango, which implies that mango and

---

[350] Letter from Scott Gottlieb, M.D., Commissioner of Food and Drugs, U.S. FDA to Kevin Burns, JUUL Labs, Inc. (Sept. 25, 2018); Letter from Scott Gottlieb, M.D., Commissioner of Food and Drugs, U.S. FDA to Howard A. Willard, III, ALTRIA Group Inc. (Sept. 25, 2018).

mint were fungible goods for JLI's underage users.[351] As alleged in a Whistleblower Complaint, JLI's then-CEO told his employees: "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."[352]

424.    In furtherance of this scheme to keep mint flavor unregulated, ALTRIA dually lobbied to prevent regulation of mint while also publicly announced its decision to remove its pod-based products from the market as a means to address the dramatic increase in youth e-cigarette use. The latter in this instance provided credibility and credence for the former. The seemingly altruistic step of removing was fraudulent and two-faced, as ALTRIA knew the public and FDA was unaware it was secretly in talks to acquire significant interest in JLI's pod-based business.

425.    ALTRIA furthered its efforts to lobby FDA to preserve mint flavor by fraudulently claiming mint is a traditional tobacco flavor (it was not) and by providing dubious quasi-scientific studies.

426.    At the heart of these acts of fraud was DEFENDANTS' characterization of mint as a tobacco product that was targeted to adult smokers. This characterization was fraudulent because DEFENDANTS knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products. ALTRIA supported this plan and helped execute it. Together, these actions by JLI and ALTRIA ensured that mint would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-vapor users in order to ensure a steady and growing customer base.

---

[351] See Appendix 1 at Image 21.
[352] Angelica LaVito, Former JLI executive sues over retaliation, claims company knowingly sold tainted nicotine pods, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/former-juulexecutive-sues-over-retaliation-claims-company-knowingly-sold-tainted-pods.html.

427.     The deceptive scheme worked, and FDA did not and has not to date taken steps to regulate or prohibit the sale of mint flavored e-cigarettes. JLI continues to sell menthol-flavored products.

IX.     **JUUL Usage Increases the Risk of Cardiovascular, Pulmonary, Neurological, and Other Bodily Injuries**

A.     **JUUL Products Cause Acute and Chronic Lung (Pulmonary) Injuries.**

428.     The use of e-cigarettes, including JUUL, cause significant lung toxicity and have been implicated in multiple severe pathological lung injuries.

429.     Recent studies have demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[353]

430.     Lung epithelial cells are the first-line of defense and provide barrier protection from toxic inhalants. Epithelial barrier dysfunction can allow toxic inhalants access to systemic circulation by which they can interact with other tissues to generate fibrosis. In addition, the impaired barrier function allows greater passage of inhaled chemicals into the body, increasing inflammation both locally in the lungs and systemically. This can lead to acute and chronic lung injury as well as exposure to, and increased susceptibility to, respiratory infections in users of e-cigarettes, including JUUL.[354]

431.     Research has also demonstrated that ultrafine metal particles from heating devices

---

[353] Thivanka Muthumalage, et al., E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.
[354] Laura E. Crotty Alexander et al. Chronic Inhalation of E-cigarette Vapor Containing Nicotine Disrupts Airway Barrier Function and Induces Systemic Inflammation and Multiorgan Fibrosis in Mice, 314 Am. J. Physiol. Regul. Comp. Physiol. R834 (2018), https://journals.physiology.org/doi/full/10.1152/ajpregu.00270.2017; Pieter S. Hiemstra et al., The Innate Immune Function of Airway Epithelial Cells in Inflammatory Lung Disease, 45 Eur. Respir. J. 1150 (2015), https://erj.ersjournals.com/content/45/4/1150.

have been found in e-cigarette aerosol, and in e-cigarette user's lungs.[355]

432.    In addition, exposure to JUUL aerosol has shown to significantly impair endothelial function comparable to impairment of endothelial function caused by use of combustible cigarettes.[356]

433.    It is well-established that endothelial dysfunction and injury from direct toxic effects of inhalants such as cigarette smoke, cause lung injuries such as chronic obstructive pulmonary disease (COPD), emphysema, asthma and chronic bronchitis.[357]

434.    Recent epidemiological and toxicological studies detected links between asthma frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.[358]

435.    A study published in December 2019, found that among individuals who never smoked combustible cigarettes, current e-cigarette use was associated with 75% higher odds of chronic bronchitis, emphysema, and COPD compared to those who never used e-cigarettes.[359]

436.    Moreover, the flavoring compounds used in e-cigarettes such as JUUL, include numerous chemicals known to be toxins if inhaled, such as diacetyl, acetyl propionyl, and

---

[355] Alessandra Caporale et al., Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI, 293 Radiology 97 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31429679.
[356] Poonam Rao et al., Juul and Combusted Cigarettes Comparably Impair Endothelial Function, 6 Tob. Regul. Sci. 30 (2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6953758/.
[357] Francesca Polverino et al. COPD as an Endothelial Disorder: Endothelial Injury Linking Lesions in the Lungs and Other Organs? 8 Pulm. Circ. 2045894018758528 (2018), https://www.ncbi.nlm.nih.gov/pubmed/29468936.
[358] Phillip W. Clapp and Ilona Jaspers, Electronic Cigarettes: Their Constituents and Potential Links to Asthma, 79 Curr Allergy Asthma Rep. 17 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28983782.
[359] Albert D. Osei, et al., Association Between E-Cigarette Use and Chronic Obstructive Pulmonary Disease by Smoking Status: Behavioral Risk Factor Surveillance System 2016 and 2017, 132 Am. J. Prev. Med. 949 (2019), https://www.ncbi.nlm.nih.gov/pubmed/30853474.

benzaldehyde. These chemicals are linked to serious lung disease.[360] A multitude of published case reports have linked e-cigarette use, including JUUL, to a variety of acute inhalational lung injuries such as lipoid pneumonia, bronchiolitis obliterans (popcorn lung), alveolar hemorrhage, eosinophilic pneumonia, hypersensitivity pneumonitis, chemical pneumonitis and collapsed lungs, among others.

437.    In 2012, the first article was published in the medical literature describing respiratory illness occurring as a result of e-cigarettes. McCauley et al. reported on the case of a 42-year-old woman admitted with a seven-month history of dyspnea, cough, and fevers, for which she had been given multiple courses of antibiotics after presenting to the emergency department, without improvement. Coinciding with the onset of symptoms the patient had begun using e-cigarettes. Chest imaging revealed "new multifocal bilateral opacities" and "extensive bilateral upper- and lower-lobe patchy ground glass pulmonary opacities in a 'crazy paving' pattern." All other testing, including immunological, was unremarkable. The patient was diagnosed with lipoid pneumonia, a "primarily chronic inflammatory reaction secondary to the presence of lipid substances in the lungs, with subsequent uptake by alveolar macrophages and accumulation in the interstitium." The authors also hypothesized the source of lipoid pneumonia was e-cigarette use, due to "glycerin-based oils found in e-cigarette nicotine vapor" added to "make the visual smoke when the solution is vaporized."[361]

---

[360] Centers for Disease Control & Prevention, Flavorings-Related Lung Disease (Oct. 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/default.html; Won Hee Lee et al., Modeling Cardiovascular Risks of E-Cigarettes with Human-Induced Pluripotent Stem Cell-Derived Endothelial Cells. 73 J. Am. College of Cardiology 2722 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31146818; Sheila Kaplan & Matt Richtel, Mysterious Vaping Illness That's 'Becoming an Epidemic,' N.Y. Times (Aug. 31, 2019), https://www.nytimes.com/2019/08/31/health/vaping-marijuana-ecigarettes-sickness.html?auth=login-email&login=email.
[361] Lindsay McCauley et al., An Unexpected Consequence of Electronic Cigarette Use. 141

438.     Thota et al., published another report of respiratory illness associated with e-cigarette use in 2014. This report described a 20-year-old previously healthy U.S. active-duty male sailor who presented with a three-day history of "persistent cough, shortness of breath, and facial flushing" which began an hour after using an e-cigarette device. The patient had no history of exposure to pulmonary irritants and had experienced worsening of symptoms when using e-cigarettes again en route to the emergency department. Tachycardia and tachypnea were noted in his initial workup. Chest imaging found "subtle diffuse patchy reticulonodular opacities" and "predominantly diffuse ground-glass opacities involving the upper and middle lobes of the lungs more than lower lobes." The patient was administered antibiotics for presumed diagnosis of community-acquired pneumonia, but absence of microorganism infection upon bronchoscopy evaluation, nor indeed any other infectious etiology determined from subsequent testing, led to a diagnosis of acute eosinophilic pneumonia. The patient was given prednisone and discharged after five days in the hospital, with improvement of his symptoms and significant resolution of lung opacity.[362]

439.     In 2015, Atkins and Drescher reported a case of acute inhalational lung injury with ENDS with, importantly, positive rechallenge and dechallenge, significant indicators of an exposure being a causative effect for an outcome. A 60-year-old man with a history of cigar smoking was admitted with weakness, chills, and cough, which was treated with antibiotics and the patient discharged, and within three days he felt better. However, a month later the patient presented again with similar symptoms as well as a fever and hypoxemia, with "bilateral upper

---

Chest 1110 (2012).
[362] Darshan Thota & Emi Latham, Case Report of Electronic Cigarettes Possibly Associated with Eosinophilic Pneumonitis in a Previously Healthy Active-duty Sailor, 47 J. Emerg. Med. 15 (2014).

lung zone crackles and bilateral upper lobe predominant ground glass infiltrate on chest CT."
The patient revealed before each emergency room admittance he had used e-cigarettes. The
patient was diagnosed with "suspected acute hypersensitivity pneumonitis, related to ENDS" and
had no further episodes with cessation of ENDS use. Repeat chest CT at three months post-
diagnosis revealed normal pulmonary function.[363]

440.     Another case of lipoid pneumonia was reported in 2015 by Modi et al., who saw a
31-year-old woman admitted to the hospital for dyspnea and cough. Chest imaging found
"bilateral air space opacities" and "diffuse ground-glass opacities with interlobular septal
thickening consistent with 'crazy paving' pattern" and, despite antibiotic administration, the
patient "became increasingly hypoxic and was intubated due to concerns of acute respiratory
distress syndrome." Bronchoalveolar lavage demonstrated "reactive pneumocytes and alveolar
macrophages with positive staining (Oil-Red-O) for lipid content." Thus, the patient was started
on IV steroids and diagnosed with lipoid pneumonia, given the close temporality of her recent
initiation of e-cigarettes three months prior to her onset of symptoms. The patient rapidly
improved with steroids and cessation of use of e-cigarettes.[364]

441.     In 2015, Moore et al., published a case report describing bilateral pneumonia and
pleural effusions associated with e-cigarette use.[365]

442.     In 2016, another case report recognizing a link between e-cigarettes and
respiratory illness was published by Mantilla et al., who reported a case of a 27-year-old

---

[363] Graham Atkins & Frank Drescher, Acute Inhalational Lung Injury Related to the Use of
Electronic Nicotine Delivery System (ENDS),148 Chest 83A (2015).
[364] Sujal Modi et al., Acute Lipiod Pneumonia Secondary to E-Cigarettes Use: An Unlikely
Replacement for Cigarettes, 148 Chest 382A (2015).
[365] Kendall Moore et al., Bilateral Pneumonia and Pleural Effusions Subsequent to Electronic
Cigarette Use, 3 Open Journal of Emergency Medicine 18 (2015).

otherwise healthy man who was admitted to the hospital with dyspnea, cough, fever, and hemoptysis after increasing use of e-cigarettes for seven months prior to presentation, initiated in an effort to decrease his combustible tobacco dependence. Chest imaging revealed "diffuse, military nodular pattern" with "innumerable pulmonary nodules." The patient worsened and required intubation and mechanical ventilator support in spite of absence of any notable findings on microorganism workup, "making infectious etiology for his pneumonia very unlikely." Lung biopsy demonstrated bronchiolitis obliterans organizing pneumonia, which was treated with methylprednisolone.[366]

443.    Additional published case reports and case series were published since 2016 noting serious and significant acute lung injuries associated with vaping or e-cigarette use. Despite the increasing reports in the published medical literature and the widespread use of JUUL among teenagers, JLI did not take any steps to warn the public and consumers of the risks of JUUL products. Instead it continued to aggressively market the product as safe and promoted it extensively in various media forms including on social media outlets and via influencers.

444.    Over the summer of 2019, healthcare providers started to note an influx of acute respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes. This prompted a Center for Disease Control ("CDC") investigation of an outbreak of vaping associated lung injuries. The reported injuries mirrored the injuries that had been reported in the medical literature since 2012.

445.    In October 2019, the CDC, recognizing the seriousness of the vaping epidemic, issued treatment guidelines to assist doctors in clinical practice including a protocol for inquiring

---

[366] Ronnie D. Mantilla et al., Vapor Lung: Bronchiolitis Obliterans Organizing Pneumonia (BOOP) in Patient with E-Cigarette Use, 193 Am. J. of Respiratory and Critical Care Med. A6513 (2016).

about vaping or e-cigarette history of use. The CDC defined a new recognized medical condition referred to as E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI).

446.    Researchers noted that the recent proliferation of vaping-related cases, known as EVALI, demonstrated a heterogeneous collection of pneumonitis patterns that include acute eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and acute respiratory distress syndrome (ARDS), diffuse alveolar hemorrhage, hypersensitivity pneumonitis, and the rare giant-cell interstitial pneumonitis. It was stated that, though the precise manifestations of the respiratory injury may be diverse, there were clues to the precipitants that warrant attention. About 80% of persons who vaped and became ill reported having used both nicotine products and tetrahydrocannabinol (THC) or cannabidiol (CBD) products. Active infection (which would include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit. It was suggested that mixing of multiple ingredients with primary compounds and potential contaminants may result in in vitro (or even in vivo) production of new agents that may be toxic.[367]

447.    Further, a recent publication in 2020 noted that there were almost 2000 cases of EVALI at the time it was written. The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak but there may be more than one cause and therefore, everyone should refrain from using any e-cigarette or vaping products.[368]

448.    Another publication in January 2020 noted that there were a number of patients who were diagnosed with EVALI, reported the use of nicotine only e-cigarettes and had negative

---

[367] David C. Christiani, Vaping-Induced Injury, 68 New England J. Med. 787 (2019).
[368] Sascha Ellington et al., Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use-Associated Lung Injury—United States, August 2019–January 2020, Morbidity and Mortality Weekly Report (MMWR) 69(2); 44-49 (2020).

drugs screens for THC or CBD. The authors concluded that EVALI was also associated with nicotine only products and a different causative agent might be implicated in those cases.[369]

449.    Also in January 2020, Lu, et al. reported a teenager who developed acute fibrinous organizing pneumonia (AFOP) after using JUUL as well as other e-cigarettes. AFOP presents with diffuse ground glass infiltrates and intra-alveolar fibrin balls. Subpleural sparing and pneumomediastinum described elsewhere in vaping associated lung injury were also seen. The authors noted that this patient's presentation fit with existing literature, but his young age, choice of e-cigarette, and lung pathology were considered unique. The images characterized AFOP, a newly evolving rare lung pathology within the field of pulmonology, which is now associated with e-cigarette use.[370]

450.    In addition, multiple reports have been published in the medical literature of acute alveolar hemorrhage caused by e-cigarette use.[371] Diffuse alveolar hemorrhage (DAH) is a life-threatening disorder which refers to bleeding that originates in the pulmonary microvasculature. It often results in acute respiratory failure.[372]

451.    Hypersensitivity pneumonitis is a disease of the lungs in which the lungs become inflamed as a result of an allergic reaction to inhaled dust, fungus, molds or chemicals. Hypersensitivity pneumonitis has been linked to the use of e-cigarettes, such as JUUL, since

---

[369] Isaac Ghinai et al., Characteristics of Persons Who Report Using Only Nicotine-Containing Products Among Interviewed Patients with E-cigarette, or Vaping, Product Use-Associated Lung Injury Ê Illinois, August-December 2019, Morbidity and Mortality Weekly Report (MMWR) 69(3); 84-89 (2020).

[370] Monica A. Lu et al., Vaping-related Lung Injury in an Adolescent. 201 American J. of Respiratory & Critical Care Med. 481(2020).

[371] Michael Agustin et al., Diffuse Alveolar Hemorrhage Induced by Vaping, 7 Case Rep. Pulmonol. 9724530 (2018); Peter J. Edmonds et al., Vaping-induced Diffuse Alveolar Hemorrhage, 29 Respiratory Med. Case Reports 100996 (2020).

[372] Brandi R. Newsome & Juan E. Morales, Diffuse Alveolar Hemorrhage, 104 Southern Med. J. 269 (2011).

2015.[373]

452.    In 2018, Sommerfield, et al, published the first reported case of hypersensitivity pneumonitis and acute respiratory distress syndrome (ARDS) as a risk of e-cigarette use in an adolescent.[374] ARDS is a buildup of fluid in the alveoli, the tiny air sacs in the lungs. This results in less oxygen travelling to organs, which is very dangerous and can result in severe life-threatening injuries, including death. ARDS can occur as a result of indirect or direct trauma to the lung.

453.    The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation and death.

454.    Recent case reports have also linked spontaneous pneumothorax (lung collapse) to vaping and use of e-cigarettes.[375]

455.    While understandably the focus of concern over vaping is the addiction of a new generation of youth, there is certainly ample concern for older individuals as well. As noted by an article written by the American Associated for Retired Persons (AARP) entitled Vaping Dangers for Older Adults: What to know about recent lung illnesses and deaths, "Most vaping patients were under 35 but a new CDC report shows adults older than 50 are getting hit hard: Among 342 people with vaping illness, 69 percent of those over age 50 were admitted to hospital

---

[373] Graham Atkins et al., Acute Inhalational Lung Injury Related to the Use of Electronic Nicotine Delivery Systems (ENDS), 148 Chest 83A (2015).

[374] Casey G. Sommerfield et al., Hypersensitivity Pneumonitis and Acute Respiratory Distress Syndrome From E-Cigarette Use, 141 Pediatrics e20163927 (2018).

[375] Alex Bonilla et al., Recurrent Spontaneous Pneumothoraces and Vaping in an 18-year-old Man: A Case Report and Review of the Literature, 13 J. of Med. Case Reports 283 (2019), https://doi.org/10.1186/s13256-019-2215-4; Munish Sharma et al. A Case Report of Secondary Spontaneous Pneumothorax Induced by Vape, 11 Cureus e6067 (2019), https://doi:10.7759/cureus.6067.

intensive-care units compared with 38 to 56 percent of younger adults and teens; older adults were more likely to need breathing tubes and spent nearly 15 days in the hospital, compared with six to seven days for younger people." (Emphasis added).[376]

456.    JUUL users are also at greater risk of suffering more serious complications if they contract the coronavirus. Michael Felberbaum, an FDA spokesman, noted that "E-cigarettes can damage lung cells," and expose people who "smoke and/or vape tobacco or nicotine-containing products" to more "serious complications from Covid-19."[377]

457.    Further, according to Nora Volkow, director of the National Institute on Drug Abuse, "[b]ecause it attacks the lungs, the coronavirus that causes COVID-19 could be an especially serious threat to those who smoke tobacco or marijuana or who vape".[378]

458.    In short, older adults, especially those who were smokers are at increased risk of lung and other complications due to their baseline higher risk status, making them more vulnerable to the adverse health effects of vaping.

459.    It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia, chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, acute respiratory distress syndrome (ARDS), asthma, emphysema and COPD. DEFENDANTS never warned the public of the risk of serious acute and

---

[376] Sari Harrar, Vaping Dangers for Older Adults: What to know about recent lung illnesses and deaths, AARP (Oct. 17, 2019), https://www.aarp.org/health/conditions-treatments/info-2019/vaping-e-cigarettes-illnesses-deaths.html.

[377] Anna Edney and Angelica LaVito, Vaping Could Compound Health Risks Tied to Virus, FDA Says, BLOOMBERG (Mar. 27, 2020), https://www.bloomberg.com/news/articles/2020-03-27/vaping-could-increase-health-risks-tied-to-covid-19-fda-says

[378] Nora Volkow, MD, COVID-19: Potential Implications for Individuals with Substance Use Disorders, National Institute on Drug Abuse (Apr. 6, 2020) https://www.drugabuse.gov/about-nida/noras-blog/2020/04/covid-19-potential-implications-individuals-substance-use-disorders

chronic lung injuries that were associated with the use of e-cigarettes, including JUUL. In fact, JLI downplayed any risk associated with the inhalation of JUUL aerosol and continued to overtly promote JUUL as safe.

460.    It is notable, however, that in August 2019, JLI CEO Kevin Burns admitted that the long term health effects of JUUL are unknown.[379] The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety and warrants an award of punitive damages.

### B.    JUUL Products Cause Cardiovascular Injuries.

461.    In addition to severe lung injuries and addiction, JUUL products cause significant and severe risks of cardiovascular injuries. Studies have shown that use of e-cigarettes such as JUUL increase the risk of strokes and heart attacks. [380]

462.    Research has demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which also increases the risk of for strokes and heart attacks.[381] Further, scientists have found that e-cigarettes cause oxidative stress, which leads to vascular disease and

---

[379] CBS Interview JLI CEO, Kevin Burns (Aug. 29, 2019).

[380] E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries, American Stroke Association News Release, Abstract 9, Session A2 (Jan. 30, 2019), https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries; Mohindar R. Vindhyal et al., Impact on Cardiovascular Outcomes Among E-cigarette Users: A Review From National Health Interview Surveys, 73 J. of the Am. College of Cardiology Suppl. 2 (2019), www.onlinejacc.org/content/73/9_Supplement_2/11.; Paul M. Ndunda & Tabitha M. Muutu, Electronic Cigarette Use is Associated with a Higher Risk of Stroke, 50 Int'l Stroke Conference 2019 Oral Abstracts: Community/Risk Factors, Suppl. 1, Abst. 9, www.ahajournals.org/doi/10.1161/str.50.suppl_1.9.

[381] Charalambos Vlachopoulos et al., Electronic Cigarette Smoking Increases Aortic Stiffness and Blood Pressure in Young Smokers, 67 J. Am. Coll. Cardiol. (2016).

damage, known risk factors for cardiovascular injuries.[382]

463.    Recent biological and epidemiologic studies found that significant associations exist between e-cigarette use and myocardial infarctions (heart attacks), which appear to be dose-dependent. Biological investigations support this association, whereby a prothrombotic phenotype may develop after exposure to nicotine-containing e-cigarette vapors.[383]

464.    Rader, et al., found that chronic e-cigarette users demonstrated substantially impaired coronary microvascular endothelial function, even more pronounced than that seen in chronic tobacco cigarette users. These findings also suggested that chronic e-cigarette use leads to measurable and persistent adverse vascular effects that are not directly related to nicotine.[384]

465.    Alzahrani, et al., found that daily e-cigarette use was associated with an increased risk of myocardial infarction.[385]

466.    A systematic review of the literature found that acute mainstream exposure to aerosol from JUUL, or from previous generation e-cigarettes using free-base nicotine, impaired vascular function comparably to combusted cigarette smoke and delivered considerably more nicotine to the blood on a per puff basis.[386]

---

[382] Dennis Thompson, Vaping May Hurt the Lining of Your Blood Vessels, WebMD HealthDay Reporter (May 28, 2019), www.webmd.com/mental-health/addiction/news/20190528/vaping-may-hurt-the-lining-of-your-blood-vessels#1; JUUL e-cigarettes and JUUL pods deliver dangerous toxins and carcinogens to users. The ingredients in JUUL pods include glycerol, propylene glycol, nicotine, benzoic acid, and flavoring chemicals, www.juul.com/learn/pods.

[383] Giuseppe Lippi & Emmanuel J. Favaloro, An Update on Biological and Clinical Associations Between E-Cigarettes and Myocardial Infarction, Semin. Thromb. Hemost. (2019), https//:doi 10.1055/s-0039-3402451.

[384] Florian Rader et al., E-Cigarette Use and Subclinical Cardiac Effects, medRxiv (preprint) https//:doi:https://doi.org/10.1101/2020.01.16.20017780 (2020).

[385] Talal Alzahrani et al., Association Between Electronic Cigarette Use and Myocardial Infarction, 55 Am. J. Preventive Med. 455 (2018).

[386] Nicholas Buchanan et al., Cardiovascular Risk of Electronic Cigarettes: A Review of Preclinical and Clinical Studies, 116 Cardiovascular Research 40 (2019).

467.     The overarching conclusion from dozens of studies published in the past 8 years is that use of e-cigarettes, including JUUL, increases the risk of cardiovascular injury which can lead to strokes, heart attacks and death.

468.     JLI never warned the public or consumers of the serious and significant risk of cardiovascular injuries associated with its products.

### C.     JUUL Products Cause and Contribute to Seizures.

469.     On April 3, 2019 the FDA Center for Tobacco Products issued a Special Announcement notifying the public of an increase in reports of tobacco-related seizures, specifically relating to an increase in e-cigarette use, particularly among youth.[387]

470.     The FDA is currently investigating the direct connection between e-cigarette use in young people and increased risk of seizures, and requested that physicians and members of the public report any similar incidents.[388]

471.     Additionally, FDA Commissioner Scott Gottlieb, M.D. and the Principal Deputy Commissioner Amy Abernethy M.D., PhD issued a joint statement addressing the FDA's ongoing scientific investigation of seizures following e-cigarette use as a potential safety issue in youth and young adults. The statement flags seizures following e-cigarette use as a source of concern for the FDA, adding that in addition to the 35 reported cases from 2010 to early 2019, the FDA "recognize[s] that not all of the cases may be reported" due to their voluntary nature.[389]

---

[387] Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults, U.S. Food & Drug Administration (April 10, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.
[388] *Id.*
[389] Scott Gottlieb & Amy Abernethy, Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's Ongoing Scientific Investigation of Potential Safety Issue Related to Seizures Reported Following E-cigarette Use, Particularly in Youth and Young Adults (April 3, 2019), https://www.fda.gov/news-events/press-

472.     Symptomatic nicotine toxicity is a consequence of excessive vaping.[390]As the FDA acknowledges in their statement, "seizures or convulsions are known potential side effects of nicotine toxicity."[391]

473.     It is well-documented that nicotine poisoning can cause seizures, including ingestion of e-cigarette fluid.[392] Nicotine-induced seizure has long been considered a possible side effect of long-term nicotine exposure.[393]

474.     Nicotine has proconvulsive actions and, when overdosed, induces convulsive seizures both in humans and animals.[394] JUUL's high nicotine content and addictive nature cause JUUL users to be highly susceptible to seizures.

475.     As indicated in the FDA's announcement, reports of minor and young adult seizures following e-cigarette use have increased. At the time of the initial announcement in April 2019, 35 cases of seizures following e-cigarette use had been reported. As of August 7, 2019, the agency had received 127 reports of seizure or other neurological symptoms, such as fainting or tremors that occurred after vaping between 2010 and 2019 representing an increase of 92 cases since April 3, 2019.[395]

---

announcements/statement-fda-commissioner-scott-gottlieb-md-and-principal-deputy-commissioner-amy-abernethy-md-phd.

[390] Adrienne Hughes et al., An Epidemiologic and Clinical Description of E-cigarette Toxicity, 57 Clin. Toxicol. 287 (2018), https://doi: 10.1080/15563650.2018.1510503.

[391] FDA Apr. 10, 2019 statement.

[392] Gerdinique C. Maessen et al., Nicotine Intoxication by E-cigarette Liquids: A Study of Case Reports, Pathophysiology, 58 Clinical Toxicology 1 (2020), https://www.tandfonline.com/doi/full/10.1080/15563650.2019.1636994.

[393] Lucinda L. Miner et al., The Effect of Chronic Nicotine Treatment on Nicotine-induced Seizures, 52 Psychopharmacology 52 (2018), https://doi.org/10.1007/BF00212766.

[394] Higor Iha et al. Nicotine Elicits Convulsive Seizures by Activating Amygdalar Neurons, 8 Frontiers in Pharmacology 57 (2017).

[395] FDA in Brief. FDA Encourages Continued Submission of Reports Related to Seizures Following E-cigarette Use as Part of Agency's Ongoing Scientific Investigation of Potential Safety Issue, U.S. Food & Drug Administration (Aug. 7, 2019), https://www.fda.gov/news-

476.    According to the Tobacco Product Problem Reports issued by the FDA, now a total of 187 events of seizures or grand mal seizures mentioning e-cigarette, or other vaping device have been reported thereby representing a greater recognition of this growing problem.[396]

477.    Moreover, it has been suggested that the use of e-cigarettes has been associated with an exacerbation of seizures in individuals who are predisposed.[397]

478.    Seizures following e-cigarette use are a significant cause for concern due to the unnecessarily high levels of nicotine delivered, by design, via JUUL. As described herein, JLI intentionally designed its products to deliver a higher amount of nicotine, particularly targeting young people, and then failed to warn of the subsequent risks. JUUL devices were deliberately designed to deliver higher concentrations of nicotine per puff as compared to cigarettes, creating the risk for addiction as well as the risk of seizure due to potentially toxic levels of nicotine exposure.

479.    JLI never warned the public or consumers of the risk of seizures associated with the use of e-cigarettes including JUUL.

**D.    Animal Studies Demonstrate Carcinogenic Potential of JUUL.**

480.    In 2017, Canistro, et al. found that e-cigarettes induce toxicological effects that can raise the risk of cancer.[398]

481.    Similarly, a 2018 study measured the DNA damage induced by nitrosamines in

---

events/fda-brief/fda-brief-fda-encourages-continued-submission-reports-related-seizures-following-e-cigarette-use.

[396] Tobacco Product Problem Reports, U.S. Food & Drug Administration (Nov. 1, 2019), https://www.fda.gov/tobacco-products/tobacco-science-research/tobacco-product-problem-reports#2019-reports.

[397] Jessica D. Wharton et al. Increased Seizure Frequency Temporally Related to Vaping. Where There's Vapor, There's Seizures? 104 Pediatric Neurology 66 (2020).

[398] Donatella Canistro et al., E-cigarettes Induce Toxicological Effects That Can Raise the Cancer Risk, 7 Scientific Reports (2017).

the organs (lung, bladder, and heart) of mice subjected to e-cigarette vapor. They concluded that e-cigarette vapor induces DNA damage in all three organs and reduces DNA-repair functions and proteins in mouse lungs. They further found that nicotine-derived nitrosamine ketone can induce the same effects and enhance mutational susceptibility and tumorigenic transformation of cultured human bronchial epithelial and urothelial cells (leading them to believe that vaping could contribute to heart disease and lung and bladder cancer in humans).[399]

482.    In 2019, Tang, et al. found that exposure to e-cigarette vapor, induced lung adenocarcinoma and bladder urothelial hyperplasia in mice.[400]

483.    In 2020, researchers found that both vapers and smokers showed significant loss of DNA methylation in LINE-1 repeat elements in comparison to controls. The methylation levels of LINE-1 repeats were not significantly different between vapers and smokers. Because repetitive DNA elements comprise almost 50% of the human genome and account for more than one third of genome wide DNA methylation, it is largely thought that the global loss of methylation that is observed in cancer is primarily due to hypomethylation at repetitive elements. The observation that vapers have significant loss of methylation in LINE-1 repeat elements has important implications. Additionally, the finding that vapers and smokers have similar reductions in LINE-1 methylation levels is consistent with previous studies by others who have shown significantly reduced levels of LINE-1 methylation in smokers, environmentally or occupationally exposed individuals to carcinogens, as well as in cells treated in vitro with cigarette smoke condensate or select tobacco smoke carcinogens. Together, those studies

---

[399] Hyun-Wook Lee et al., E-cigarette Smoke Damages DNA and Reduces Repair Activity in Mouse Heart, Lung, and Bladder as well as in Human Lung and Bladder Cells, 115 PNAS E1560 (2018).
[400] Moon-shong Tang, et al., Electronic-cigarette Smoke Induces Lung Adenocarcinoma and Bladder Urothelial Hyperplasia in Mice, 116 PNAS 21727 (2019).

demonstrated the utility of LINE-1 hypomethylation as an informative biomarker of exposure as well as effect for known or suspected carcinogens.[401]

484.    There is a likely association between e-cigarettes, including JUUL, and cancer. Long term epidemiological studies will likely reveal an increased risk of cancer among this generation of youth who were unwitting targets of JLI in complete and utter reckless disregard for their safety.

## X.    Plaintiff Hankerson

485.     Plaintiff first used JUUL in March 2016, when he was 22 years old. Plaintiff first tried a friend's JUUL and was immediately hooked. He was drawn to the smell, flavors, sleek design, and buzz it gave him. Although he knew JUUL contained nicotine, he did not know it was addictive. Rather, Plaintiff had the impression from DEFENDANTS' representations that JUUL was a safe product that was healthier than cigarettes. Before using JUUL, he had never tried nicotine.

486.    After trying JUUL, Hankerson began using and purchasing JUUL vaping products on a regular basis within a month or so.

487.    Plaintiff rapidly became severely addicted to JUUL. Plaintiff's consumption of JUUL grew to around three pods per week.

488.    This reliance on nicotine came with profound side effects.  Plaintiff experienced anxiety, irritation, reduced academic performance, conflict in relationships, shortness of breath, irritated throat, obsessive thinking about JUUL, a lack of focus, withdrawals, and financial harm.

489.    In an attempt to help break Plaintiff's addiction to JUUL, Plaintiff has tried using

---

[401] Andrew W. Caliri et al., Hypomethylation of LINE-1 Repeat Elements and Global Loss of DNA Hydroxmyethylation in Vapers and Smokers, 5 Epigenetics 1 (2020), https//:doi. 10.1080/15592294.2020.1724401.

nicotine gum and switching to cigarettes. In February 2020, Plaintiff was able to quit JUUL. Now, he continues to suffer from nicotine addiction and smokes a cigarette or two a week.

490.     Before and during his usage of JUUL, Plaintiff was inundated with JUUL marketing and promotional materials through social media, in and around stores, and online. He was exposed to JUUL advertisements directly from JUUL and through third-party users due to the viral nature of JUUL's marketing campaign. JUUL advertisements were ubiquitous and impossible to escape.

491.     Prior to Plaintiff's initiation and addiction to JUUL, none of the advertisements, in-store promotions, or labels Plaintiff saw adequately disclosed the nature, addictiveness or risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL products poses significant health risks. Nor did they indicate that the JUUL was an age-restricted product and not safe for anyone under the age of 26. Rather, the JUUL advertisements portrayed JUUL as fun, natural, desirable, trendy, and cool. The advertisements touted JUUL's appealing flavors and normalized nicotine usage by portraying JUUL in nature and with desserts and coffee, as if it was meant to be paired.

492.     Many of the JUUL advertisements Plaintiff saw failed to provide any warnings whatsoever.  Other advertisement contained warnings that were wholly inadequate to inform Plaintiff of the dangers associated with using JUUL and were overshadowed by appealing models, images, bright colors, and scenery.

493.     When he first began "JUULing", Plaintiff was not aware of the dangers associated with the use of nicotine or the extent and severity of addiction it would cause.

494.    Plaintiff still struggles with this nicotine addiction and will continue to struggle with this addiction for the rest of his life. Plaintiff's nicotine addiction from JUUL permanently injured and altered his developing brain. In addition to his severe nicotine addiction and brain injury, Plaintiff has suffered harm through exposure to significant toxic substances, which may cause or contribute to causing disease and future health problems. Plaintiff has also experienced anxiety, irritation, reduced academic performance, conflict in relationships, shortness of breath, irritated throat, obsessive thinking about JUUL, a lack of focus, withdrawals, and financial harm. Plaintiff has experienced an overall decrease in his well-being in meaningful and preventable ways.

495.    DEFENDANTS' conduct has also harmed Plaintiff emotionally and financially.

496.    Plaintiff seeks compensatory, treble, punitive damages, medical monitoring, and all such other relief arising from Plaintiff's personal injuries as the Court deems proper. DEFENDANTS' conduct described herein, preying on youth and poisoning kids for profit, is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. DEFENDANTS' conduct is atrocious and utterly intolerable. DEFENDANTS' outrageous conduct caused and/or substantially contributed to Plaintiff's injuries alleged herein. Plaintiff would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

## CAUSES OF ACTION

### Count I – Negligence/Gross Negligence
### (Against All Defendants)

498.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

499.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident States. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident State.

500.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff.

501.    JUUL Products were the types of products that could endanger others if negligently made or promoted.

502.    DEFENDANTS had a duty of reasonable care in designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing and/or selling JUUL to avoid causing harm to those that consumed JUUL Products.

503.    DEFENDANTS knew, or should have known the exercise of reasonable care, the risks to consumers of JUUL, a powerfully addictive and dangerous nicotine-delivery device.

504.    DEFENDANTS knew, or should have known the exercise of reasonable care, that minors and young people would be attracted to these products.

505.     DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL Products was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

506.     The DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

507.     DEFENDANTS knew or, by the exercise of reasonable care, should have known, that JUUL Products posed risks including the risks of addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

508.     DEFENDANTS knew or should have known that JUUL Products needed to be researched, designed, manufactured, assembled, inspected, tested packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold properly, without defects and with due care to avoid needlessly causing harm.

509.     DEFENDANTS knew or should have known that its JUUL Products could cause serious risk of harm, particularly to young persons and minors.

510.     DEFENDANTS knew or should have known that adults who were encouraged to cease smoking by using JUUL as a cessation device were individuals with greater preexisting cardiovascular and other health risk factors who were at enhanced risk of harm by utilizing the

misleadingly labeled JUUL Pods which misrepresented the nicotine content and failed to warn of the other chemicals' content and risks.

511.    The DEFENDANTS were grossly negligent in affirmatively encouraging new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

512.    DEFENDANTS were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Plaintiff to suffer harm.

513.    The negligence and extreme carelessness of DEFENDANTS includes, but is not limited to, the following:

> a.    Failure to perform adequate testing of the JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, respiratory, pulmonary and immune systems, and other related medical conditions, as well as its effect on mental health;
>
> b.    Failure to warn consumers that JUUL Products had not been adequately tested or researched prior to marketing to ensure safety;
>
> c.    Failure to take reasonable care in the design of JUUL Products;
>
> d.    Failure to use reasonable care in the production of JUUL Products;
>
> e.    Failure to use reasonable care in the manufacture of JUUL Products;
>
> f.    Failure to use reasonable care in the assembly of JUUL Products;
>
> g.    Failure to use reasonable care in advertising, promoting, and marketing JUUL Products;

h.      Failure to use reasonable care in the sale of JUUL Products without adequate warnings; use of flavors and design to appeal to minors and young people, in that the products smell good, look cool and are easy to conceal from parents and teachers;

i.      Use of a design that maximizes nicotine delivery while minimizing "harshness," thereby easily creating and sustaining addiction;

j.      Failure to utilize proper materials, ingredients, additives and components in the design of JUUL Products to ensure they would not deliver unsafe doses of nicotine and cause other injuries from inhalation of other hazardous chemicals;

k.      Failure to inspect JUUL Products for them to operate properly and avoid delivering unsafe levels of nicotine and causing the injuries described herein;

l.      Failure to reasonably and properly test and properly analyze the testing of JUUL Products under reasonably foreseeable circumstances;

m.      Failure to warn consumers about the dangers associated with use of JUUL Products, in that it was unsafe, significantly increases blood pressure, causes vascular and pulmonary damage, causes seizures, carries risks of stroke, heart attacks, and pulmonary and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition;

n.      Failure to warn consumers of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained with JUUL Products;

o. Failure to warn consumers of the actual nicotine content, JUUL Products' cigarette equivalence and the pharmacokinetics of JUUL use;

p. Misleadingly stating the amount of nicotine in JUUL Pods is "approximately equivalent to a pack of cigarettes", when the amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes;

q. Failure to provide any instructions regarding a safe amount of JUUL Pods to consume in a day;

r. Failure to take necessary steps to modify JUUL Products to avoid delivering high doses of nicotine and repeatedly exposing them to toxic chemicals;

s. Failure to recall JUUL Products;

t. Shipping JUUL Products to retail locations with actual or constructive knowledge that retailers were not utilizing age verification procedures resulting in unlawful sales to minors; and,

u. All other failures, acts and omissions set forth herein.

514. DEFENDANTS' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

515. DEFENDANTS acted and/or failed to act willfully, and with conscious and reckless disregard for the rights, interests, and safety of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

516.    Based on their strategic and intentional promotion, advertising and marketing history, DEFENDANTS reasonably should have foreseen that young people would try JUUL Products and quickly become addicted to JUUL Products, resulting in teenagers and young adults developing lifelong addictions. After placing unnecessarily massive amounts of nicotine into their products, DEFENDANTS reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

517.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein. Such harm includes nicotine addiction with its behavioral and emotional sequelae, seizures, acute and chronic respiratory injuries, cardiovascular injuries, addiction, and significant exposure to toxic substances, which may cause or contribute to additional disease.

518.    DEFENDANTS' negligence and/or gross negligence were a substantial factor in causing and or contributing to Plaintiff's harms.

519.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### Count II – Negligent Design
### (Against Defendants JLI, MONSEES, and BOWEN)

520.    Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

521.    At all relevant times, DEFENDANTS JLI, MONSEES, and BOWEN manufactured, designed, formulated, marketed, tested, promoted, supplied, sold and/or distributed the JUUL Products in the regular course of business that Plaintiff consumed.

522.    JUUL Products were designed and intended to be used as a method of ingesting nicotine and the other vaporized constituents of JUUL Products nicotine solution.

523.    DEFENDANTS JLI, MONSEES, and BOWEN knew or by the exercise of reasonable care, should have known, the use of JUUL Products was dangerous, harmful and injurious when used by Plaintiff and consumers in a reasonably foreseeable manner, particularly with minors and young adults.

524.    DEFENDANTS JLI, MONSEES, and BOWEN knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine per JUUL pod than an entire pack of combustible cigarettes.

525.    DEFENDANTS JLI, MONSEES, and BOWEN breached their duty by failing to use reasonable care in the design of JUUL Products by negligently creating a marketing campaign and product designs that targeted susceptible minors, who were unable to appreciate the risks posed by JUUL Products. DEFENDANTS JLI, MONSEES, and BOWEN created features such as "party mode" lights, sweet flavors targeted to appeal to minors, and a sleek virtually smoke-free design capable of escaping detection by adults and school authorities.

526.    DEFENDANTS JLI, MONSEES, and BOWEN knowingly increased the ease of inhaling JUUL Products through the utilization of nicotine salts to reduce throat hit and the use of youth appealing flavors, which masked the level of nicotine absorbed by users, making the product even more addictive and dangerous in a way never seen by smoking devices.

527.    JUUL Products continued harmful chemicals which lead to nicotine addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular, behavioral, cognitive and mental health injuries, among other harmful effects, all of which DEFENDANTS JLI, MONSEES, and BOWEN knew, or by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would be victim to.

528.    DEFENDANTS JLI, MONSEES, and BOWEN breached their duty when they failed to use commercially-feasible alternative designs to minimize these harms, including but not limited to designing products that delivered less nicotine per puff, used less potent and addictive forms of nicotine (without reduction of the "throat hit"), utilized cut-off features to prevent users from overuse, and reduced repeated exposure to toxic chemicals that do not pose substantial health risks to users while still delivering sufficient levels of nicotine to preexisting cigarette smokers.

529.    DEFENDANTS JLI, MONSEES, and BOWEN breached their duty by failing to use reasonable care by declining to include an expiration or best if "used by" date, which left open the potential for the products' chemical properties to change in an even more harmful manner.

530.    DEFENDANTS JLI, MONSEES, and BOWEN breached their duty by failing to implement safe and effective age verification mechanisms on their website(s) and internet advertising to prevent minors from easily accessing and consuming highly addictive JUUL Products.

531.    As a direct and proximate result of Defendants JLI, MONSEES, and BOWEN's neglect design, Plaintiff suffered and will continue to suffer damages for which he is entitled to recover, including but not limited to compensatory damages, medical monitoring to diagnose

JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, consequential damages, interest, costs, and attorneys' fees.

## Count III – Negligent Failure to Warn
### (Against All Defendants)

532.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

533.    Plaintiff pleads all Causes of Action of this complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident State.

534.    At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiff consumed.

535.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL Products was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner, particularly with minors and young adults.

536.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

537.    The DEFENDANTS knew or, by the exercise of reasonable care, should have known, that JUUL Products posed risks including the risks of addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries,

among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

538.    The DEFENDANTS owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of JUUL Products.

539.    The DEFENDANTS breached their duty of care by failing to use reasonable care in providing adequate warnings in JUUL's labeling and packaging and through marketing, promoting and advertising of JUUL including that:

    a.    prior to November 2017 that JUUL Products contained nicotine;

    b.    the amount of nicotine contained in a JUUL pod is as much as twice as high as that in a pack of cigarettes, and not as "approximately equivalent to a pack of cigarettes" as represented;

    c.    JUUL Products cause, maintain, or aggravate nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, *i.e.,* compulsive behavior can result in, and that this danger was even greater for minors;

    d.    JUUL Products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein;

    e.    the representations about the actual nicotine content did not conform to the pharmacokinetics of JUUL use and the products' cigarette equivalence;

    f.    JUUL was an e-cigarette intended not intended for persons under age 26;

    g.    JUUL delivered more nicotine than cigarettes;

    h.    JUUL's pharmacokinetic profile had been engineered to create risks of abuse and addiction that exceeded that of a cigarette;

i.      JUUL can be life-threatening and carries the risk of lung injuries, seizure, strokes, heart attacks and cardiovascular injuries, behavioral, cognitive and mental health injuries among other harmful effects;

j.      which and when medical symptoms warranted medical care;

k.      how many JUUL Pods are safe to consume in a day;

l.      urging customers to keep puffing even if they found the vapor harsh; and

m.      JUUL products were comprised of many chemical additives and artificial flavors that are known to cause injury to exposed workers in factories.

540.    Through its aggressive social media campaign, and in other mass marketing efforts the DEFENDANTS circumvented the post-August 2018 requirement to warn of nicotine addiction by deputizing teenagers and young adults as social media influencers who failed to warn of nicotine addiction and of all the other injuries as set forth above.

541.    The failure of the DEFENDANTS to adequately warn about its defective products and to misleadingly advertise through conventional and social media avenues created a danger of injuries described herein that were reasonably foreseeable at the time of labeling, design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

542.    The DEFENDANTS were negligent in affirmatively encouraging new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

543.    At all relevant times, DEFENDANTS could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and

accurate information about the products in advertising, at point of sale, and on the product labels.

544.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

545.    Plaintiff was injured as a direct and proximate result of DEFENDANTS' failure to warn and instruct because he would not have used or purchased JUUL Products had he received adequate warnings and instructions that they could be harmed by higher-than-perceived nicotine exposure, develop an addiction, be exposed to a panoply of harmful chemical additives in the flavorings and suffer other negative health consequences including but not limited to life threatening lung injuries, strokes, heart attacks, cardiovascular injuries, seizure, behavioral, cognitive and mental health injuries.

546.    JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising was a substantial contributing factor in causing the harm to Plaintiff.

547.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### Count IV – Negligent Manufacturing
### (Against All Defendants)

548.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

549.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of

Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident State.

550.   At all relevant times, the DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Plaintiff consumed.

551.   The DEFENDANTS had a duty to use exercise reasonable care, in the manufacturing, assembling, inspecting and packaging of JUUL Products.

552.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known, use of JUUL Products carelessly manufactured, assembled, inspected and packaged was dangerous, harmful and injurious when used by Plaintiff in a reasonably foreseeable manner.

553.   The DEFENDANTS knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of JUUL products improperly manufactured assembled, inspected and packaged.

554.   The DEFENDANTS contracted to supply, manufacture, process and blend the E-liquids and flavoring following specifications in a "menu."

555.   Without limitation, examples of the DEFENDANTS breached their duty to exercise reasonable care in manufacturing, assembling, inspecting and packaging by their:

   a.   Failure to follow Good Manufacturing Practices ("GMPs");

   b.   Failure to adequately inspect/test JUUL Products during the manufacturing process;

   c.   Failure to ensure that instruments used to prepare E-Liquids for JUUL Pods were properly cleaned and sterilized to ensure there was no cross contamination between products;

d.    Failure to implement procedures that would measure and confirm the

amount of nicotine in each JUUL pod:

e.    Failure to timely establish procedures or practices to prevent JUUL

Products from being contaminated on the production line or elsewhere at

production facilities; and,

f.    Failure to have sanitary conditions and protocol at the facilities to avoid

contamination.

556.    A reasonable manufacturer under the same or similar circumstances would have

implemented appropriate manufacturing procedures to better ensure the quality of their product.

557.    Plaintiff was injured as a direct and proximate result of DEFENDANTS failure

to use reasonable care in the manufacturing, assembling, inspecting and packaging of JUUL

Products as described herein.

558.    The DEFENDANTS' negligent manufacturing, assembling, inspecting and

packaging of JUUL Products was a substantial factor in causing Plaintiff's harms.

559.    Plaintiff demands judgment against DEFENDANTS for compensatory, treble,

and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date

to allow for timely treatment and prevention of exacerbation of injuries, together with interest,

costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## Count V – Negligent Failure to Recall/Retrofit
### (Against All Defendants)

560.    Plaintiff incorporates by reference each preceding and succeeding paragraph as

though set forth fully at length herein.

561.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense,

pursuant to all laws that may apply under choice-of-law principles, including the law of

Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident State.

562.    At all relevant times, the  DEFENDANTS designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff.

563.    The DEFENDANTS knew or reasonably should have known that JUUL Products were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner, particularly with minors and young adults.

564.    The DEFENDANTS knew that its flavors had attracted young people and non-smokers, yet instead of withdrawing flavored JUUL Pods, these Pods remained available for purchase online until October 2019 and JUUL continued to offer mint-flavored JUUL Pods until November 2019. However, to date, menthol-flavored JUUL Pods are still available for purchase online and in retail stores which are still regularly consumed by minors and young adults suffering from addiction.

565.    Additionally, DEFENDANTS were aware of growing reports of E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI) and other injuries related to vaping, yet continue to sell JUUL Products.

566.    The DEFENDANTS could have retrofitted the JUUL devices with a kill switch or locking component.

567.     Despite the DEFENDANTS' knowledge and awareness of defects in JUUL Products causing injuries to Plaintiff, these DEFENDANTS failed to retrofit their products and delayed withdrawal of flavored JUUL Pods from the market.

568.     DEFENDANTS' continue to market and sell JUUL Products without adequate warnings to advise consumers of these dangers.

569.     A reasonable company under the same or similar circumstances would have recalled or retrofitted the products and/or provided revised warnings.

570.     The DEFENDANTS' negligent failure to recall and/or retrofit JUUL Products was a substantial factor in causing Plaintiff's harms.

571.     Plaintiff was injured as a direct and proximate result of these DEFENDANTS' negligent failure to recall and/or retrofit JUUL Products as described herein. Such harm includes seizures, stroke, heart attack, acute and chronic respiratory injuries, cardiovascular injuries, addiction, behavioral, cognitive and mental health and significant exposure to toxic substances, which may cause or contribute to additional disease.

572.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### Count VI - Strict Liability - Defective Manufacture
### (Against All Defendants)

573.     Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

574.     At all relevant times, DEFENDANTS were engaged in the business of manufacturing and distributing addictive and harmful smoking cessation devices to consumers,

all of which was a knowingly integral part of the overall manufacture, design, and production of JUUL Products introduced into the stream of interstate commerce.

575.    At all relevant times, the JUUL Products were expected to and did reach Plaintiff without a substantial change in their condition.

576.    Finished JUUL devices and pods deviated, in terms of construction and quality, from the specifications or planned output in a manner that made them unreasonably dangerous.

577.    At all relevant times, the JUUL Products were defectively and improperly manufactured and designed by DEFENDANTS in that, DEFENDANTS continued to supply consumers with JUUL Products despite having full knowledge that JUUL Products were (i) not a smoking cessation device, and/or were knowingly not an effective smoking cessation device by even the lowest of quantifiable standards (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms (iv) were extremely addictive, even more so than combustible cigarettes, (v) posed substantial and avoidable bodily injury as a result of the products use, and (vi) that the amount of nicotine in one JUUL pod exceeded a pack of dated combustible cigarettes.

578.    The foreseeable risks of JUUL Products were known and could have been avoided.

579.    At all relevant times, the JUUL Products were defectively manufactured by DEFENDANTS in that their design and formulation is more dangerous than what an ordinary consumer would expect when used in an intended and reasonably foreseeable manner.

580.    At all relevant times, DEFENDANTS actively deceived users of all ages that their use of the JUUL Products posed safety risks that far outweighed any benefits.

581.    Furthermore, JUUL Products were defectively manufactured in that the content, formulation, concentration, and other measurements of liquid contained in batches of JUUL Pods was not identical, distinguishable, or at all predictable. As a consequence, Plaintiff and other similarly-situated consumers were unknowingly subjected to receiving different doses of nicotine, toxins, carcinogens, and other deleterious components and contaminants when using JUUL Products.

582.    As a direct and proximate result of the defective design and manufacture of JUUL Products, Plaintiff suffered and will continue to suffer damages for which he is entitled to recovery, including but not limited to compensatory damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, consequential damages, interest, costs, and attorneys' fees.

**Count VII - Strict Liability - Defective Design**
**(Against Defendants JLI, MONSEES and BOWEN)**

583.    Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

584.    At all relevant times, DEFENDANTS JLI, MONSEES, and BOWEN designed and sold JUUL Products with full knowledge that JUUL Products were not a safer alternative to traditional combustible cigarettes.

585.    DEFENDANTS defectively designed JUUL Products which misrepresented the amount of nicotine per JUUL pod, enabling users to believe there was less nicotine than traditional combustible cigarettes.

586.    JUUL products were defectively designed so as to render them unreasonable dangerous.

587.    Through DEFENDANTS JLI, MONSEES, and BOWEN's inadequate instructions on the labeling of JUUL Products, consumers were not aware of the foreseeable harm when purchasing JUUL Products.

588.    The foreseeable risk of harm of the JUUL Products' use far outweighed the benefits associated with their design and formulation.

589.    Despite DEFENDANTS JLI, MONSEES, and BOWEN's knowledge of the harmful and addictive nature of JUUL Products, intentionally marketed to a youth-driven audience, DEFENDANTS JLI, MONSEES, and BOWEN never attempted to provide a safer alternative.

590.    Furthermore, DEFENDANTS JLI, MONSEES, and BOWEN defectively and intentionally designed JUUL Products to include dangerous features that make JUUL Products more attractive and more palatable to youth and non-smokers. Such features include in part "party mode" lights, youth appealing colors and flavors, and a sleek virtually smoke-free design capable of escaping detection by adults and school authorities.

591.    The risks inherent in the design of JUUL Products significantly outweigh any benefits of such design.

592.    A safer alternative design existed for JUUL products.

593.    DEFENDANTS JLI, MONSEES, and BOWEN could have utilized reasonable technologically and commercially feasible alternative designs to minimize these harms, such as designing products that delivered less nicotine per puff, used less potent and addictive forms of nicotine, reduced repeated exposure to toxic chemicals that do not pose substantial health risks to users while still delivering sufficient levels of nicotine to preexisting cigarette smokers.

594.     Through omission and misrepresentations, DEFENDANTS JLI, MONSEES, and BOWEN led Plaintiff and the general public to believe JUUL Products were a safer alternative than combustible cigarettes.

595.     The design of JUUL products was no unreasonable that a reasonable person, aware of the relevant facts, would not use or consume a product of that design.

596.     As a direct and proximate result of the defective design and manufacture of the JUUL Products, Plaintiff suffered and will continue to suffer damages for which he is entitled to recovery, including but not limited to compensatory damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, consequential damages, interest, costs, and attorneys' fees.

<u>Count VIII - Strict Liability - Failure to Warn</u>
<u>(Against All Defendants)</u>

597.     Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

598.     At all relevant times, DEFENDANTS marketed and sold JUUL Products with full knowledge that JUUL Products were not a safer alternative to traditional combustible cigarettes and were intrinsically unsafe. By designing, marketing, branding, labeling and promoting JUUL Products, DEFENDANTS knew of the substantial health risks associated with their products but failed to warn the consuming public of these risks.

599.     Not only did DEFENDANTS fail to properly inform consumers and the general public when placing JUUL Products into the stream of interstate commerce, but DEFENDANTS exploited minors' psychological vulnerabilities to induce young consumers to try or "switch" to JUUL Products, through their "Make a Switch" campaign.

600.    Despite DEFENDANTS knowledge that the JUUL Products contained more nicotine per JUUL pod than a pack of cigarettes and could cause substantial health risks, DEFENDANTS promoted the use of JUUL Products by hosting parties where they offered free JUUL Products to get new consumers hooked.

601.    At no time did DEFENDANTS provide adequate or sufficient warning and/or instruction to consumers, including Plaintiff, regarding the health risks associated with the use of JUUL Products.

602.    Due to the absence of adequate and/or sufficient warning(s) or instruction(s) by DEFENDANTS as to the significant health and safety risks posed by the use of JUUL Products as described herein, Plaintiff was unaware that the JUUL Products were intrinsically unsafe and posed serious health risks with use.

603.    DEFENDANTS actually knew or should have reasonably foreseen the risk of harm at the time the product was marketed.

604.    The absence of the warning or instructions rendered the product unreasonably dangerous to the ultimate user of the product.

605.    As a direct and proximate result of DEFENDANTS failure to warn Plaintiff of the increased risk of addiction and the health risks associated with e-cigarettes when used, Plaintiff suffered and will continue to suffer damages for which he is entitled to recovery, including but not limited to compensatory damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, consequential damages, interest, costs, and attorneys' fees.

**Count IX - Fraud**
**(Against All Defendants)**

606.    Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

607.    At all relevant times, DEFENDANTS designed manufactured, assembled, inspected, tested, packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to consumers, such as Plaintiff.

608.    DEFENDANTS knowingly and intentionally made fraudulent statements regarding the safety of JUUL Products, the level of addictiveness, the substantial health risks associate when using JUUL Products, all the while intending to deceive Plaintiff and the general public.

609.    At all reasonable times, DEFENDANTS fraudulently misrepresented JUUL Products as a safer alternative to combustible cigarettes, when in fact JUUL Products: (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL Products are not fit for their ordinary, intended use as either cigarette replacement devices or recreational smoking devices.

610.    DEFENDANTS knowingly advertised one JUUL pod as having a dosage of nicotine that is "approximately equivalent to about 1 pack of cigarettes," when there is actually two times as much nicotine in one JUUL pod as there are in a traditional pack of 20 cigarettes.

611.    DEFENDANTS compared JUUL Products' nicotine to combustible cigarettes, despite knowing PRODUCTS' E-liquid formulation is highly addictive not only because it

contains a high concentration of nicotine, but because it contains a particularly potent form of nicotine, i.e., nicotine salts.

612.    DEFENDANTS posted on their website(s), shared with journalists, sent to retailers, and distributed to third party promoters, information claiming that JUUL's 5% nicotine solution achieved a pk profile just below that of a cigarette, when in fact they knew their information was false and misleading.

613.    DEFENDANTS touted JUUL Products as safe, despite a failure to adequately research or test JUUL Products to assess their safety prior to marketing and promoting their use.

614.    DEFENDANTS further falsely represented the nature and risks associated with JUUL Products, and its marketing and strategy regarding the same, in general statements to the media, general public, federal agencies, and Congress. An exemplar of DEFENDANTS' fraudulent and misleading statements are documented above at paragraphs 257-274 and incorporated herein.

615.    DEFENDANTS' fraudulent misrepresentations and omissions were material facts that were essential to Plaintiff's decision to purchase JUUL Products.

616.    DEFENDANTS' fraudulent misrepresentations and omissions were reasonably calculated to deceive Plaintiff.

617.     Plaintiff was unaware that DEFENDANTS were knowingly concealing these material facts, which Plaintiff relied on to his detriment.

618.    By knowingly misrepresenting this material information, DEFENDANTS breached their duty to protect Plaintiff and consumers.

619.    Plaintiff relied to his detriment on DEFENDANTS' fraudulent statements. Had Plaintiff been adequately informed of the material facts concealed from them regarding the

safety of JUUL Products, and not intentionally deceived by DEFENDANTS, he would not have acquired/purchased or used JUUL Products.

620.    As a direct and proximate result of DEFENDANTS fraudulent misrepresentations, Plaintiff suffered and continues to suffer from the injuries and damages for which he is entitled to recovery, including but not limited to compensatory damages, consequential damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, interest, costs, and attorney fees.

## Count X - Fraudulent Concealment
### (Against All Defendants)

621.    Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

622.    At all relevant times, DEFENDANTS designed manufactured, assembled, inspected, tested, packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff.

623.    DEFENDANTS had a duty to disclose material facts about JUUL Products that would substantially affect Plaintiff's and the general public's use when purchasing JUUL Products.

624.    At all reasonable times, DEFENDANTS fraudulently misrepresented JUUL Products as a safer alternative to combustible cigarettes, when in fact JUUL Products were (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other

features, JUUL Products are not fit for their ordinary and intended use as either cigarette replacement devices or recreational smoking devices.

625.   DEFENDANTS actually knew about all of the above facts.

626.   Through strategic and cunning marketing campaigns, DEFENDANTS concealed the true nature of JUUL Products through (i) the use of youth-focused campaigns designed to make the product seem kid friendly, (ii) their "Make a Switch" campaign, which was created to make Plaintiff and the general public wrongly believe switching to JUUL Products were a safer alternative and/or that beginning use of JUUL Products as a first-time smoking product user would be safe unlike past-known harms about traditional cigarettes.

627.   At all relevant times, DEFENDANTS fraudulently and deceptively concealed their failure to adequately research or test JUUL Products to assess its safety before marketing to susceptible users.

628.   Through deceitful labeling and marketing campaigns, DEFENDANTS fraudulently concealed PRODUCTS' addictive nature.

629.   DEFENDANTS fraudulently concealed the fact that JUUL Products contained more nicotine per JUUL pod than an entire pack of combustible cigarettes, when the amount of nicotine contained in one JUUL pod is actually equivalent to the amount of nicotine consumed through at least two packs of combustible cigarettes.

630.   DEFENDANTS further falsely represented the nature and risks associated with JUUL Products, and its marketing and strategy regarding the same, in general statements to the media, general public, federal agencies, and Congress. An exemplar of DEFENDANTS' fraudulent and misleading statements are documented above at paragraphs 257-273 and incorporated herein.

178

631.    DEFENDANTS misrepresentations and omissions were material facts that were essential to Plaintiff's decision making when purchasing and using JUUL Products.

632.     Plaintiff was completely unaware that DEFENDANTS were concealing these material facts.

633.    DEFENDANTS intentionally deceived and concealed material information concerning the safety of JUUL Products from Plaintiff and the general public, which had a direct impact on Plaintiff's and consumers' health and wellbeing.

634.    DEFENDANTS' fraudulent concealments were reasonably calculated to deceive Plaintiff.

635.    Plaintiff relied to his detriment on DEFENDANTS' fraudulent omissions. Had Plaintiff been adequately informed of the material facts concealed regarding the safety of JUUL Products, and not intentionally deceived by DEFENDANTS, he would not have acquired/purchased, used, or been injured by JUUL Products.

636.    As a direct and proximate result of DEFENDANTS fraudulent concealment, Plaintiff suffered and continues to suffer from the injuries and damages for which he is entitled to recovery, including but not limited to compensatory damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, consequential damages, interest, costs, and attorney fees.

### Count XI - Negligent Misrepresentation
### (Against All Defendants)

637.    Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

638.    At all relevant times, DEFENDANTS designed manufactured, assembled, inspected, tested, packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold

and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to consumers.

639.    DEFENDANTS owed a duty to Plaintiffs to make accurate and truthful representations regarding JUUL Products.

640.    JUUL Products are highly addictive and have harmful health effects on users, such as seizures, acute and chronic respiratory injuries, stroke, heart attack, other cardiovascular injuries, addiction, behavioral, cognitive and mental health injuries and significant exposure to toxic substances, which may cause or contribute to additional disease, DEFENDANTS' actions were negligent, reckless and careless.

641.    DEFENDANTS further falsely represented the nature and risks associated with JUUL Products, and its marketing and strategy regarding the same, in general statements to the media, general public, federal agencies, and Congress. An exemplar of DEFENDANTS' fraudulent and misleading statements are document above at paragraphs 257-274 and incorporated herein. As described above, through omission and misrepresentation of material facts about these harms, DEFENDANTS breached its duty to Plaintiff and the general public through misleading packaging, labeling, marketing, and promotions.

642.    DEFENDANTS failed to exercise reasonable care or competence in preparing, obtaining, or communicating information.

643.    As a direct and proximate result of DEFENDANTS' negligence, misrepresentations and omissions of important facts about the use and risks associated with JUUL Products were not disseminated to Plaintiff or the general public.

644.    Plaintiff relied on DEFENDANTS deceptive statements regarding JUUL Products, leading Plaintiff to rely to his detriment when purchasing JUUL Products.

645.     Had Plaintiff been adequately informed of the material facts concealed from him regarding the safety of JUUL Products, and not been misled by DEFENDANTS, he would not have acquired/purchased or used JUUL Products.

646.     As a direct and proximate result of DEFENDANTS' negligent misrepresentations and omissions, and Plaintiff's reliance thereon, Plaintiff suffered and continues to suffer from the injuries and damages for which he is entitled to recovery, including but not limited to compensatory damages, consequential damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, interest, costs, and attorney fees.

## Count XII - Civil Conspiracy
### (Against All Defendants)

647.     Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

648.     Prior to investing in and acquiring a substantial share of Defendant JLI, Defendant ALTRIA and/or their predecessors-in-interest knowingly agreed, contrived, combined, confederated, and/or conspired with DEFENDANTS to cause Plaintiff's injuries by exposing the Plaintiff to harmful and dangerous JUUL Products.

649.     DEFENDANTS knowingly agreed, contrived, confederated, and/or conspired to defraud Plaintiff and consumers of the JUUL Products regarding the true nature of the JUUL Products and their potential to cause nicotine addiction and the substantial health risks associated with JUUL Products chemicals when used in a reasonably foreseeable manner.

650.     DEFENDANTS knowingly agreed, contrived, confederated, and/or conspired to defraud Plaintiff and consumers of the JUUL Products with the purpose of maintaining the

popularity and reputation of the JUUL Products and therefore maintaining high PRODUCT

sales, at the expense of consumer safety.

651.    At all relevant times, pursuant to and in furtherance of said conspiracies, the

DEFENDANTS performed the following overt and unlawful acts:

a.    DEFENDANTS designed and sold JUUL Products with full knowledge

that JUUL Products were not a safe alternative to traditional combustible

cigarettes.

b.    Upon information and belief, despite available medical and scientific data,

literature, and test reports possessed by and available to DEFENDANTS,

DEFENDANTS individually, jointly, and in conspiracy with each other,

fraudulently, willfully, and maliciously:

i.Withheld, concealed, and suppressed said medical information regarding

the increased risk addiction from consumers, including Plaintiff; and,

ii.Through the use of social media influencers, advertising on youth-driven

mediums, attractive flavors that curbed the harsh hit of inhaling smoke,

and free promotional campaigns where JUUL pods were given to

attendees at no charge, DEFENDANTS knowingly conspired to create an

image of JUUL Products that disguised the inherent and harmful effects

that JUUL Products contained.

652.    Plaintiff and the general public reasonably relied upon the aforementioned

fraudulent representations, omissions, and concealments made by the DEFENDANTS regarding

the nature of the JUUL Products.

653.     Were it not for DEFENDANTS' unlawful actions to mislead the public and limit the natural dissemination of scientific research and knowledge on the dangers and harms of e-cigarette use, Plaintiff and the general public could have learned of the dangers of e-cigarette use at an earlier date and potentially prevented their introduction to and use of JUUL Products.

654.     As a direct and proximate result of DEFENDANTS' overt unlawful acts regarding the nature of the JUUL Products which were made pursuant to and in furtherance of a common scheme, and Plaintiff's reliance thereon, Plaintiff suffered and continues to suffer from the injuries and damages for which he is entitled to recovery, including but not limited to compensatory damages, consequential damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, interest, costs, and attorney fees.

### Count XIII – Unjust Enrichment
### (Against All Defendants)

652.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

653.     Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident State.

654.     At all relevant times, all DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff.

655.    DEFENDANTS created and implemented a plan to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. DEFENDANTS' plan was intended to portray JUUL Products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerns JUUL nicotine content, addictiveness, and safety.

656.    DEFENDANTS were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions and advertisements that included the following non-exhaustive list of omissions regarding: (i) whether JUUL Products are reasonable alternatives to cigarettes, (ii) were extremely potent nicotine-delivery mechanisms, (iii) contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and (iv) posed unreasonable risks of substantial bodily injury resulting from the use of the products. DEFENDANTS were also unjustly enriched through their scheme of marketing, distributing and selling their products to minors in violation of 21 C.F.R. § 1140.14.

657.    DEFENDANTS requested and received a measurable benefit at the expense of Plaintiff in the form of payment for JUUL Products.

658.    DEFENDANTS appreciated, recognized, and consciously chose to accept the monetary benefits Plaintiff conferred onto DEFENDANTS at the Plaintiff's detriment. These benefits were the expected result of DEFENDANTS acting in their pecuniary interests at the expense of its customers.

659.    There is no justification for DEFENDANTS' enrichment. It would be inequitable, unconscionable, and unjust for DEFENDANTS to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

660.     DEFENDANTS wrongfully obfuscated the harm caused be their conduct. Thus, Plaintiff, who mistakenly enriched DEFENDANTS by relying on DEFENDANTS' fraudulent representations, could not and did not know the effect that using JUUL Products would have on Plaintiff's health.

661.     Acceptance of the benefit by DEFENDANTS under these circumstances would be inequitable.

662.     Plaintiff is entitled to restitution of the benefits DEFENDANTS unjustly retained and/or any amounts necessary to return Plaintiff to the position he occupied prior to dealing with DEFENDANTS. Due to the sprawling, decades-long tobacco litigations and other notice they have received as a result of lawsuits filed against them, DEFENDANTS are reasonably notified that Plaintiff would expect compensation from DEFENDANTS' unjust enrichment stemming from their wrongful actions.

663.     The benefit accepted by DEFENDANTS was not conferred gratuitously or by an interference in the affairs of the other party.

664.     Plaintiff demands judgment against DEFENDANTS for compensatory, treble, and punitive damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## Count XIV – Breach of Express Warranties
### (Against All Defendants)

664.     Plaintiff hereby incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

665.    The DEFENDANTS, through their advertising and promotional materials, expressly warranted and affirmed that JUUL Products were safe for the use intended and for uses which were reasonably foreseeable.

666.    DEFENDANTS' representations became a basis of the bargain.

667.    DEFENDANTS made express warranties which extended beyond delivery of JUUL Products and expressly warranted for future performance of JUUL Products. These express warranties include, but are not limited to, the following:

    a.    DEFENDANTS advertised and labeled JUUL Products as safer alternative to traditional combustible cigarettes, creating the "Make a Switch" campaign intended to induce traditional smokers to use JUUL products instead, with advertisements that say "I was looking to find something to replace cigarettes. The switch was easy."

    b.    DEFENDANTS advertised JUUL Products through the use of influential models and actors who looked and acted like teenagers. For example, DEFENDANTS adopted nearly identical campaigns that traditional cigarette companies used, and have since been prohibited from utilizing, with sayings such as "Vaporized," and referring to itself as "the future of smoking."

668.    At all relevant times, DEFENDANTS breached said express warranties in that JUUL Products were unsafe, specifically when used by impressionable minors, because JUUL Products when advertised and packaged in this manner significantly increased minors to use JUUL Products without knowing of the harmful and substantial consequences to their health.

669.    At all relevant times, DEFENDANTS had knowledge of the hazards and health risks posed by JUUL Products when inhaled.

670.     At all relevant times, DEFENDANTS willfully failed to disclose the defects and health risks of JUUL Products to Plaintiff and the consuming public.

671.     In reliance upon the express warranties made by DEFENDANTS, Plaintiff acquired/purchased and used JUUL Products, believing JUUL Products were inherently safe and/or a safer alternative to combustible cigarettes.

672.     Plaintiff notified DEFENDANTS of the breach.

673.     As a direct and proximate result of DEFENDANTS' breach of its express warranties concerning the JUUL Products, Plaintiff suffered and continues to suffer from the injuries and damages for which he is entitled to recovery, including but not limited to compensatory damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, consequential damages, interest, costs, and attorneys' fees.

### Count XV – Breach of Warranty, Implied Warranty – Fitness for a Particular Purpose (Against All Defendants)

674.     Plaintiff hereby incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

675.     At all relevant times, DEFENDANTS, through their advertising and promotional materials, expressly and impliedly warranted and affirmed that JUUL Products purpose was to offer a reasonably safe alternative to combustible cigarettes.

676.     DEFENDANTS advertised and labeled the JUUL Products as a safer alternative to traditional combustible cigarettes, creating the "Make a Switch" campaign intended to induce traditional smokers and non-smokers to use JUUL Products, despite knowing JUUL Products safety warranties were false.

677.     DEFENDANTS withheld, concealed, and suppressed said medical information regarding the increased risk addiction from consumers, including Plaintiff, knowing addiction would induce Plaintiff and consumers like him to be both repeat and long-term customers of JUUL Products.

678.     DEFENDANTS touted JUUL Products as safe, despite knowingly having never adequately researched or tested JUUL Products to assess their safety before placing those products on the market and promoting them to consumers.

679.     DEFENDANTS knowingly advertised JUUL pods as having a dosage of nicotine that is "approximately equivalent to about 1 pack of cigarettes;" when they knew there was actually two times as much nicotine in one JUUL pod as there is in a traditional pack of 20 cigarettes.

680.     DEFENDANTS intended to make Plaintiff and the general public believe JUUL Products were a safe device and/or safer option, with comparable or less nicotine than combustible cigarettes.

681.     DEFENDANTS knowingly mislead Plaintiff and the general public to believe JUUL Products were safe for use, despite knowing said JUUL Products could lead to nicotine addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular, behavioral, cognitive and mental health injuries, among other harmful effects, all of which DEFENDANTS knew, or by the exercise of reasonable care, should have known, ordinary consumers such as Plaintiffs would be victim to.

682.     At all relevant times, DEFENDANTS had knowledge of the hazards and health risks posed by the JUUL Products when inhaled.

683.     DEFENDANTS had knowledge of the particular purpose for which the good were required, and that Plaintiff was relying on DEFENDANTS' skill or judgment to furnish a suitable product.

684.     At all relevant times, DEFENDANTS willfully failed to disclose the defects and health risks of the JUUL Products to Plaintiff and the consuming public.

685.     Plaintiff relied to his detriment on the information publicized by DEFENDANTS.

686.     In reliance upon these implied warranties as to the safety of JUUL Products by DEFENDANTS, Plaintiff acquired/purchased and used JUUL Products, believing that JUUL Products were inherently safe and/or a safer alternative to combustible cigarettes.

687.     Plaintiff notified DEFENDANTS of the breach.

688.     As a direct and proximate DEFENDANTS' warranties concerning the JUUL Products, as described herein, Plaintiff suffered and continues to suffer from the injuries and damages for which he is entitled to recovery, including but not limited to compensatory damages, consequential damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries,  interest, costs, and attorneys' fees.

## Count XVI - Breach of the Implied Warranty of Merchantability
### (Against All Defendants)

689.     Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

690.     At all relevant times DEFENDANTS have been a merchant in regard to the JUUL Products they created and sold to consumers.

691.    DEFENDANTS breached its implied warranty of merchantability since its products were defective when created and designed, and do not conform with the promises represented on the label.

692.    DEFENDANTS failed to comply with merchantability requirements at the time of sale, as JUUL Products do not achieve the ordinary purposes they advertise: a healthy alternative to combustible cigarettes.

693.    JUUL Products are defective and are not fit for use as a healthy alternative to combustible cigarettes—or any other cognizable use by humans—because they (i) were not smoking cessation devices, (ii) were not reasonable alternatives to combustible cigarettes, (iii) were extremely potent nicotine-delivery mechanisms, (iv) were powerfully addictive, and (v) posed unreasonable risks of substantial bodily injury. Due to these and other features, JUUL Products are not fit for their ordinary, intended use as either cigarette replacement devices or recreational smoking devices.

694.    Beyond DEFENDANTS' own direct sales of JUUL Products, Plaintiff and other consumers are third-party beneficiaries of DEFENDANTS' agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL Products to consumers. Plaintiffs and consumers are the intended beneficiaries of DEFENDANTS' implied warranties since JUUL Products are manufactured with the express and intended purpose of selling its JUUL Products to consumers.

695.    DEFENDANTS were provided notice of these issues by numerous complaints filed against it, including legal Complaints, numerous individual letters and communications sent by consumers before or within a reasonable amount of time after they discovered or should have

discovered that JUUL Products were defective and unmerchantable, media coverage, and by governmental communications directly to DEFENDANTS.

696.    As a direct and proximate result of DEFENDANTS' breach of their implied warranties of merchantability regarding JUUL Products, Plaintiff was damaged because, had he been aware of the unmerchantable condition of JUUL Products, he would may have not acquired/purchased JUUL Products and not suffered injuries and damages from their use, for which he is entitled to recovery, including but not limited to compensatory damages, consequential damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, interest, costs, and attorneys' fees.

## Count XVII - Violation of the North Carolina Unfair Deceptive Trade Practices Act (UDTPA)
### (Against All Defendants)

697.    Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

698.    Plaintiff is a "person injured" as described in N.C. Gen. Stat. § 75-16 in that Plaintiff was injured by reason of acts of the DEFENDANTS done in violation of Chapter 75.

699.    DEFENDANTS' actions in marketing, advertising, and otherwise making public representations about the JUUL Products constitute "commerce" as defined by N.C. Gen. Stat. § 75-1.1 as they were actions that created, altered, repaired, furnished, made available, provided information about, or, directly or indirectly, solicited or offered for or effectuated a sale, lease, or transfer of consumer goods.

700.    At all relevant times, the DEFENDANTS knew or should have known of the unreasonably dangerous and addictive nature of JUUL Products.

701.    Through the following actions, among others, DEFENDANTS engage in unfair or deceptive trade practices in violation of N.C. Gen. Stat. § 75-1.1

702.    At all relevant times, DEFENDANTS, through their labeling and marketing of the JUUL Products, intentionally misrepresented material facts in order to mislead consumers that JUUL Products were a safe alternative to combustible cigarettes, focusing its marketing campaigns on minors.

703.    DEFENDANTS mislead consumers regarding the dosage of nicotine, addictiveness of JUUL Products and the substantial health risks associated when smoking JUUL Products constituting a misrepresentation and an unlawful trade practice.

704.    The labeling and advertisements for JUUL Products failed to disclose JUUL Products were not a smoking cessation devise or a reasonable alternative to combustible cigarettes. DEFENDANTS' misleading advertising scheme failed to disclose the JUUL Products were addictive and unsafe, rather using statements on its packaging such as "Have a sweet tooth? Try Brule," and referring to itself as a "truly satisfying alternative," despite the nicotine dosage in one JUUL pod exceeding the nicotine consumed through a pack of combustible cigarettes.

705.    DEFENDANTS engaged in unlawful trade practices by unlawfully selling nicotine laced tobacco products to minors due to their websites ineffective age-verification mechanism.

706.    DEFENDANTS engage in another unfair or deceptive practice when they falsely represented themselves when claiming that JUUL Products are a (i) reasonable alternatives to combustible cigarettes (ii) included similar amounts of nicotine per JUUL pod to that of a pack of cigarettes (iii) were not highly addictive (iv) and do not pose unreasonable and substantial risks to their health.

707.    DEFENDANTS omitted material facts and falsely misrepresented itself regarding the amount of nicotine in JUUL Products, referring to itself as a safe alternative to combustible cigarettes, despite the known substantial health consequences associated with use of JUUL Products, and the addictive nature of JUUL Products.

708.    DEFENDANTS intentionally led consumers to believe JUUL Products were a safe alternative to combustible cigarettes, omitting the fact one JUUL pod contains more nicotine than a traditional pack of cigarettes. These omissions led consumers to believe they were making a healthy switch when smoking JUUL Products.

709.    DEFENDANTS unlawfully marketed JUUL Products by falsely advertising its dose of nicotine through the ambiguous comparison with combustible cigarettes, for which they are in-fact not comparable to, and by misrepresenting material facts that would be critical to consumers decision making when purchasing JUUL Products.

710.    DEFENDANTS unlawfully marketed JUUL Products as (i) reasonable alternatives to combustible cigarettes despite knowing JUUL pods contained more nicotine per pod than an entire pack of cigarettes, (ii) were highly addictive and, (iii) posed unreasonable and substantial risks to human health while marketing JUUL Products on youth-focused mediums. DEFENDANTS thus knowingly deceived consumers and the general public by offering a product they did not advertise.

711.    DEFENDANTS failed to offer truthful information about the JUUL Products, tactically marketing the JUUL Products through misrepresentation that JUUL Products are a healthy alternative to combustible cigarettes.

712.    Plaintiff acted in reasonable reliance upon DEFENDANTS' unlawful trade practices through DEFENDANTS' misrepresentations and omissions. Had DEFENDANTS not

engaged in the deceptive conduct described herein, reasonable consumers and Plaintiff would not have acquired/purchased JUUL Products if they had known JUUL Products posed unreasonable and substantial risks to their health. Knowledge of these material factors would have highly impacted the Plaintiff's decision when first acquiring/purchasing and using JUUL Products.

713.   DEFENDANTS engaged in unfair and deceptive trade practices when they knowingly marketed and advertised JUUL Products to a youth focused audience, i.e. consumers like Plaintiff, when they:

a.   Designed JUUL Products to mimic cool and modern tech products;

b.   Simulated flavors that appealed to youth;

c.   Advertised on youth-focused websites, such as educational websites; and,

d.   Used intentionally ineffective age-verification mechanisms on their website(s) that allowed minor consumers to easily and unlawfully to access, purchase, and acquire JUUL smoking products.

714.   DEFENDANTS omitted material facts misleading consumers about what was in JUUL Products by:

a.   Failing to provide adequate warnings regarding the level of comparable nicotine in one JUUL pod to a combustible cigarette;

b.   Failing to inform users of the substantial health risks associated when smoking JUUL Products; and

c.   Failing to inform users that JUUL Products are not a safe alternative to combustible cigarettes or other e-cigarette products on the market.

715.   As a direct and proximate result of the unlawful trade practices of DEFENDANTS, in violation of N.C. Gen. Stat. § 75-1.1, *et seq.*, Plaintiff suffered and will

continue to suffer damages for which he is entitled to recovery, including but not limited to compensatory damages, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, consequential damages, treble or per-violation damages, interest, costs, attorneys' fees, and all other damages cognizable under § 75-16.

### Count XVIII – Intentional Infliction of Emotional Distress (IIED)
### (Against All Defendants)

714.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

715.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident State. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of Plaintiff's resident State.

716.    At all relevant times, the DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff.

717.    DEFENDANTS acted intentionally, willfully or wantonly towards Plaintiff by the following actions, among many others mentioned and unmentioned in this Complaint:

a.    DEFENDANTS created a product designed to addict a new generation to nicotine and implemented a plan to generate a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. DEFENDANTS' plan was intended to

portray JUUL Products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, based in part on food flavors while misrepresenting or omitting key facts concerns JUUL nicotine content, addictiveness, flavoring content and safety.

b.       Because nicotine addiction forms more quickly and stronger in minors, DEFENDANTS' created a design of vape and marketing scheme intended to appeal to youth.

c.       DEFENDANTS' marketing, promotions and advertisements contained deceptive statements that JUUL e-cigarettes were reasonable alternatives to combustible cigarettes and that they contained nicotine "approximately equivalent to a pack of cigarettes", when in fact the amount of nicotine in a JUUL pod is as much as twice as high as that in a pack of cigarettes, higher than what DEFENDANTS represented.

d.       DEFENDANTS' marketing, promotions and advertisements failed to disclose that JUUL e-cigarettes were not reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and posed significant risks of substantial physical injury resulting from the use of the products.

e.       The labels and packaging of the JUUL Products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels and packaging also falsely stated that JUUL Products contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and that they were reasonable alternatives to combustible cigarettes.

f.       The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JUUL marketing, promotions and advertising its products as reasonable alternatives to cigarettes.

g.       DEFENDANTS' misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including the Plaintiff.

h.       The predatory design of JUUL products, as provided elsewhere in this complaint, combined with DEFENDANTS' deceptive marketing and labeling scheme, caused severe injuries to a generation, including Plaintiff.

718.     DEFENDANTS' actions are ones which evoke outrage or revulsion in civilized society.

719.     DEFENDANTS' conduct was extreme and outrageous.

720.     The acts were directed at or intended to cause extrem emotional distress to Plaintiff, Plaintiff suffered severe emotional distress as a direct result of the acts of the DEFENDANTS, and such resulting emotional distress was foreseeable from the intentional acts of DEFENDANTS.

721.     Plaintiff demand judgment against DEFENDANTS for compensatory, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

### Count XIX – Negligent Infliction of Emotional Distress (NIED)
### (Against All Defendants)

722.     Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein.

723.    Plaintiff pleads all Causes of Action of this Complaint in the broadest sense, pursuant to all laws that may apply under choice-of-law principles, including the law of Plaintiff's resident state. Plaintiff pleads this Cause of Action under all applicable product liability acts, statutes, and laws of the resident state.

724.    At all relevant times, the DEFENDANTS named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Plaintiff.

725.    Plaintiff's prior allegations regarding the five elements of ordinary negligence are incorporated here.

726.    Plaintiff has suffered a serious and severe emotional injury as proximately caused by DEFENDANTS' conduct, including but not limited to anger/outbursts, mood swings, irritability, depression, and anxiety.

727.    Plaintiff demand judgment against DEFENDANTS for compensatory, medical monitoring to diagnose JUUL induced injuries at an earlier date to allow for timely treatment and prevention of exacerbation of injuries, treble, and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems proper.

## DAMAGES AND PRAYER FOR RELIEF

735.    Plaintiff incorporates by reference and re-alleges all above paragraphs of this Complaint as if fully set forth herein.

736.    WHEREFORE, Plaintiff seeks judgment in his favor against DEFENDANTS as follows:

a.    Medical expenses;

b.    Pain and suffering;

c.    Mental anguish, anxiety, and discomfort;

d.    Lost wages and income;

e.    Fear of cancer or other related diseases;

f.    Loss of enjoyment of life;

g.    Loss of consortium;

h.    Pre and post judgment interest;

i.    Exemplary and Punitive Damages in an amount to be determined at trial;

j.    Treble damages;

k.    General damages;

l.    Damages allowed and/or provided for under D.C. Code § 28–3905.

m.    Damages allowed and/or provided for under D.C. Code § 28–4508.

n.    Reasonable attorneys' fees and expenses;

o.    Such other relief to which Plaintiff may be justly entitled; and

p.    Any and all other damages to be shown at trial.

737.    WHEREFORE, Plaintiff Jhaquille Hankerson, prays for judgment against DEFENDANTS, individually and collectively, in an amount exceeding $10,000.00 and for additional aggravating circumstances damages, and for the costs and fees herein expended.

DATED: July 27, 2021             RESPECTFULLY SUBMITTED,

ASHCRAFT & GEREL, LLP

BY:    /s/ Michelle A. Parfitt
           Michelle A. Parfitt (DC Bar # 358592)
           James F. Green (DC Bar # 214965)

Drew LaFramboise (DC Bar # 1018140)
Patrick K. Lyons (DC Bar # 1034531)
ASHCRAFT & GEREL, LLP
1825 K Street, NW, Suite 700
Washington, DC 20006
Tel:  202-783-6400
mparfitt@ashcraftlaw.com
jgreen@ashcraftlaw.com
dlaframboise@ashcraftlaw.com
plyons@ashcraftlaw.com

AND

*/s/ Joseph G. VanZandt*
Andy D. Birchfield, Jr. (*pro hac vice*
anticipated)
Joseph G. VanZandt (*pro hac vice* anticipated)
James W. Lampkin II (*pro hac vice*
anticipated)
Sydney Everett (*pro hac vice* anticipated)
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, PC
234 Commerce Street
Montgomery, AL 36103
Tel: 334-269-2343
Andy.Birchfield@BeasleyAllen.com
Joseph.VanZandt@BeasleyAllen.com
James.Lampkin@BeasleyAllen.com
Sydney.Everett@BeasleyAllen.com

*Counsel for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.

/s/ Michelle A. Parfitt
Michelle A. Parfitt

# Superior Court of the District of Columbia

### CIVIL DIVISION- CIVIL ACTIONS BRANCH

### INFORMATION SHEET

JHAQUILLE HANKERSON

Case Number: _____

vs

Date: July 27, 2021 _____

JUUL LABS, INC., et al.

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>MICHELLE A. PARFITT, Esq.<br><br>Firm Name:<br>ASHCRAFT & GEREL, LLP<br><br>Telephone No.:          Six digit Unified Bar No.:<br>202-783-6400               358592 | Relationship to Lawsuit<br><br>☒ Attorney for Plaintiff<br>☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:   ☐ Non-Jury      ☒ 6 Person Jury      ☐ 12 Person Jury

Demand: $ __amount exceeding $10,000__        Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

**NATURE OF SUIT:**      *(Check One Box Only)*

**A. CONTRACTS**                              **COLLECTION CASES**

☐ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent    ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation                ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                  Over $25,000 Pltf. Grants Consent          Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation                ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees             Under $25,000 Pltf. Grants Consent         Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                        Award (Collection Cases Only)

---

**B. PROPERTY TORTS**

☐ 01 Automobile                  ☐ 03 Destruction of Private Property   ☐ 05 Trespass
☐ 02 Conversion                  ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

---

**C. PERSONAL TORTS**

☐ 01 Abuse of Process            ☐ 10 Invasion of Privacy          ☒ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection     ☐ 11 Libel and Slander                   Not Malpractice)
☐ 03 Assault and Battery         ☐ 12 Malicious Interference       ☐ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution        ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)  ☐ 14 Malpractice Legal            ☐ 20 Friendly Suit
☐ 06 False Accusation            ☐ 15 Malpractice Medical (Including Wrongful Death)   ☐ 21 Asbestos
☐ 07 False Arrest                ☐ 16 Negligence- (Not Automobile, ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                              Not Malpractice)           ☐ 23 Tobacco
                                                                   ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
  (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

**II.**

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
  Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- ☐ 21 Petition for Subpoena
  [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

| | |
|---|---|
| /s/ Michelle A. Parfitt | July 27, 2021 |
| Attorney's Signature | Date |

CV-496/ June 2015

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513
------------------------------------------------------------------------
                                                        Plaintiff

                        vs.
                                                                        Case Number _____

JUUL LABS INC., 1000 F Street, NW, Washington, DC 20004
------------------------------------------------------------------------
                                                        Defendant

### SUMMONS

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.
_____          *Clerk of the Court*
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700          By _____
_____
Address                                                                  Deputy Clerk
Washington, DC 20006

(202) 783-6400                                                      Date _____
_____
Telephone
如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주세요씨요          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
                                              Demandante

        contra

_____          Número de Caso:  _____
                                              Demandado

## CITATORIO

Al susodicho Demandado:

        Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

        A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                                        *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                              Por: _____
_____                        Subsecretario
Dirección

_____              Fecha _____

_____
Teléfono
如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
 (202) 879-4828           ፣            (202) 879-4828

        IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

        Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

                                Vea al dorso el original en inglés
                                See reverse side for English original

CV-3110 [Rev. June 2017]                                                        Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513
_____
                                                    Plaintiff

                            vs.
                                                                        Case Number _____

ALTRIA GROUP, INC., 6601 W. Broad Street, Richmond, VA 23230
_____
                                                    Defendant

## SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.                                  *Clerk of the Court*
_____
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700          By _____
_____
Address                                                           Deputy Clerk
Washington, DC 20006

(202) 783-6400                                             Date _____
_____
Telephone
如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주세요 위엔쥬원쓰씨세요          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




# TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
## DIVISIÓN CIVIL
### Sección de Acciones Civiles
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                    Demandante

        contra

                                    Número de Caso: _____

_____
                                    Demandado

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                    *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                        Por: _____
_____
Dirección                                    Subsecretario

_____
                        Fecha _____
_____
Teléfono
如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

นี่คือการแปล (202) 879-4828 เพื่อรับ    ኣማርኛ ተርጓሚ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513

---------------------------------------------------------------------
Plaintiff

vs.

Case Number  _____

---------------------------------------------------------------------
ALTRIA ENTERPRISES LLC, 6601 W. Broad Street, Richmond, VA 23230

---------------------------------------------------------------------
Defendant

### SUMMONS

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.
_____
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700
_____
Address
Washington, DC 20006

(202) 783-6400
_____
Telephone

*Clerk of the Court*

By  _____
              Deputy Clerk

Date  _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주세요     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

—————————————————————————————
                                                     Demandante

        contra

        —————————————————————                Número de Caso: —————————————————
                                                     Demandado

## CITATORIO

Al susodicho Demandado:

        Por la presente se le cita a comparecer y se le requiere entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

        A usted también se le requiere presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                                     *SECRETARIO DEL TRIBUNAL*

————————————————————
Nombre del abogado del Demandante

                                   Por: ————————————————————————————
————————————————————                              Subsecretario
Dirección

————————————————————
                                   Fecha ————————————————————————————

————————————————————
Teléfono
如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

만약 번역을 원하시면 (202) 879-4828 로 전화주십시오          ያማርኛ   ተርጓሚ   ለማግኘት   (202) 879-4828   ይደውሉ

        IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBREN LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

        Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

                                   Vea al dorso el original en inglés
                                   See reverse side for English original

CV-3110 [Rev. June 2017]                                                     Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513

-------------------------------------------------------------------
Plaintiff

vs.

Case Number _____

PHILIP MORRIS USA, INC., 6601 W. Broad St., Richmond, VA 23230-1723

-------------------------------------------------------------------
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.
_____
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700
_____
Address
Washington, DC 20006

(202) 783-6400
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화하여 주십시오.     የትርጉም እገዛ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]

Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                    Demandante

        contra

                                    Número de Caso: _____

_____
                                    Demandado

### CITATORIO

Al susodicho Demandado:

　　　　Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

　　　　A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                    _SECRETARIO DEL TRIBUNAL_

_____
Nombre del abogado del Demandante

                        Por: _____

_____                    Subsecretario
Dirección

_____
                        Fecha _____

_____
Teléfono
如需翻译，请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828 로 전화주십시오       የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

　　IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.

　　Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

                    Vea al dorso el original en inglés
                    See reverse side for English original

CV-3110 [Rev. June 2017]                                    Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513
_____
Plaintiff

vs.

Case Number _____

JAMES MONSEES, 89 Belgrave Avenue, San Francisco, CA 94117
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.
_____
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700
_____
Address
Washington, DC 20006

(202) 783-6400
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오        የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                      Super. Ct. Civ. R. 4




## TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
### DIVISIÓN CIVIL
#### Sección de Acciones Civiles
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                              Demandante

        contra

                                              Número de Caso: _____

_____
                                              Demandado

### CITATORIO

Al susodicho Demandado:

      Por la presente se le cita a comparecer y se le requiere entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

      A usted también se le requiere presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                              *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                              Por: _____
_____
Dirección                                          Subsecretario

_____
                              Fecha _____
_____
Teléfono
如需翻译，请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면 (202) 879-4828 로 전화하십시오    ከአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

      IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO._

      Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

                              Vea al dorso el original en inglés
                              See reverse side for English original

CV-3110 [Rev. June 2017]                                          Super. Ct. Civ. R. 4

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513

-------------------------------------------------------------------------
Plaintiff

vs.

Case Number _____

ADAM BOWEN, 360 Elm Street, San Mateo, CA 94401-2512

-------------------------------------------------------------------------
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.
_____
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700
_____
Address
Washington, DC 20006

(202) 783-6400
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                   Super. Ct. Civ. R. 4




**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001
Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov

_____
Demandante

contra

_____
Demandado

Número de Caso: _____

## CITATORIO

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____
Nombre del abogado del Demandante

_____
Dirección

_____

Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: _____
Subsecretario

Fecha _____

如需翻译,请打电话 (202) 879-4828       Veuillez appeler au (202) 879-4828 pour une traduction       Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828로 전화주십시오        የአማርኛ ትርጉም አስፈላጊ ከሆነ (202) 879-4828 ይደውሉ

IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513
-------------------------------------------------------------------------------
Plaintiff

vs.

Case Number _____

NICHOLAS PRITZKER, 1 Letterman Drive, Building C - Suite C4-420,
San Francisco, CA 94129-2402
-------------------------------------------------------------------------------
Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.
-------------------------------------------
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700
-------------------------------------------
Address
Washington, DC 20006

(202) 783-6400
-------------------------------------------
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                           Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                          Demandante

        contra

        Número de Caso: _____

_____
                                          Demandado

### CITATORIO

Al susodicho Demandado:

        Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

        A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                        *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                    Por: _____

_____                    Subsecretario
Dirección

_____
                    Fecha _____

_____
Teléfono
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
[Korean] (202) 879-4828 [Korean]        [Amharic] (202) 879-4828 [Amharic]

        IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO.*

        Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

                    Vea al dorso el original en inglés
                    See reverse side for English original

CV-3110 [Rev. June 2017]                                        Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513
-----------------------------------------------------------------
                                                    Plaintiff

vs.
                                                                        Case Number _____

HOYOUNG HUH, 6 Redberry Ridge, Portola Valley, CA 94028-8077
-----------------------------------------------------------------
                                                    Defendant

## SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.
_____              *Clerk of the Court*
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700          By _____
_____
Address                                                                          Deputy Clerk
Washington, DC 20006

(202) 783-6400
_____              Date _____
Telephone

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주세요          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                      Super. Ct. Civ. R. 4





## TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA
### DIVISIÓN CIVIL
### Sección de Acciones Civiles
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
                                    Demandante

        contra

                                    Número de Caso: _____

_____
                                    Demandado

### CITATORIO

Al susodicho Demandado:

    Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

    A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

                                                       *SECRETARIO DEL TRIBUNAL*

_____
Nombre del abogado del Demandante

                                    Por: _____

_____
Dirección                                                    Subsecretario

_____
                                            Fecha   _____

_____
Teléfono

如需翻译,请打电话 (202) 879-4828   Veuillez appeler au (202) 879-4828 pour une traduction   Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 전화하십시오    የአማርኛ  ትርጉም ካስፈለገዎ (202) 879-4828  ይደውሉ

**IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBRE LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, *NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO*.**

    Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original

CV-3110 [Rev. June 2017]                                                    Super. Ct. Civ. R. 4

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
Telephone: (202) 879-1133 Website: www.dccourts.gov

JHAQUILLE HANKERSON, 522 Forest Wind Way, Cary, NC 27513
-------------------------------------------------------------------------------
Plaintiff

vs.

RIAZ VALANI, 9 Isabella Avenue, Atherton, CA 94027-4031    Case Number _____
-------------------------------------------------------------------------------
Defendant

**SUMMONS**

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Michelle A. Parfitt, Esq.                          *Clerk of the Court*
_____
Name of Plaintiff's Attorney

ASHCRAFT & GEREL, LLP - 1825 K Street, NW, Suite 700        By _____
_____
Address                                            Deputy Clerk
Washington, DC 20006

(202) 783-6400                                     Date _____
_____
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주세요      የtranslation ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                            Super. Ct. Civ. R. 4





**TRIBUNAL SUPERIOR DEL DISTRITO DE COLUMBIA**
**DIVISIÓN CIVIL**
**Sección de Acciones Civiles**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Teléfono: (202) 879-1133 Sitio web: www.dccourts.gov**

_____
Demandante

contra

Número de Caso: _____

_____
Demandado

**CITATORIO**

Al susodicho Demandado:

Por la presente se le cita a comparecer y se le require entregar una Contestación a la Demanda adjunta, sea en persona o por medio de un abogado, en el plazo de veintiún (21) días contados después que usted haya recibido este citatorio, excluyendo el día mismo de la entrega del citatorio. Si usted está siendo demandado en calidad de oficial o agente del Gobierno de los Estados Unidos de Norteamérica o del Gobierno del Distrito de Columbia, tiene usted sesenta (60) días, contados después que usted haya recibido este citatorio, para entregar su Contestación. Tiene que enviarle por correo una copia de su Contestación al abogado de la parte demandante. El nombre y dirección del abogado aparecen al final de este documento. Si el demandado no tiene abogado, tiene que enviarle al demandante una copia de la Contestación por correo a la dirección que aparece en este Citatorio.

A usted también se le require presentar la Contestación original al Tribunal en la Oficina 5000, sito en 500 Indiana Avenue, N.W., entre las 8:30 a.m. y 5:00 p.m., de lunes a viernes o entre las 9:00 a.m. y las 12:00 del mediodía los sábados. Usted puede presentar la Contestación original ante el Juez ya sea antes que usted le entregue al demandante una copia de la Contestación o en el plazo de siete (7) días de haberle hecho la entrega al demandante. Si usted incumple con presentar una Contestación, podría dictarse un fallo en rebeldía contra usted para que se haga efectivo el desagravio que se busca en la demanda.

_____
Nombre del abogado del Demandante

_____
Dirección

_____
Teléfono

*SECRETARIO DEL TRIBUNAL*

Por: _____
Subsecretario

Fecha _____

如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면 (202) 879-4828 로 연락하십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

**IMPORTANTE: SI USTED INCUMPLE CON PRESENTAR UNA CONTESTACIÓN EN EL PLAZO ANTES MENCIONADO O, SI LUEGO DE CONTESTAR, USTED NO COMPARECE CUANDO LE AVISE EL JUZGADO, PODRÍA DICTARSE UN FALLO EN REBELDÍA CONTRA USTED PARA QUE SE LE COBREN LOS DAÑOS Y PERJUICIOS U OTRO DESAGRAVIO QUE SE BUSQUE EN LA DEMANDA. SI ESTO OCURRE, PODRÍA RETENÉRSELE SUS INGRESOS, O PODRÍA TOMÁRSELE SUS BIENES PERSONALES O BIENES RAÍCES Y SER VENDIDOS PARA PAGAR EL FALLO. SI USTED PRETENDE OPONERSE A ESTA ACCIÓN, _NO DEJE DE CONTESTAR LA DEMANDA DENTRO DEL PLAZO EXIGIDO_.**

Si desea conversar con un abogado y le parece que no puede pagarle a uno, llame pronto a una de nuestras oficinas del Legal Aid Society (202-628-1161) o el Neighborhood Legal Services (202-279-5100) para pedir ayuda o venga a la Oficina 5000 del 500 Indiana Avenue, N.W., para informarse sobre otros lugares donde puede pedir ayuda al respecto.

Vea al dorso el original en inglés
See reverse side for English original